**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Docket  No. 15-cr-10037-IT** |
| | ) | |
| **ROBERT RANG** | ) | |

**MOTION TO SUPPRESS STATEMENTS AND REQUEST**
**FOR EVIDENTIARY HEARING**

Defendant Robert Rang respectfully moves this Court to suppress all statements obtained

from him by law enforcement officers on December 29, 2014 in violation of his rights under the

Fifth Amendment to the United States Constitution.  Mr. Rang has been indicted for attempted

coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b).  Evidence against him

includes statements obtained from him by a Postal Inspector and a Massachusetts state trooper in

an interrogation at defendant's home that lasted nearly two and one-half hours on December 29,

2014.  Rang now moves the Court to suppress these statements because they were obtained in

violation of his Fifth Amendment rights.  Rang also requests that the Court hold an evidentiary

hearing on this motion.

I.   **Relevant Facts**

   a.   The Initial Encounter

On December 29, 2014, federal and state law enforcement officers executed a federal

search warrant at 143 2nd Street, Coaldale, Pennsylvania for evidence, fruits, and

instrumentalities of violations of 18 U.S.C. §2422(b) (coercion and enticement of a minor),

§2252 (possession or receipt of child pornography), and §2252A (possession or receipt of child

pornography), including all electronic media and storage devices.  See Affidavit in Support of

1

Criminal Complaint ("Complaint Aff."), at Exhibit A, ¶ 29.  The investigation that led to the issuance of the search warrant began with a grandmother's call to a local police station concerning her grandchild's contact with an adult male via Sony PlayStation and text messaging. Complaint Aff. ¶ 5.

At the time the search warrant was executed, defendant Robert Rang, his mother Catherine Rang, father Thomas Rang, sister Allison Rang and brother Thomas Rang lived at the address.  See Affidavit of Catherine Rang ("C. Rang Aff."), at Exhibit B, ¶ 2.  Defendant was 25 years old.  He has a borderline full scale IQ of 67, bipolar illness, and attention deficit hyperactivity disorder.[1]  See Social Security Records, at Exhibit C.

Law enforcement officers arrived at the home at around 8 o'clock in the morning.  See Transcript of Probable Cause Hearing, held February 25, 2015, at Exhibit D ("Hearing Tr."), at 25:1-2.  They encountered Robert Rang's father, who had been sleeping in a room on the first floor.  See C. Rang Aff. at ¶ 3.  They led him outside the home to the front porch.  C. Rang Aff. at ¶ 8.

The officers then proceeded to climb the stairway to the second floor.  C. Rang Aff. at ¶ 5.  Defendant's mother, who had been sleeping in her bedroom on the second floor, heard a commotion on the stairs and came to the bedroom doorway to the second floor hallway and looked down the stairway.  C. Rang Aff. at ¶ 5.  She saw approximately ten people on the stairs, some in uniform and some not.  C. Rang Aff. at ¶ 5.  The first person on the stairs had a gun out. C. Rang Aff. at ¶ 5.  He demanded she show him her hands, and she did.  C. Rang Aff. at ¶ 6. He then demanded "Where is Robert?"  C. Rang Aff. at ¶ 6.

Mrs. Rang answered that Robert was at the end of the hallway.  C. Rang Aff. at ¶ 7.  The officer told her that she had to go downstairs.  C. Rang Aff. at ¶ 7.  She asked if she could go into her daughter's bedroom to wake her up, and he allowed her to do so.  C. Rang Aff. at ¶ 7.  She and her daughter went downstairs together, where her husband and 4 or 5 law enforcement officers were.  C. Rang Aff. at ¶ 8.

In the meantime, defendant was located in the bathroom, about to take a shower after just having awakened from sleep when he heard someone call his name.  See Affidavit of Robert Rang ("R. Rang Aff."), at Exhibit E, at ¶ 3-4; Hearing Tr. at 25:12-18; Transcript of Interrogation of Defendant, at Exhibit  ("Interrogation Tr."), December 29, 2014, at Exhibit F, at 4:18-20; Audio Record of Defendant's Interrogation, December 29, 2014, at Exhibit ("Recording"), at 1:59-2:04.  He opened the bathroom door and saw four law enforcement officers.  R. Rang Aff. at ¶ 4.  One had his gun out, pointing it at defendant.  R. Rang Aff. at ¶ 4. He asked "Are you Rob Rang?"  R. Rang Aff. at ¶ 4.

When defendant answered yes, the officer told him to put his hands behind his back.  R. Rang Aff. at ¶ 5.  He handcuffed defendant just outside the bathroom and led him into his adjacent bedroom and had him sit in a chair.  R. Rang Aff. at ¶ 5; Hearing Tr. at 25:12-18. The officer told defendant that they were going to search for things like drugs.  R. Rang Aff. at ¶ 5.

Defendant's mother, after approximately twenty minutes downstairs, told officers that the defendant was diagnosed as borderline mentally retarded, bipolar, had attention deficit hyperactivity disorder, and was off of his medications for the latter two conditions.  C. Rang Aff. at ¶ 9.  She also told the officers that he had the mental capacity of a twelve-year-old.  C. Rang

---

[1] Defendant was determined by an administrative law judge to be eligible for social security benefits as a result of the combined effects of  bipolar illness, attention deficit hyperactivity disorder, and a borderline full scale IQ of 67

Aff. at ¶ 9.  A female officer on the first floor indicated that she would let the officers upstairs know, and left to go upstairs.  C. Rang Aff. at ¶ 9.

Defendant sat upstairs in the bedroom for approximately ten minutes.  Officers then told him that it was all clear and that they were going to go to another room because they wanted to talk to him.  R. Rang Aff. at ¶ 6.  Postal Inspector Michael Connolly and Massachusetts State Trooper Robert Smith then brought defendant upstairs, in handcuffs, to the unheated attic.  R. Rang Aff. at ¶ 6; C. Rang Aff. at ¶ 3, 12.

Meanwhile, defendant's family was still downstairs on the first floor.  C. Rang Aff. at ¶ 8-16.  Defendant's mother asked if she could use the bathroom, and she was told an officer would have to accompany her upstairs.  C. Rang Aff. at ¶ 10.  She went upstairs with the officer, and noticed the female officer she told about defendant's mental condition blocking the doorway to the attic.  C. Rang Aff. at ¶ 11.  Defendant's mother asked where Robert was, and was told he was in the attic.  C. Rang Aff. at ¶ 11-12.  She asked why, and said that the attic was unheated. C. Rang Aff. at ¶ 12.  After going back downstairs, defendant's sister Allison asked if she could use the bathroom, and was also told that she had to be accompanied.  C. Rang Aff. at ¶ 13. Defendant's mother reiterated that defendant is mentally retarded, and suffers from bipolar and ADHD disorders.  C. Rang Aff. at ¶ 14.  She was told by officers that they knew.  C. Rang Aff. at ¶ 14.  She asked if she could let their dog out, who had not been outside since the night before. C. Rang Aff. at ¶ 15.  She was told she could, but that an officer would accompany her as she took the dog from the first floor kitchen down to the basement, where she would let the dog outside by the basement door.  C. Rang Aff. at ¶ 15.  She, along with her husband and daughter Allison, remained on the first floor until around noon, when she was given permission to drive her daughter to work.  C. Rang Aff. at ¶ 16.

in an April 19, 2012 Notice of Decision contained as Exhibit C.

Once in the attic, defendant was seated on the floor. Postal Inspector Connolly sat on a box across from him, and Trooper Smith initially sat next to defendant on the floor, then sat up on a box as well.  R. Rang Aff. at ¶ 6.

### b.  The Interrogation

After having been led in handcuffs up the stairs to the attic of the house, defendant received a confusing account of his status, the point of the conversation Connolly and Smith wanted to have with him, the implications of any statements he might make, and his <u>Miranda</u> rights.

Connolly said that defendant was not under arrest and was free to leave at any time "but we can't have you just walking around just for our safety because, you know, there's sharp things in the house . . . we don't want there to be any misunderstandings."  Interrogation Tr. at 2:22-25; Recording, at 0:42-0:52.  He said further "This isn't anything crazy.  We're just sitting down just kind of having a casual chat."  Interrogation Tr. at 5:16-17; Recording at 2:23-2:27.

Connolly told defendant that an investigation had been going on for a number of months, and that this didn't work the way it did with local police, since in a federal investigation once a search warrant was issued, that is close to the end of the investigation.  Interrogation Tr. at 6:2-11; Recording at 2:44-3:00.  He just wanted to make sure that what he had was right and to get defendant's side of the story.  Interrogation Tr. at 6:21-7:3; Recording at 3:21-3:29.  But, he said, "one of the things we have to do and we want to make sure that you understand your rights - - because we want to talk to you about it ... what I'm going to give you is a one page form. . . Just because we got the recorder on, because I got to turn this over to my boss later on, I got to make sure that you understand your rights.  So do me a favor. Read over that."  Interrogation Tr. 7:12-

8:2; Recording at 3:42-4:12.   Immediately after this Smith said " . . .like he was saying, there's two sides to every story . . ."  Interrogation Tr. 8:6-7; Recording at 4:13-4:16.

When defendant saw the form Connolly gave him, he said "these are just Miranda rights", to which Connolly responded, "yes, those are just rights.  They're nothing, you know, nothing crazy . . ."  Interrogation Tr. at 8:15-17; Recording at 4:31-4:35.

Trooper Smith read the Miranda rights aloud.  Interrogation Tr. at 9:10-10:2; Recording at 4:57-5:29.  Instead of telling defendant that any statement can <u>and will</u> be used against him in court, he said that any statement can be used against him in court.  Interrogation Tr. at 9:11; Recording at 4:57-4:59.  Defendant then signed the statement that his rights had been read to him and he understood them, and signed a waiver of rights provision.  Interrogation Tr. at 10:2-12:23; Recording at 5:30-7:03.  According to the agents' statements during the interview, the waiver form was signed at 8:47 a.m. – approximately 45 minutes after the agents entered the home, and twenty minutes after Mrs. Rang had informed the officers that her son suffered from bipolar disorder, mental retardation, and ADHD, and had the mental functioning of a 12-year old. Interrogation Tr. at 10:12-15; Recording at 5:37-5:41; C. Rang Aff. at ¶ 9.

Inspector Connolly knew that defendant had been arrested before.  Interrogation Tr. at 13:10-14; Recording at 7:35-7:43.  He told defendant that this time it was different because it is a crime to lie to a federal agent, a felony punishable by 5 years.  Interrogation Tr. at 13:17-25; Recording at 7:38-8:09.  He told defendant that he knew the answers to 99% of the questions he was going to ask.  Interrogation Tr. at 14:12-13; Recording at 8:33-8:35.  Connolly stressed the importance of telling the truth because credibility is "all you have in this particular arrangement."   Interrogation Tr. at 15:1-2; Recording at 8:57-9:00.  He said that he would be reporting back to the U.S. Attorney's Office, and could say that defendant was a "perfect

gentleman," pointed out the evidence, and "was great" or on the other hand, that he would also have to say if defendant started "trying to minimize," "trying to clarify" or "trying to make things seem a little different."  Interrogation Tr. 15:12-19; Recording at 5:37-5:41.

Defendant told Connolly at that point that his "mind's not working 100%."  Interrogation Tr. at 15:24; Recording at 9:35-9:37.  Connolly said that defendant could answer "I don't know" to a question, but that he didn't want him to say it to everything.  Interrogation Tr. at 15:25-16:3; Recording at 9:38-9:42.  Defendant said that he didn't like "I don't know" answers, and Connolly responded that "we're on the same page." Interrogation Tr. at 16:4-6; Recording at 9:42-9:48.  Defendant then asked Connolly what was going to happen in the end when Connolly got defendant's report and it came out how Connolly wanted it.  Interrogation Tr. at 16:23-17:2; Recording at 10:05-10:11.

Connolly said that at the end of the day he would make a few phone calls to the U.S. Attorney's Office, and if they had cleared up the matter and the U.S. Attorney said we're good, no problem, defendant would be "let to go, you know, on about your merry way."  Interrogation Tr. at 18:3-8; Recording at 10:53-11:04.  On the other hand, he said, if they were to find "three children and three kilos in your basement" things would be different.  Interrogation Tr. 18:14-19; Recording at 11:07-11:15.

Defendant said that they wouldn't find anything like that - he didn't do drugs, although he tried wine once and didn't like it.  Interrogation Tr. at 18:17-23; Recording at 11:11-11:24. Connolly assured him that he had no reason to believe "anything crazy's going to go on." Interrogation Tr. at 19:1-2; Recording at 11:30-11:34.

c.  Defendant's Demeanor

In addition to being directly told about defendant's mental conditions, Connolly and Smith had first-hand evidence of their behavioral manifestations.  Throughout the interview, defendant exhibited signs of immaturity, digression, lack of understanding, failure to appreciate the point of the interview, anxious, pressured speech, and crying.  Interrogation Tr. at 21:11-15, 25:12-27:13, 44:18-23, 69:14-15, 76:4-6; Recording at 15:45-17:32, 30:34-30:41, 42:17-42:28, 48:58-49:02, 53:02-53:08.  His child-like, digressive thought patterns were immediately on display, for example, when defendant learned that Trooper Smith's first name is Rob.  Defendant asked "You're name's Rob, too?  Nice."  Interrogation Tr. at 16:8-13; Recording at 9:50-9:56.

There were several instances of this behavior.  After telling Connolly that defendant previously had lived next door to where he currently lived, Connolly remarked that it must have been an easy move.  Interrogation Tr. at 21:10; Recording at 13:00-13:07.  Rather than simply acknowledge it and move on, defendant went into irrelevant details about how he had done it with a friend, and that they had managed by starting early and ending late.  Interrogation Tr. at 21:11-15; Recording at 13:07- 13:15.  Connolly brought the topic to a close by saying "That a boy."  Interrogation Tr. at 21:16; Recording at 13:15-13:16.  As noted above, defendant asserted that he didn't do drugs, although he tried wine once and didn't like it.  Interrogation Tr. at 18:21-23; Recording at 11:11-11:24.  He later launched into irrelevant details about his attempted visit to the alleged victim's mother in jail.  He noted that it was 19 hour round trip, that he got a speeding ticket on the way back, and he wasn't allowed to see her because he had a prior record.  Interrogation Tr. at 25:12-27:13; Recording at 15:45-17:32.  When questioned about his relationship with a boy who was not the alleged victim in the case, defendant talked about going to an amusement park with the boy and his mother.  Interrogation Tr. at 67:17-21; Recording at

8

47:42-49:50.  He said he was mistaken about the name of the park, then irrelevantly noted he had

been to a third amusement park but only with a friend of his.  Interrogation Tr. at 69:5-69:15;

Recording at 48:58-49:02.  He also spoke irrelevantly about how he didn't like iPhones as much

as other phones, and the problem of short hours at his local post office.  Interrogation Tr. at 76:4-

6 and 114:2-5; Recording at 53:02-53:08.

His limited and immature understanding was further exhibited when Connolly tried to

indicate that he could tell if defendant was lying and gave an analogy to situations in which

drivers lie about drunk driving.  Connolly began "Have you ever had a cocktail and then gotten

behind the wheel and driven your car?" Defendant responded "Well, I had wine, wine like I said,

I would never do that again."  Interrogation Tr. at 44:18-23; Recording at 30:34-30:41.

Throughout the interview, Connolly and Smith repeatedly had to tell defendant to slow

down.  Interrogation Tr. at 23:4, 31:6, 32:13, 46:3, 46:15, 47:20-22, 54:1, 77:14-15, 79:1-4, &

82:18-20.  They told him he was drifting (Interrogation Tr. at 39:23 & 95:12; Recording at

26:57-26:58 & 1:08:35-1:08:55), and called him "dopey" (Interrogation Tr. at 47:5; Recording at

32:43-32:44).  Connolly told defendant he could see him getting "amped up and getting

stressed."  Interrogation Tr. at 50:11-12; Recording at 34:56-34:58.  Defendant later began to

cry.  Recording, at 1:05:07-1:09:01.

d.  Connolly and Smith's Admonitions Concerning Defendant's Mental State

Connolly and Smith proceeded to try to get inculpatory statements from defendant,

ultimately by portraying the statements as what he needed therapeutically to get over his shame

and the internal weight he was bearing.  About twenty minutes into the interrogation, Connolly

told defendant that the reason that he and Smith were there was because of things defendant had

said to Ryan.  Interrogation Tr. at 30:8-9; Recording at19:30-19:34.  When defendant asked what

things he meant, Connolly responded "You know exactly what I'm talking about."  Interrogation
Tr. at 30:10-11; Recording at 19:35-19:38.  Connolly said that they had recordings from
Playstation 3, so they knew.  Interrogation Tr. at 30:24-25; Recording at 19:55-20:00.

Defendant spoke at length about how he ran a "clan" on Playstation, and there were
things that others had typed.  Interrogation Tr. at 32:14-35:21; Recording at 21:03-22:15.  Smith
moved to asking him about his cell phone, and defendant gave him his cell phone number.
Interrogation Tr. at 36:2-3; Recording at 23:32-23:42.  Connolly asked why defendant called
Ryan "babe" and why did he tell him that he loved him.  Interrogation Tr. at 36:14-15;
Recording at 23:47-23:50.  Defendant said that he was looking after him.  Interrogation Tr. at
36:16-23; Recording at 23:57-24:13.  Connolly said "This is me trying to get you to understand
the fact that this is the part where I know what the fuck I'm talking about."  Interrogation Tr. at
37:10-12; Recording at 24:38-24:46.

Soon after, Connolly said that he was not implying that defendant ever touched Ryan.
Interrogation Tr. at 39:3-5; Recording at 26:18-26:22.  Trooper Smith added that he had talked to
many people like defendant, and there was some shame in what happens, and they were not there
to judge him.  Interrogation Tr. at 39:12-14; Recording at 26:30-26:42.

Defendant said he did not remember texting Ryan that he loved him.  Interrogation Tr. at
40:11-12; Recording at 27:14-27:17.  Connolly asked about defendant texting "You're the best
boyfriend" to Ryan.  Interrogation Tr. at 42:6-8; Recording at 28:42-29:07.  Defendant asked
whether it came from Playstation or his cell phone, and Connolly replied that it was the cell
phone.  Interrogation Tr. at 42:16-19; Recording at 29:07-29:11.  Connolly warned that they had
everything in black and white so that if defendant said something different it would be a lie,
which is a crime.  Interrogation Tr. at 43:22-25; Recording at 29:21-30:04.

Defendant started to talk about autocorrect on his phone. Interrogation Tr. at 44:1-3; Recording at 30:05-30:12. He said that he did not remember typing "OMG I love you so much you're making my dick so hard." Interrogation Tr. at 49:21-22; Recording at 34:33-34:35. Smith asked him whether he did not remember because it was two months ago. Interrogation Tr. at 49:25-50:1; Recording at 34:35-34:38. Defendant said that it was because he had so much going on, being sued, and that he had a lot on his head. Interrogation Tr. at 50:2-4; Recording at 34:39-34:48.

Connolly noted that defendant was getting "amped up and getting stressed." Interrogation Tr. at 50:11-12; Recording at 34:56-34:58. After having told defendant that lying to Connolly was a federal offense, and that minimizing would go back to the U.S. Attorney's office, Connolly said that defendant was minimizing. Interrogation Tr. at 52:10; Recording at 36:06-36:07. He recounted several of defendant's denials that he had sent the alleged victim any statements with sexual connotations. Interrogation Tr. at 52:14-21; Recording at 36:14-36:44.

Connolly went on to have an extended dialogue with defendant. He said "you have a lot more comfortable time interacting with people online because get that little bit of a barrier . . . you've been making some real good strides in that and really working on it . . . I recognize that you are struggling inside. I can see it in your face. The wrinkles in your forehead is telling me . . ." Interrogation Tr. at 88:15-89:2; Recording at 1:01:28-1:01:54. Defendant responded "I have wrinkles all over my face and I'm only 25." Interrogation Tr. at 89:3; Recording at 1:01:53-1:01:56. Connolly continued, "You are struggling with something deep" and defendant responded "I'm stressed out massive." Interrogation Tr. at 89:6; Recording at 1:01:56-1:02:00.

Connolly followed with "deep down inside and you've got a lot of other things going on too, but one thing I do know . . . you've been struggling with this demon for a while now . . .

11

you've kept it under wraps and you've kept yourself in control cause you are not someone who

loses control very easily."  Interrogation Tr. at 89:7-13; Recording at 1:02-00-1:02:19.

Defendant told him, "I used to. I'm ADHD bipolar . . . and I actually trained myself not to have

to take the medication too."  Interrogation Tr. 89:14-17; Recording at 1:02:19-1:02:24.

Connolly went on to praise defendant and to advise him about the only way to overcome

his mental difficulties was to admit his attraction to children:

> . . . And you were strong enough to walk away to medication when in America, every
> day, every one takes a pill for everything because you were able to figure out a way to
> deal with that . . .
> I already can tell that you've been working on is this attraction that you have, and I'm not
> saying that there is anything criminal in that . . . I'm not saying you ever touched a kid.
> We're just talking about you talking and this demon that you're struggling with.  You've
> been carrying this fucking bag of bricks with you everywhere that you go for the last, I'm
> guessing at least dozen years, because you know there's something that's not quite right
> about it. . .
> this is just us talking and you've been carrying this weight for so god damn long that this
> has to be eating you out from the inside and one of the ways that you got to deal with it is
> you have to let some of this out.  If you suck it down and you hold it inside, it literally
> tears you apart from the inside out and that's no friggin' way to live.  It's just not.

Interrogation Tr. at 89:18-92:17; Recording at 1:02:24-1:06:33.

Defendant began crying.  Recording at 1:05:07-1:09:01. Connolly and Smith then pushed

to get a statement that defendant asked the alleged victim for naked pictures.  Interrogation Tr. at

93:21-94:13; Recording at 1:06:52-1:08:04.  Defendant admitted he did.  Interrogation Tr. at

94:4-9; Recording at 1:07:29-1:08:05.  They asked about texting him about masturbating.

Interrogation Tr. at 94:15-21; Recording at 1:08:13-1:08:28.   Defendant again admitted.

Interrogation Tr. at 94:20; Recording at 1:08:28-1:08:30.

Connolly and Smith asked defendant whether it was just texting, and the defendant went

into a discussion about problems he had with calling on the phone, then about irrelevant

problems with Playstation, to which Connolly said, "Rob listen, we're drifting again."

Interrogation Tr. at 95:12; Recording at 1:08:35-1:08:55. Defendant expressed a lack of

understanding about how talking about the content of calls didn't answer the question.

Interrogation Tr. at 95:9-18; Recording at 1:05:56-1:09:07. Connolly said "Listen to the

question, buddy, ok?" and Smith tried to regroup to be able to focus the questions. Interrogation

Tr. at 95:19; Recording at 1:09:08-1:09:10.

       Connolly and Smith again attempted to get defendant to admit that he was attracted to the

alleged victim. Interrogation Tr. at 96:7-10; Recording at 1:09:27-1:09:28. When they did not at

first succeed, they again discussed the therapeutic benefits of admission:

> I'm trying to help you through this and I know you are still trying to push back. . . I don't
> think you're lying to me, but I think you're not, you're not there yet. We're trying to
> make you understand we've been in this position before with people who've struggled
> with addiction. People who struggled with, you know, heroin and cocaine and people
> who've been forced to admit that they have an issue. The first step in Alcoholics
> Anonymous is admitting that you have a problem.

Interrogation Tr. at 96:9-20; Recording at 1:09:35-1:10:10.

       Defendant told them he went through classes for this. Interrogation Tr. at 96:21;

Recording at 1:10:11-1:10:12. Smith responded that they were there to help him. Interrogation

Tr. at 96:22-23; Recording at 1:10:14-1:10:15. Connolly added that they were not there to judge

him but to find the truth. Interrogation Tr. at 96:25-97:2; Recording at 1:10:15-1:10:22.

Defendant asked if it would go back to his parents. Interrogation Tr. at 97:6-7; Recording at

1:10:33-1:10:34. Smith said no, it was between "just the three of us," and Connolly agreed.

Interrogation Tr. at 97:10-13; Recording at 1:10:35-1:10:40. Connolly then said the "recorder's

going to go to the prosecutor's office because they require us to do it" but they wouldn't tell his

parents because they are required to protect his privacy. Interrogation Tr. at 97:14-19;

Recording at 1:10:40-1:10:54. Connolly pressed defendant to say that it was not defendant's

parents who texted the alleged victim, but that he was the one who texted him, and defendant

agreed.  Interrogation Tr. at 97:23-25; Recording at 1:10:54-1:11:01.

Smith again talked about how defendant's problem was like an addiction for which

Alcoholics Anonymous helps, and remarked that their discussion was a step toward getting help

for his addiction, and that he had to get over his fear of talking about it.  Interrogation Tr. at

132:11-136:12; Recording at1:37:43-1:40:13.

Connolly later remarked ". . . you felt enough of a connection to be able to come out and

tell me some very private things that you held very deep inside for a long time."  Interrogation

Tr. at 169:24-170:1; Recording at 2:04:57-2:05:05.  He later asked:

> Is there, let's put it this way, you know how you were saying sometimes with a
> psychologist or something like that, get comfortable, get things off your chest, if you
> were asking him . . .
> - if he just answers the question directly or if there's more that you should say, is there
> something more, now that you've got more comfortable with us, is there something more
> we haven't asked you that you'd like to get off your chest?

Interrogation Tr. at 172:10-19; Recording at 2:06:52-2:07:01.  Defendant responded that he was

sorry, that he shouldn't have done it and he made a mistake. Interrogation Tr. at 172:20-12;

Recording at 2:07:16-2:07:21.

Defendant later provided email addresses, passwords, screen names, and usernames for

his Facebook accounts, cell phones, and Playstation account.  Interrogation Tr. at 176:22-186:10;

Recording at 2:10:03-2:18:36.  He offered to let Connolly and Smith play games on his

Playstation account or on applications he had.  Interrogation Tr. at 187:3-187:18; Recording at

2:19:06-2:19:35.

**ARGUMENT**

I.      DEFENDANT'S STATEMENTS SHOULD BE SUPPRESSED AS THE PRODUCTS
        OF A CUSTODIAL INTERROGATION CONDUCTED WITHOUT PROPER
        MIRANDA WARNINGS

      a.      **Defendant was in custody**

Law enforcement officers may not interrogate a person taken into custody or otherwise
deprived of his freedom of action in any significant way unless the person has received Miranda
warnings.  United States v. Mittel-Cary, 493 F.3d 36, 39 (1st Cir. 2007), citing Stansbury v.
California, 511 U.S. 318, 322 (1994).  The question of whether a defendant was in custody
during an interrogation turns on whether there was a formal arrest or a restraint on freedom of
movement of the degree associated with a formal arrest.  Id.  The determination of custodial
status is made by considering the totality of the circumstances and asking whether a reasonable
person would have felt he was not at liberty to terminate the interrogation and leave.  Id.

The First Circuit has identified four factors to consider in determining whether a suspect
is in custody: whether the questioning was in familiar surroundings, the number of law
enforcement officers present at the scene, the degree of physical restraint placed upon the
suspect, and the duration and character of the interrogation.  Id.  In Mittel-Carey, the First Circuit
found that the defendant was in custody where eight law enforcement officers arrived at
defendant's home, which he shared with his girlfriend, to execute a search warrant.  It was early
in the morning and the defendant and his girlfriend were asleep upstairs.  The girlfriend
answered the door, the agents entered, and two went up to the defendant's bedroom, one with an
unholstered gun that the defendant saw.  The agents escorted the defendant downstairs, told him
where to sit, and then separated him from his girlfriend by sending her upstairs.  As other agents
searched the house, two FBI agents remained with the defendant.  One of the agents explained to

the defendant that the house was being searched based on an undercover sting operation investigating child pornography.  The agent told him that he didn't have to respond to questions but that in his experience those who cooperated did better.  The agents proceeded to Interrogation the defendant for one and a half to two hours, during which he received permission three times to move from the interrogation spot, accompanied by agents.  Id. at 38.

The Court held that the most significant element in finding custody was the physical control exercised over the defendant during the search and interrogation, noting that the defendant was ordered to dress, go downstairs, told where to sit, physically separated from his girlfriend, and escorted by agents when he was permitted to move.  Id. at 40.  It noted that the level of control over the defendant outweighed any consideration that the interrogation took place inside the defendant's home.  Id.

Similarly here, defendant was confronted in the second-floor bathroom next to his bedroom, in the morning, where he was about to shower after having just awakened from sleep.  R. Rang Aff. at ¶ 3.  There were four law enforcement officers present at the confrontation, at least one of whom had his weapon drawn.  R. Rang Aff. at ¶ 4.  Defendant was immediately handcuffed.  R. Rang Aff. at ¶ 5.

Defendant's mother, who had been sleeping in her second-floor bedroom when the agents arrived, initially saw about ten law enforcement officers.  C. Rang Aff. at ¶ 5.  She was told to go downstairs.  C. Rang Aff. at ¶ 7.  She informed officers downstairs about defendant's borderline IQ and unmedicated bipolar and ADHD conditions, and one officer went to tell those questioning defendant about his condition.  C. Rang Aff. at ¶ 9 (too strong).  Defendant's mother and sister had to ask permission to use the bathroom, which was located on the second floor, and were accompanied when they went.  C. Rang Aff. at ¶ 10, 13. An officer blocked the doorway to

the stairs to the attic where defendant then was.  C. Rang Aff. at ¶ 11.  Defendant's family

otherwise had to remain apart from defendant, on the first floor, while he was interrogated up in

the third floor attic.  C. Rang Aff. ¶ 10-16.  Defendant's mother also had to ask permission to let

the family dog out, and was accompanied by police as she did so.  C. Rang Aff. ¶ 15.

      The officers initially brought defendant into his bedroom, having ordered his mother

downstairs.  R. Rang Aff. ¶ 5; C. Rang Aff. ¶ 7.  Officers inside the bedroom told defendant that

they were executing a search warrant.  Defendant remained handcuffed.  R. Rang Aff. at ¶ 6.

Defendant was then brought, handcuffed, upstairs to an attic space by two officers.  R. Rang Aff.

at ¶ 6.  No other family members who were present were permitted to be with defendant.  C.

Rang Aff. ¶ 10-16.  Defendant sat on the floor and both officers sat on boxes as a nearly two and

one-half hour interrogation ensued.  R. Rang Aff. at ¶ 6-7; Interrogation Tr. at 2:2 & 191:12-13.

      Defendant was told he was not under arrest and "was free to leave at any time."

Interrogation Tr. at 2:20-22.  This statement, however, was contradicted by the actions of the

officers, e.g., the handcuffing, removal to the attic, and separation from his family members (R.

Rang Aff. at 5-7), as well as the immediate disqualifying statement "but we can't have you just

walking around just for our safety because, you know, there's sharp things in the house . . . we

don't want there to be any misunderstandings" (Interrogation Tr. at 2:22-25) as well as the fact

that defendant was then given a form with Miranda warnings on it (Interrogation Tr. 7:12-11:19).

Under these circumstances, a reasonable person would not believe that he was free to leave.  Cf.

United States v. Kim, 292 F.3d 969, 973 (9th Cir. 2001) (despite officer's testimony that he told

defendant she was free to leave, reasonable person who was separated from spouse, precluded

from speaking with son, and having store entry locked behind her would not believe she was free

to leave);  United States v. Griffin, 7 F.3d 1512, 1519 (10th Cir. 1993) (being separated from

family and secluded in a nonpublic room contributes to a police dominated environment); see also United States v. Smith, No. CRIM.A. 13-10064-NMG, 2013 WL 6072876, at *4 (D. Mass. Nov. 13, 2013) (suspect was under de facto arrest where he was handcuffed at a gas station and two police officers were present); United States v. Dunfee, No. 12-CR-10024-PBS, 2013 WL 6488710, at *4 (D. Mass. Dec. 9, 2013) (Defendant reasonably believed he was not free to leave even where officers told him he could leave, he was not handcuffed, and there were only two police officers present).

> **b.** **Defendant Did Not Receive Proper Miranda Warnings**

While Smith did read Miranda rights to defendant, both Connolly and Smith minimized and even contradicted the rights and the consequences of speaking, in effect voiding the warnings.

Smith first incorrectly read the rights, stating that anything defendant said can be used against him, rather than anything he said can and will be used against him.  Interrogation Tr. at 9:10-11; Miranda v. Arizona, 384 U.S. 436, 469 (1966) ("This warning is needed in order to make him aware not only of the privilege [of remaining silent] but also of the consequences of foregoing it.  It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege.  Moreover this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system – that he is not in the presence of persons acting solely in his interest.").  When defendant asked if his statements would go back to his parents, Smith said no, it was between "just the three of us," and Connolly agreed.  Interrogation Tr. at 97:6-13.  Connolly then said the "recorder's going to go to the prosecutor's office because they require us to do it" but that they

wouldn't tell his parents because they are required to protect his privacy. Interrogation Tr. at 97:13-19.

The Miranda warnings about the consequences of speaking were then further contradicted by Connolly, who implied that no prosecution would take place unless defendant lied to him. Interrogation Tr. at 18:3-19. When defendant asked him what would happen when defendant gave him the information he wanted, Connolly responded that the options were either that the U.S. Attorney would say it was fine to let defendant go, or on the other hand if they found "three children and three kilos in your basement" things would be different. Interrogation Tr. at 18:3-16. Defendant eagerly said they would not find that (Interrogation Tr. at 18:17), and the agent replies, "I have no reason to believe that, you know, anything crazy's going to go on. If something does change, I'm going to tell you about it." Interrogation Tr. at 19:1-3. Connolly further undercut the warnings by characterizing the interaction as merely a "chat" – "this isn't anything crazy. We're just sitting down just kind of having a casual chat." Interrogation Tr. at 5:16-17, 7:3. "We're not going to play any games with you." Interrogation Tr. at 7:6-7.

When defendant told Connolly that his mind was not working 100%, Connolly told him that he could say "I don't know" to anything he didn't understand but he didn't want him saying "I don't know" to everything. Interrogation Tr. at 15:21-16:3. This signaled, particularly in light of defendant's mental condition, that contrary to the Miranda warnings, defendant was not free to refuse to speak. See United States v. Harrison, 34 F.3d 886, 891 (9th Cir. 1994) (vacating defendant's conviction and remanding for new trial when district court erroneously admitted evidence of statement made by defendant to agents after the agent improperly implied that defendant should not exercise her right to remain silent because the judge could be informed she had not cooperated).

Connolly and Smith's exploitation of defendant's mental condition by giving a false impression that the statements would not lead to prosecution "undercut the gist of [the] warning." United States v. Byram, 145 F.3d 405, 408 (1ˢᵗ Cir. 1998). The giving of the warnings here, then, was tantamount to not giving the warnings at all. As such, the Court must suppress defendant's statements to the agents during the execution of the search warrant at his home as the product of a custodial interrogation conducted without proper Miranda warnings, in violation of his Fifth Amendment rights.

II.     DEFENDANT'S STATEMENTS MADE PRIOR TO THE AGENTS' ATTEMPT TO ADVISE HIM OF HIS MIRANDA WARNINGS SHOULD BE SUPPRESSED AS THE PRODUCT OF CUSTODIAL INTERROGATION CONDUCTED IN THE ABSENCE OF MIRANDA WARNINGS

Prior to the agents' attempt to advise him of his Miranda warnings, defendant was held up in the attic and questioned about why he thought the agents were there. See Interrogation Tr. at 3:17-8:9. In response to questioning, defendant made statements indicating that he knew Megan Ashe, the minor victim's mother, and the minor victim, and had communicated with both of them. Interrogation Tr. at 3:18-3:23, 5:25-6:1, 7:18-20, 8:8-9. As outlined above, defendant was in custody at this point, and the agents had not yet administered Miranda warnings of any kind. Miranda v. Arizona, 384 U.S. 436, 444 (1966) (defendant must be apprised of rights when police conduct a custodial interrogation or statements are inadmissible). As such, the Court must suppress defendant's statements to the agents at this time (specifically, the statements captured at 3:17- 8:20, Interrogation Transcript) because they were the product of a custodial interrogation conducted in the absence of Miranda warnings.

III.    DEFENDANT'S STATEMENTS SHOULD BE SUPPRESSED AS INVOLUNTARY
        WHERE OBTAINED BY KNOWING EXPLOITATION OF HIS BORDERLINE IQ,
        IMMATURITY, AND UNMEDICATED BIPOLAR AND ATTENTION DEFICIT
        HYPERACTIVITY DISORDERS

An involuntary statement violates due process and may not be admitted into evidence at

trial.  United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990).  A court assesses the due

process voluntariness of a confession by looking to the totality of the circumstances.  Withrow v.

Williams, 507 U.S. 680, 693 (1993).  Those circumstances include police coercion, the length of

the interrogation, and the defendant's maturity and his mental health.  Id.  The government must

prove by a preponderance of the evidence that the statement was voluntary.  Lego v. Twomey,

404 U.S. 477, 488-89 (1972).

In determining whether a defendant's will was overborne, a court looks to both the

characteristics of the accused and the details of the interrogation.  Schneckloth v. Bustamonte,

412 U.S. 218, 226 (1973).  Nevertheless, "the admissibility of a confession turns as much on

whether the techniques for extracting the statements, as applied to this suspect, are compatible

with a system that presumes innocence and assures that a conviction will not be secured by

inquisitorial means as on whether the defendant's will was overborne."  Miller v. Fenton, 474

U.S. 104, 116 (1985).  The notion of voluntariness reflects society's views about the

acceptability of imposing certain interrogation methods on a particular person.  Haley v. Ohio,

332 U.S. 596, 603 (1948) (Frankfurter, J., concurring).

Coercion can be mental as well as physical.  Arizona v. Fulminante, 499 U.S. 279, 287

(1991).  The standards for admissibility of a confession are applicable whether the confession

was a product of physical intimidation or psychological pressure.  Townsend v. Sain, 372 U.S.

293, 307 (1963).

There is "no single litmus-paper test for constitutionally impermissible interrogation" and no individual feature of an interrogation is determinative of whether a confession is voluntary. Culombe v. Connecticut, 367 U.S. 568, 601 (1961).  While the mental condition of the defendant alone is insufficient to establish deprivation of due process, mental condition is relevant to an individual's susceptibility to police coercion.  Colorado v. Connelly, 479 U.S. 157, 164-65 (1986).  As interrogators have turned to more subtle forms of psychological persuasion and away from physical coercion, courts have found the mental condition a more significant factor in the 'voluntariness' calculus.  Connelly, 479 U.S. at 164.

Nonetheless, coercive police activity is a necessary predicate to finding a confession involuntary under the due process clause.  Id. at 167.  Coercive police activity may include extracting a confession by "direct or implied promises, however slight, or by the exertion of any improper influence."  Hutto v. Ross, 429 U.S. 28, 30 (1976).  Where a person's compromised mental state is known to interrogating officers, a lesser quantum of coercion is required to call an ensuing confession into legitimate question.  United States v. Hughes, 640 F.3d 428, 438-39 (1st Cir. 2011).

Here, aware of defendant's borderline IQ, emotional immaturity, and unmedicated bipolar and ADHD conditions, Connolly and Smith began their encounter by presenting defendant with a confusing account of what was happening to him and what the consequences of speaking with them could be.  Despite handcuffing defendant, bringing him to an attic, and separating him from his family, he was told that he was not under arrest, was "free to go" and they were just going to have a "casual chat."  Interrogation Tr. at 2:20-22 & 5:16-17.  Connolly told him that they were close to the end of the investigation and he just wanted to make sure that what he had was right and to get defendant's side of the story.  Interrogation Tr. at 6:8-7:3.

While Smith did read <u>Miranda</u> rights to defendant, both Connolly and Smith capitalized on defendant's mental state by encouraging him to speak while minimizing and even contradicting the importance of the rights and the consequences of speaking. Connolly told defendant that Connolly needed to make sure defendant understood his rights "just because we got the recorder on, because I got to turn this over to my boss later on, I got to make sure that you understand your rights. So do me a favor. Read over that." Interrogation Tr. at 7:24-8:2. Smith added "like he was saying, there's two sides to every story." Interrogation Tr. at 8:6-7. Connolly said that the rights were "nothing crazy." Trial Tr. at 8:17.

The pro-forma impression Connolly gave of the <u>Miranda</u> rights was reinforced first by Smith's incorrect reading of the rights, stating that anything defendant said can be used against him, rather than anything he said can <u>and</u> <u>will</u> be used against him. Trial Tr. at 9:11. It was again reinforced when defendant asked if his statements would go back to his parents. Smith said no, it was between "just the three of us", and Connolly agreed. Interrogation Tr. at 97:10-13. Connolly then said the "recorder's going to go to the prosecutor's office because they require us to do it" but they wouldn't tell his parents because they are required to protect his privacy. Interrogation Tr. at 97:14-19.

The <u>Miranda</u> warnings about the consequences of speaking were in effect contradicted by Connolly, implying that no prosecution would take place unless defendant lied to him. Interrogation Tr. at 16:23-17:9. When defendant asked him what would happen when defendant gave him the information he wanted, Connolly responded that the options were either that the US Attorney would say it was fine to let defendant go, or on the other hand if they found "three children and three kilos in your basement" things would be different. Interrogation Tr. at 18:3-19. Defendant eagerly noted they would find no such thing. Interrogation Tr. at 18:17.

Connolly urged defendant to speak in spite of his mental condition.  He told him that "your credibility is all that you have in this matter."  Interrogation Tr. at 14:25-15:2.  When defendant told Connolly that his mind was not working 100%, Connolly told him that he could say "I don't know" to anything he didn't understand but he didn't want him saying "I don't know" to everything.  Interrogation Tr. at 15:21-16:3.  This signaled, particularly in light of defendant's mental condition, that contrary to the <u>Miranda</u> warnings, defendant was not free to refuse to speak.  <u>See</u> <u>Harrison</u>, 34 F.3d at 891-92.

Connolly and Smith's exploitation of defendant's mental condition by giving a false impression that the statements would not lead to prosecution "undercut the gist of [the] warning."  <u>United States v. Byram</u>, 145 F.3d 405, 408 (1st Cir. 1998).  The giving of the warnings here, then, failed to redound to the voluntariness of defendant's statements.  Moreover, any waiver of those rights should be deemed involuntary in light of their confused presentation to a defendant known to have a borderline IQ and other mental conditions.  C. Rang Aff. at ¶ 9.

There is little doubt that Connolly and Smith knew of defendant's compromised mental condition.  C. Rang Aff. at ¶ 14.  Defendant's mother had the information conveyed to them (C. Rang Aff. at ¶ 14), defendant told them himself (Interrogation Tr. at 89:14), they alluded to it themselves in advising him of the therapeutic benefits of talking to them (Interrogation Tr. at 96:14-23), and they were able to observe the effects of it throughout the interview in his digressions, immaturity, pressured speech, agitation, and crying.

Connolly and Smith's exploitation of defendant's low IQ, immaturity, unmedicated bipolar and ADHD condition, and troubled emotional state amounted to coercion.  As the Supreme Court noted in <u>Fulminante</u>, coercion can be mental as well as physical.  499 U.S. at 287.  Moreover, the First Circuit in <u>Hughes</u> has held that where, as here, there is knowledge of a

person's compromised mental state, a lesser degree of coercion is required to call an ensuing confession into legitimate question.  640 F.3d at 438-39.  Here Connolly and Smith mislead defendant to believe that no prosecution would result from his statements to them unless they believed he was lying.  Interrogation Tr. at 16:23-17:9.  They observed his mounting agitation under interrogation and accusations of minimizing.  Interrogation Tr. at 59:16-23 & 89:3-6.  They then told defendant that his psychological distress stemming from what they guessed was a dozen-year problem could only begin to be addressed by confessing to them.  Interrogation Tr. at 96:14-23.  In extended orations about the defendant's distressing mental problems, during which Connolly invited defendant to join in agreement about just how distressed he was, Connolly told him that the solution to his enduring distress was to make admissions.  Interrogation Tr. at 88:25-89:11; See United States v. Preston, 751 F.3d 1008, 1026-28 (9th Cir. 2014) (defendant's confession ruled involuntary where, inter alia, police suggested there would be no prosecution, defendant had IQ of 65 and "mentally retarded often lack ability to comprehend seriousness of situation," and "under interrogation are not likely to understand . . . the long term consequences of making an incriminating statement" and "even subtle coercion . . . can have an extraordinary effect on one of low mental capabilities.").

Under these circumstances, defendant's statements were involuntary and should not be admitted into evidence.  Connolly and Smith's interrogation did not "reflect society's views about the acceptability of imposing [such] interrogation methods" on a suspect with a borderline IQ and mental illness.  Haley 332 U.S. at 603; United States v. Byram, 145 F.3d at 408.  Accordingly, defendant respectfully requests that the Court suppress the introduction of these statements at trial.

## Conclusion

For the foregoing reasons, defendant's motion to suppress should be granted and all of his statements made to Postal Inspector Connolly and Trooper Smith on December 29, 2014 in violation of his Fifth Amendment rights should be suppressed.

Defendant also respectfully requests that the Court hold an evidentiary hearing on this motion.


RESPECTFULLY SUBMITTED,

ROBERT RANG,
By his attorney,

*/s/ Jennifer C. Pucci*
Jennifer C. Pucci
  B.B.O. #669823
Federal Defender Office
51 Sleeper Street, Fifth Floor
Boston, MA  02210
Tel: 617-223-8061


Date:   October 2, 2015

## CERTIFICATE OF SERVICE

I, Jennifer Pucci, certify that a copy of this motion was served on all counsel of record via ECF filing on October 2, 2015.

*/s/ Jennifer C. Pucci*
Jennifer C. Pucci