UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | Criminal No. 1:15-cr-10037-IT-1 |
| | * | |
| ROBERT RANG, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

January 6, 2017

TALWANI, D.J.

I.      Introduction

On February 26, 2015, a federal grand jury indicted Robert Rang for the attempted

coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b). Rang now moves to

suppress statements he made to law enforcement officers on December 29, 2014. For reasons set

forth in this opinion, Rang's Motion to Suppress Statements [#41] is ALLOWED in part and

DENIED in part.

II.     Background

Acting on evidence that Rang had engaged in sexually-explicit communications with a

nine-year-old boy via the telephone, internet, and a video game console, between eight and ten

law enforcement officers executed a federal search warrant of Rang's Pennsylvania home on the

morning of December 29, 2014. After being let in by Rang's father, the officers encountered

Rang on the second floor. United States Postal Inspector Michael J. Connelly and Massachusetts

State Trooper Robert Smith subsequently led Rang to the third-floor attic to question him. The

interview was audiotaped. The officers administered Rang his rights under Miranda v. Arizona,

384 U.S. 436 (1966), which Rang waived in writing. He initially denied having sent sexually-explicit communications to the minor and provided multiple explanations before ultimately admitting that he had sent the communications knowingly. The interrogation lasted two hours and twenty-two minutes, and Rang was arrested shortly thereafter.

III.    Discussion

Rang now moves to suppress the statements he made to Inspector Connelly and Trooper Smith. He has presented evidence that he has a borderline intelligence quotient ("IQ") as well as Bipolar Disorder and Attention Deficit Hyperactivity Disorder and that his mother alerted officers to these conditions on the morning of the search. He contends that his conditions prevented him from fully comprehending his rights and the significance of waiving them and that Inspector Connelly and Trooper Smith purposefully exploited his cognitive impairments. Consequently, he argues four grounds for suppression: (1) he made certain statements before being apprised of his Miranda rights; (2) the officers incorrectly articulated the Miranda warnings and made statements to contradict and minimize their impact which effectively rendered them void; (3) he did not knowingly, intelligently, and voluntarily waive his rights; and (4) he made the statements involuntarily.

*A. Custody*

At the outset, the court must determine whether Rang was in custody at the time of the interrogation.[1] It is well established that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first" be administered Miranda warnings. Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (quoting Miranda, 384 U.S. at 444). "'[C]ustody' is a term of art," Howes v. Fields,

---

[1] There is no dispute that the questioning constituted an interrogation.

132 S. Ct. 1181, 1187 (2012), arising only when "there is 'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest," California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

In determining whether a person was in custody, the court considers "whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Howes, 132 S. Ct. at 1189 (internal citations, quotation marks, and brackets omitted). The court must scrutinize "all of the circumstances surrounding the interrogation." Id. (quoting Stansbury, 511 U.S. at 322). Relevant factors to be considered when determining the existence of freedom of movement or restraint include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." Id. (internal citations removed); see also United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007) ("Though by no means an exhaustive list, [the First Circuit] has identified four factors which ought to be considered when custody is at issue, including 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)).

An interrogation of a suspect in his home weighs against a finding of custody. United States v. Hughes, 640 F.3d 428, 435-36 (1st Cir. 2011); Mittel-Carey, 493 F.3d at 40; United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991); cf. United States v. Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003). However, it is by no means determinative. Mittel-Carey, 493 F.3d at 40; cf. Orozco v. Texas, 394 U.S. 324, 327 (1969) (requiring that law enforcement officers provide

Miranda warnings during custodial interrogations of defendants in their homes). This principle is

exemplified in Mittel-Carey, 493 F.3d 36, where the defendant was interrogated, without

Miranda warnings, in his home for ninety minutes to two hours after eight law enforcement

agents arrived at 6:25 a.m. to execute a search warrant. Id. at 38, 40. The First Circuit deemed

that, based on the totality of the circumstances, the defendant was in custody despite the

interrogation having been conducted in his home. Id. at 39-40. Driving this determination was

the degree of physical control the officers exercised over the defendant at all times—ordering

him to dress and where to sit, requiring that an officer escort him the few times he was permitted

to move, and separating him from his girlfriend in another room. Id. at 40. Other factors the court

considered included the early morning hour, the number of officers present in the home, the

length of the interrogation, an officer's brandishing of an unholstered gun when initially

confronting the defendant in his bedroom, and use of coercive statements by the interrogating

officer. Id.

      Here, many of the factors tilt toward a determination that Rang was in custody at the time

of the interrogation. Although the officers questioned him in his home, his movements were

substantially restrained. Rang first encountered the officers when their firearms were drawn. The

officers handcuffed and escorted him to his bedroom and then to the third floor—two floors

above where his parents and sister were seated under the watchful eye of other officers. Inspector

Connelly and Trooper Smith closed the door to the third floor behind them. The attic room was

finished, but unfurnished and unheated. Rang sat on the floor while at least one of the officers at

all times sat above him on a plastic storage box. Although Rang's hands were unrestrained once

on the third floor and the officers told him he could leave at any time, Inspector Connelly also

admonished him that "we can't have you just walking around just for our safety because, you

know, there's sharp things in the house . . . [W]e don't want there to be any misunderstandings." While Rang was questioned by only two officers, several others were executing the search warrant below, and officers entered and exited the attic during the two-hour-and-twenty-two-minute interrogation.

The isolation of Rang from his family while he was questioned in an unfurnished and unheated room, the restrictions on both his and his family's movements, the drawn firearm when officers first approached Rang that morning, the presence of numerous officers in his home, and the length of the interrogation outweigh any feeling of comfort or familiarity Rang otherwise might have experienced by being questioned in his home, the generally calm tone of the interrogation, and the officers' assurances that he was not under arrest and could end the questioning at any time.

Based on the totality of the circumstances, the court finds that Rang was in custody on December 29, 2014.

B.  *Statements Made Prior to Miranda Warnings*

As recorded on audiotape, the officers did not immediately inform Rang of his Miranda rights. Any statements Rang made in response to questioning before he was apprised of his rights must be suppressed. Miranda, 384 U.S. at 479.

C.  *Statements Made After Miranda Warnings*

Turning to the statements Rang made after being advised of his Miranda rights, the court considers whether he was properly apprised of his rights and whether he knowingly, intelligently, and voluntarily waived them. The court further considers whether Rang's post-Miranda statements were made voluntarily.

1.   Administration of <u>Miranda</u> Warnings

Rang claims that the officers stated his <u>Miranda</u> rights incorrectly and contradicted and minimized them in subsequent representations and assurances. In particular, Rang points to statements made before being informed of his rights that the interrogation "isn't anything crazy. We're just sitting down just kind of having a casual chat." He further claims that the warning he received that "[a]nything you say can be used against you in court" was faulty because Rang was not explicitly told that his words "can *and will* be used against" him. Rang contends that, after reciting the warnings, the officers repeatedly undermined their significance. He cites the officers' statements that he should not respond with "I don't know" to every question asked, statements that he alleges could be understood as assurances that the U.S. Attorney would not pursue charges unless they "suddenly . . . find[,] you know[,] three children and three kilos of cocaine in your basement," and statements that lying to the officers could lead to prosecution. He points to the officers' promise an hour into the interrogation that they would share Rang's statements only with the U.S. Attorney's Office and would not tell his parents. Rang claims that the officers so contradicted the warnings as to give him the false impression that he would not be prosecuted based on his statements.[2]

To support his contention that <u>Miranda</u> warnings can be so contradicted as not to carry any weight, Rang cites to <u>United States v. Byram</u>, 145 F.3d 405 (1st Cir. 1998), in which the First Circuit opined that "a false assurance to a suspect that he was not in danger of prosecution . . . might undercut the gist of a warning, raising questions whether <u>Miranda</u> had

---

[2] At oral argument, defense counsel contended that Rang was particularly vulnerable to these purportedly mixed messages as a result of his cognitive impairments. Since this argument goes directly to whether Rang knowingly and intelligently waived his rights, the court addresses it under that rubric in the next section.

been satisfied." Id. at 408. He also cites to United States v. Harrison, 34 F.3d 886 (9th Cir. 1994), in which a federal agent told the defendant that she faced a maximum prison sentence of twenty years and asked whether she preferred that the judge be told that she had cooperated or not cooperated. Id. at 890. The court in Harrison concluded that the defendant did not make subsequent incriminating statements voluntarily, because the agents suggested that exercising the right to remain silent would have resulted in harsher treatment. Id. at 891, 892.

Neither is the case here. First, Inspector Connelly did not inform Rang that he was not at risk of prosecution. To the contrary, even before advising Rang of his rights, Inspector Connelly told Rang that the federal government had been investigating Rang's relationship with the complainant for months, they already had amassed evidence in the case, and officers were downstairs searching for more evidence of the relationship. This is not the hypothetical case contemplated in Byram, in which a suspect was left in the dark as to the charges he faced. Nor does this case resemble Harrison, in which the officer told the defendant that she would suffer consequences if she remained silent. Here, Inspector Connelly advised Rang he would face penalties if he *lied*. See, e.g., Rivers v. United States, 400 F.2d 935, 943 (5th Cir. 1968) ("With Miranda awareness of his rights to remain silent, to have counsel, and his willingness to talk, [the defendant] had no constitutional right to lie[,] and officer's admonition to tell the truth . . . does not of itself measure up to a paradoxical breach of the Constitution or coercive pressure rendering the statement involuntary."). Further, telling a suspect that it is permissible to say "I don't know" while suggesting that he not claim ignorance to every question posed is a far cry from telling the suspect that he may not remain *silent*.

Nor does the assurance that the officers would not tell Rang's parents offend the principles of Miranda, because Inspector Connelly was clear that his statements would be shared

with the prosecutor. <u>Compare</u> <u>Hopkins v. Cockrell</u>, 325 F.3d 579, 584-85 (5th Cir. 2003)

(concluding that trial court erred in denying suppression of statements obtained after the officer

promised that he would not share the defendant's statement with his mother or other law

enforcement officers) <u>with</u> <u>United States v. Matchopatow</u>, 17 F. App'x 425, 428, 431 (7th Cir.

2001) (affirming suppression of statements obtained after the interrogating officer told the

defendant that "any details of what he was saying would not leave [the detective's] office, would

not leave for public consumption," because the defendant understood that his statements would

be shared within the criminal justice system). The officers' assurances that Rang's parents would

not be told about the offense did not amount to a promise that they would not use his statements

against him and, therefore, did not so undermine the <u>Miranda</u> warnings as to vitiate their impact.

      With respect to the actual phrasing of the <u>Miranda</u> warnings, the court finds no error with

the phrase "[a]nything you say can be used against you in court." <u>Miranda</u> itself uses comparable

language. 384 U.S. at 479 ("He must be warned prior to any questioning that he has the right to

remain silent, that *anything he says can be used against him in a court of law*, that he has the

right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed

for him prior to any questioning if he so desires." (emphasis added)); <u>see also</u> <u>Duckworth v.

Eagan</u>, 492 U.S. 195, 198, 203 (1989) (holding that the warnings given to the petitioner—which

included the sentence, not disputed in that case, that, "[a]nything you say can be used against you

in court"—"touched all of the bases required by <u>Miranda</u>"). Officers need only "reasonably

convey to a suspect his rights as required by <u>Miranda</u>." <u>Id.</u> at 203 (internal quotation marks and

brackets omitted) (quoting <u>California v. Prysock</u>, 453 U.S. 355, 361 (1981) (per curiam)). Since

"the rigidity of <u>Miranda</u> [does not] extend[] to the precise formulation of the warnings given a

criminal defendant," <u>Prysock</u>, 453 U.S. at 359 (internal quotation marks omitted)), the omission

of the word "will" has no impact on the legitimacy of the warnings provided.

Accordingly, none of the officers' pre- or post-<u>Miranda</u> representations and assurances, considered in their totality, rendered the warnings ineffective.

    2.  Waiver

Rang also asserts that he did not validly waive his <u>Miranda</u> rights. To use Rang's statements made during the custodial interrogation against him in court, the government must show by a preponderance of evidence that he waived his rights knowingly, intelligently, and voluntarily. <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986); <u>Miranda</u>, 384 U.S. at 444. "A waiver is knowing and intelligent when 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" <u>United States v. Bezanson-Perkins</u>, 390 F.3d 34, 39 (1st Cir. 2004) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)). It is "voluntary when 'it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" <u>Id.</u> (quoting <u>Moran</u>, 475 U.S. at 421). The court must examine the "totality of the circumstances surrounding the interrogation." <u>Id.</u> at 40 (quoting <u>Moran</u>, 475 U.S. at 421).

With respect to the knowing and intelligent waiver of rights, the threshold issue is whether the defendant understood his rights. Whether the interrogating officer *perceived* that the defendant understood is immaterial. <u>Compare</u> <u>United States v. Garibay</u>, 143 F.3d 534, 535, 537, 538, 539 (9th Cir. 1998) (waiver was not knowing and intelligent where the defendant with limited English proficiency and borderline "retard[ation]" "was not aware of the nature of the constitutional rights he was waiving" and the agent frequently had to rephrase his questions because the defendant did not appear to understand, even though he claimed to have understood); <u>Cooper v. Griffin</u>, 455 F.2d 1142, 1145, 1146 (5th Cir. 1972) (waiver was not knowing and

intelligent where "it [was] doubtful that [the defendants, whose IQs ranged between 61 and 67,] even comprehended" the Miranda warnings, regardless of testimony from the interrogating officer that they "'appeared' to understand") with United States v. Robinson, 404 F.3d 850, 861 (4th Cir. 2005) (the defendant, who had a low IQ and numerous mental disorders, knowingly and intelligently waived his rights where he indicated that he understood them and "nothing in the record" indicates he did not); United States v. Turner, 157 F.3d 552, 554, 555 (8th Cir. 1998) (knowing and intelligent waiver where the defendant, whose IQ was in the low-average-to-borderline range, was "clearly intelligent enough to understand his rights"). Prior experience and familiarity with the criminal justice system also is an important factor in this analysis. See United States v. Rojas-Tapia, 446 F.3d 1, 8 (1st Cir. 2006); Robinson, 404 F.3d at 861.

Rang has presented evidence of his borderline intellectual functioning, as well as diagnoses of Bipolar Disorder and Attention Deficit Hyperactivity Disorder, which he was not treating with medication. Both he and his mother testified at the evidentiary hearing that he showed signs of developmental disabilities starting at an early age, and his mother recalled that doctors referred to him as "mentally retarded." In third grade, Rang was placed in a learning support special education classroom, where he remained until graduating high school. Rang further presented testimony from Dr. Catherine L. Leveroni, Ph.D., ABPP, a licensed and board-certified clinical neuropsychologist who evaluated his cognitive abilities in August 2015. According to Dr. Leveroni, Rang presents with borderline intellectual functioning and is limited in his higher order thinking abilities. In particular, she testified that he has an impaired ability to understand complex or abstract concepts, to apply logic, and to use sound judgment. She opined that people who interact with him might not readily be aware of his impairment, due to his strong social skills, average vocabulary level, and ability to follow straightforward directions. The court

credits this testimony of Dr. Leveroni.

Nevertheless, the court finds that Rang was able to understand the <u>Miranda</u> rights as administered to him. "[T]here is nothing cognitively complex about the advice that one has a right to remain silent and not to talk to the police." <u>Jackson v. McKee</u>, 525 F.3d 430, 436 (6th Cir. 2008) (quoting <u>Finley v. Rogers</u>, 116 F. App'x 630, 638 (6th Cir. Nov. 18, 2004)). Of particular significance are Rang's comments after being provided with the waiver-of-rights form, which contained the warnings but did not use the term "<u>Miranda</u> rights." Reviewing the form, Rang stated, "This is just <u>Miranda</u> rights . . . I know my <u>Miranda</u> rights." He added, "I understand. I've been arrested before. I kind of know." His unprompted identification of the warnings as "<u>Miranda</u> rights" demonstrates his prior familiarity with the rights. His previous experience with the criminal justice system and his insistence that he understood further weighs toward a finding that his waiver was knowing and intelligent.

Although Rang testified at the evidentiary hearing that he had not paid attention as the officers informed him of his rights, this contention is belied by the recording, which reveals his active and responsive participation during that time. Rang's claim at the evidentiary hearing that he did not read the waiver-of-rights form is refuted by his unprompted identification of the warnings as "<u>Miranda</u> rights," his reading aloud portions of the form before signing it, and Inspector Connelly's testimony that he observed Rang's eyes moving from side to side while looking at the form. For these reasons, despite evidence of his impaired ability to understand complex or abstract concepts, nothing in the record suggests that Rang did not comprehend his right to remain silent.

Moreover, the court finds that Rang voluntarily waived his rights. Although Rang testified at the evidentiary hearing that, before beginning the audio recording, the officers yelled

and threatened him with jail if he did not speak, the court does not credit this testimony. Rang

sounded comfortable and jovial with the officers at the beginning of the recording, which is

inconsistent with his description of coercive statements purportedly made to him moments

earlier. The officers maintained calm and friendly tones throughout most of the recording, raising

their voices only moderately when Rang provided seemingly implausible explanations for the

transmission of the sexually-explicit communications to the complainant. Referring to the

officers who had arrested him years earlier for a prior offense, Rang commented that Inspector

Connelly and Trooper Smith "are actually decent compared to the last ones actually." Further, as

discussed above, the officers did not engage in impermissible trickery or deceit to prompt Rang

to waive his rights.

Based on the totality of the circumstances, the court finds that Rang knowingly,

intelligently, and voluntarily waived his <u>Miranda</u> rights.

### 3. *Voluntariness of Statements*

Rang next argues that Inspector Connelly and Trooper Smith obtained the statements

involuntarily in violation of due process. The government carries the burden to show, by a

preponderance of the evidence, that the statements were obtained voluntarily. <u>Lego v. Twomey</u>,

404 U.S. 477, 489 (1972). The central inquiry when analyzing a claim that a confession offends

due process is "'whether [the] defendant's will was overborne' by the circumstances surrounding

the giving of a confession." <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000) (quoting

<u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)). The reviewing court must weigh "the

totality of all the surrounding circumstances—both the characteristics of the accused and the

details of the interrogation." <u>Id.</u> (quoting <u>Schneckloth</u>, 412 U.S. at 226). "Relevant

considerations may include the length and nature of the questioning, any promises or threats

made, and any deprivation of essentials (e.g. food, water, sleep, bathroom facilities) imposed upon the suspect." Hughes, 640 F.3d at 438. "They also may include an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state." Id.

"[A] defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional voluntariness." Connelly, 479 U.S. at 164 (internal quotation marks omitted). Nevertheless, "[w]here . . . a person's compromised mental state is *known* to interrogating officers, a lesser quantum of coercion is required to call an ensuing confession into legitimate question." Hughes, 640 F.3d at 438-39 (emphasis added); accord Hill v. Anderson, 300 F.3d 679, 682 (6th Cir. 2002); Nickel v. Hannigan, 97 F.3d 403, 410 (10th Cir. 1996); United States v. Sablotny, 21 F.3d 747, 751-52 (7th Cir. 1994). As the First Circuit stated in Hughes, "[p]olice officers must . . . be sensitive to a suspect's mental condition." 640 F.3d at 440. "They must exercise caution when dealing with a suspect whose compromised mental state is known to them." Id.; see also United States v. Preston, 751 F.3d 1008, 1010, 1014, 1026, 1028 (9th Cir. 2014) (en banc) (concluding that, even if the officers' methods—feeding details of the crime to the defendant, purposefully structuring questions in a confusing manner, implying that the defendant would not be permitted to leave until the interrogation ended, and drafting a confession which they described as merely an apology letter that would remain in the U.S. Attorney's file—were constitutionally permissible if employed on a suspect without an intellectual disability, these methods resulted in an involuntary confession when used to confuse and compel a confession from an eighteen-year-old with "exceptionally limited linguistic ability" and "significant problems with verbal communication and comprehension").

However, where a defendant with an intellectual disability appears capable of understanding his rights *and* law enforcement does not use coercive tactics, courts are less apt to find that his or her will was overborne. For example, in <u>Smith v. Mullin</u>, 379 F.3d 919 (10th Cir. 2004), the court concluded that officers did not overbear the defendant's will because the defendant, who had "mild to borderline mental retardation" with comprehension similar to a twelve-year-old, reported that he "believed" he understood his <u>Miranda</u> rights and the interrogation was "fairly gentle" and "relatively brief." <u>Id.</u> at 933, 934-35. Similarly, in <u>United States v. Santos</u>, 131 F.3d 16 (1st Cir. 1997), the First Circuit concluded that an incarcerated suspect's statements were voluntary, even though he had chronic paranoid schizophrenia, where he did not appear to experience difficulty understanding questions, gave appropriate answers, and was able to understand his rights. <u>Id.</u> at 18, 19. Although the interrogating officer yelled at the suspect a few times, the court did not deem this to rise to the level of coercion. <u>Id.</u> at 19.

In this case, as discussed above, Rang was capable of understanding his rights. Moreover, he gave coherent answers which signaled his understanding of the questions asked. Although he was evasive and provided multiple explanations for the sexually-explicit communications before ultimately admitting that he had sent them purposefully, this is not inconsistent with an ordinary suspect's behavior when confronted with evidence of illicit and socially stigmatized activity.

Additional factors point to the voluntariness of the confession. The interrogation lasted only two hours and twenty-two minutes. Although the room was unheated and Rang was not dressed warmly, the officers multiple times offered to get him warmer clothing, which Rang declined. He was offered bathroom breaks and water, which he also turned down. The officers maintained even tones throughout the interrogation and never yelled at or threatened him. At times, the officers even laughed with him.

14

Rang points to practices by Inspector Connelly and Trooper Smith that he claims were deceptive and intentionally exploitative of his cognitive impairments. Specifically, they downplayed the significance of the investigation. They stated that Rang would "go on [his] merry way" if the search did not yield any incriminating evidence and explained that such incriminating evidence might include the presence of children or illicit drugs in his basement. They suggested that his parents would not learn of his incriminating statements. While arguably misleading, these tactics do not rise to the level of deception or trickery to overbear Rang's will, even if the officers had been aware of Rang's cognitive impairments.[3] The officers asked straightforward questions and advised him that they would relate his responses to the U.S. Attorney's Office. There is nothing to suggest that their methods were tailored to exploit Rang's cognitive impairments.

Consequently, the court finds, by a preponderance of the evidence, that Rang made the incriminating statements voluntarily.

IV.   <u>Conclusion</u>

For the above-stated reasons, Rang's <u>Motion to Suppress Statements</u> [#41] is ALLOWED in part and DENIED in part. Specifically, the court grants the motion to suppress all statements

---

[3] Rang has presented evidence, in the form of testimony and affidavits from his mother, that, on the morning of December 29, 2014, she told multiple officers that her son was "mentally retarded" and had the cognitive abilities of a twelve year old, and that a female officer told her she would relay this information to the interrogating officers. At the evidentiary hearing, U.S. Postal Inspector Rachel Heintz testified that she was the only female officer present that day and that Rang's mother told her that Rang had a history of violence but never mentioned his cognitive abilities.

The audio recording of the interrogation demonstrates that, well into the interrogation, Rang told the officers that he had Bipolar Disorder and Attention Hyperactivity Deficit Disorder. However, he did not tell them about his cognitive impairments. Although he told them, at the beginning of the interrogation, that his "mind [was] not working 100%," this was in the context of him being tired because he had just woken up.

obtained during the interrogation before the officers advised Rang of his <u>Miranda</u> rights. The court denies the motion with respect to statements Rang made after the officers apprised him of his rights and he stated his intention to waive them.

      IT IS SO ORDERED.

Date: January 6, 2017                      <u>/s/ Indira Talwani</u>
                                           United States District Judge