```
 1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2


 3
      THE UNITED STATES OF AMERICA        )
 4                                        )
                                          )
 5    vs.                                 )  CR No. 15-10037-IT
                                          )
 6                                        )
      ROBERT RANG                         )
 7


 8
      BEFORE:  THE HONORABLE JUDGE INDIRA TALWANI
 9


10
               TESTIMONY OF CATHERINE LEVERONI, Ph.D.
11
          (EXCERPTED FROM THE HEARING ON THE MOTION TO SUPPRESS)
12


13


14


15              John Joseph Moakley United States Courthouse
                             Courtroom No. 9
                             One Courthouse Way
16                           Boston, MA 02210
                          Friday, December 9, 2016
17


18
                        Cheryl Dahlstrom, RMR, CRR
19                         Official Court Reporter
                John Joseph Moakley United States Courthouse
20                  One Courthouse Way, Room 3510
                             Boston, MA 02210
21            Mechanical Steno - Transcript by Computer


22


23


24


25
```

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By:  David Tobin, AUSA
3              Anne Paruti, AUSA
          One Courthouse Way
4         Boston, Massachusetts 02210.
          On behalf of the Government.

5

6         SWOMLEY & TENNEN, LLP
          By:  Eric B. Tennen, Esq.
7         50 Congress Street
          Boston, Massachusetts 02109.
8         On Behalf of the Defendant.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2   Testimony of:            Direct  Cross  Redirect  Recross

3
    CATHERINE LEVERONI,
4   Ph.D.

5     By Mr. Tennen            4                51

6     By Ms. Paruti                   34

7

8                           E X H I B I T S

9   No.    Description                        For ID/In Evd.

10  1      2010 testing report of Dr. O'Connell..... 33

11  2      2005 evaluations done by Panther Valley . 33
           School
12
    3      Report of Dr. Leveroni.................    33
13

14

15

16

17

18

19

20

21

22

23

24

25

1    (EXCERPT AS FOLLOWS:

2         CATHERINE LEVERONI, Ph.D., Sworn

3         THE CLERK:  Please state your name for the record.

4         THE WITNESS:  Catherine Leveroni.

5         THE CLERK:  You may have a seat.

6         MR. TENNEN:  There's some water there if you need it.

7         THE WITNESS:  Thank you.

8         MR. TENNEN:  May I?

9    DIRECT EXAMINATION BY MR. TENNEN:

10   Q.   Can you also spell your name for the record?

11   A.   Sure.  L-e-v-e-r-o-n-i.

12   Q.   What do you do, Doctor?

13   A.   I'm a neuropsychologist.

14   Q.   What does that mean?

15   A.   So, basically, I'm a clinical psychologist, and my area of

16   expertise is in the assessment of cognitive functions, thinking

17   functions and brain functions.  So, basically, we use

18   paper-and-pencil tests to get a window into the functioning of

19   different systems in the brain and to understand how that

20   functioning might impact somebody's day-to-day behavior.

21   Q.   Can you give the Court just a brief sketch of your

22   educational background?

23   A.   Sure.  So I have a -- I received a master's and a doctoral

24   degree from what is now called the Rosalind Franklin University

25   at the Chicago Medical School, and it was -- I have a degree in

1   clinical psychology with a specializations in neuropsychology.

2   I completed a one-year internship at Brown University and then

3   did a two-year postdoctoral fellowship specializing in

4   neuropsychology.

5   Q.   When did you receive your Ph.D.?

6   A.   1999.

7   Q.   Are you licensed, by the way?

8   A.   I'm licensed in Massachusetts, and I'm board certified in

9   clinical neuropsychology.

10  Q.   How long have you been licensed and board certified?

11  A.   I finished my fellowship in 2001, became licensed in

12  Massachusetts, and I was board certified, I believe, in 2008.

13  Q.   You said you're a neuropsychologist.  You described a

14  little bit about what a neuropsychologist does.  Where are you

15  presently employed?

16  A.   I work at Massachusetts General, the Psychological

17  Assessment Center.

18  Q.   What does your sort of day-to-day practice entail?

19  A.   Well, we service the Mass. General medical community, and

20  so it's pretty broad in terms of the kinds of patients that we

21  see.  I generally see adults or older adolescents who are in

22  that transition from adolescence to adulthood.  The range of

23  clinical questions varies.  There's a lot of medical patients,

24  patients with epilepsy, brain tumors; a lot of patients with

25  developmental conditions such as pervasive developmental

1   autistic spectrum disorders or learning disabilities; a lot of

2   patients in the older ages with neurodegenerative conditions as

3   well.  So we really run the gamut in terms of what we do.

4          I'm primarily a clinician, but I also run the training

5   program for neuropsychology for Mass. General, for the

6   Psychology Assessment Center.  And so we have -- right now we

7   have two graduate students, six postdoctoral fellows, and two

8   interns all in clinical neuropsychology, and I'm responsible

9   for their -- overseeing their supervision as well as the

10  trajectory of their education.

11  Q.   Large part of what you do seems to be assessments, right?

12  A.   Yes.

13  Q.   Can you estimate at all how many people you've assessed in

14  your career for neuropsychology problems?

15  A.   That's hard.  We've been tracking the numbers.  I see

16  about 200 patients a year.  I've been practicing for 15 and a

17  half years.  I'm not good enough at math enough to be able to

18  add that up but --

19  Q.   Have you ever treated anyone for neuropsychological

20  issues, or has your career been more focused on the assessment

21  side of it?

22  A.   So I have a background also in cognitive behavorial

23  psychology, and I have -- with a lot of experience with people

24  with sleep disorders and anxiety disorders.  I have worked

25  really closely since about 2002 with the behavioral medicine

1    program at Mass. General to develop treatments, both kind of

2    cognitively focused as well as emotionally focused, for

3    patients with cognitive disabilities and with neurological

4    disabilities.

5         I take on a small proportion of my own clients as

6    well, but it's mostly training and supervising therapists so

7    that they can best understand how somebody's cognitive

8    liabilities might impact their ability to benefit from

9    treatment and also the kinds of ways in which these treatments

10   can help them moved forward.

11   Q.   Have you ever testified before in any court as an expert

12   regarding these matters?

13   A.   Once.

14   Q.   Which court was that in if you recall?

15   A.   It was in the South County in Rhode Island.  I'm not sure

16   exactly the court.

17   Q.   Fair enough.

18   A.   It was in 2007, I think, or 2008.  It was a long time ago.

19   Q.   Have you ever published any articles?  First, just

20   generally, have you ever published any articles?

21   A.   Yes.

22   Q.   Have you published any articles about the kinds of issues

23   you're talking about in terms of neuropsychological problems,

24   assessments, things like that?

25   A.   Yes.  A lot of my publications are in epilepsy and in

1  memory functions and neuroimaging; but in the general field of

2  neuropsychology, I have.

3  Q.   When you do these assessments, you provide psychological

4  -- different sorts of psychological testing?

5  A.   Yes.

6  Q.   Where do you get training to provide those sort of tests

7  or how do you stay current with what to do?

8  A.   Well, the training comes from the education program.  My

9  doctoral training took, I guess, seven or eight years start to

10 finish, so it sort of starts from coursework to practical

11 training or what have you.

12       In terms of staying current, there's a number of

13 different things.  One is just maintenance of your license.  It

14 requires you to continually get a certain educational

15 component.  But also as a member of the American Board of

16 Clinical Neuropsychology, I'm very involved in staying current

17 with reading the position papers, reading on standards, as well

18 as serving as an examiner for applicants to the board.

19       MR. TENNEN:  I don't know if there's any question

20 about her expertise.  I can keep asking.  Otherwise, I would

21 move on.

22       THE COURT:  No.  Did you need to voir dire?

23       MS. PARUTI:  No, your Honor.

24       THE COURT:  That's fine then.

25       MR. TENNEN:  All right.

1  Q.   So, Dr. Leveroni, we're going to move now to your work on

2  this case.

3  A.   Sure.

4  Q.   So for starters, I wasn't the one who asked you to do --

5  did you do an evaluation of Robert Rang?

6  A.   I did.

7  Q.   I wasn't the one who asked you to do that, right?

8  A.   No.

9  Q.   It was his prior attorney?

10  A.   Yes.

11  Q.   What was it that she asked you to evaluate or assess?

12  A.   Attorney Pucci had contacted me and said that she just --

13  she wanted to gain some insights into Robert's ability to

14  understand what was going on with him in the context of

15  conversations.  She didn't provide me a lot of details about

16  his case, but she asked me to meet him and to talk with him and

17  to do some testing to get a sense of kind of the ways in which

18  he processes information, follows information, and what he

19  understands about it as that might relate to his case.

20  Q.   Does that fall in line with what you do on a sort of

21  day-to-day basis?

22  A.   Yes.

23  Q.   Do you recall what information she did give you, let's say

24  document-wise, that you reviewed before you met Mr. Rang?

25  A.   I do very much, but I'm also nervous about misspeaking.

1    So I'll just say she had given me two previous reports.  One

2    was 2005 evaluations done by the school district that included

3    intellectual testing and educational testing; and she gave me a

4    testing report from Dr. O'Connell from 2010, which was an

5    evaluation that Robert had in the context of a disability

6    evaluation.

7    Q.   I'm just going to approach and ask you if these are copies

8    of the reports that she gave you.

9    A.   This one, yes; and this one, yes.

10        MR. TENNEN:  Can I just have these marked for ID, your

11   Honor?

12        THE COURT:  Certainly.

13   Q.   Any other documentation that she gave you?

14   A.   No.

15   Q.   All right.  Let's start with -- were those relevant to

16   your assessment of Mr. Rang?

17   A.   Very, for a number of reasons.  One is because, as I

18   understand it, the condition that Mr. Rang has is developmental

19   in nature, and it's very hard to evaluate anybody for a

20   developmental condition unless you have documentation of

21   whether or not it actually existed.  And so, from one

22   perspective, there's that.

23        It also is relevant to -- any time you're doing an

24   examination with somebody you're trying to determine the

25   validity of your assessment, and part of the sort of how we

1   understand something to be valid is is it consistent with what

2   we understand of this person.  So just also to see how Robert

3   was doing during my evaluation relative to how he presented at

4   age 14 or, in 2010.  You know, there's some reference to

5   childhood testing as well.  It is very relevant in terms of

6   understanding whether I'm seeing something that is persistent

7   and representative or that is somewhat different.

8   Q.    Did you read these reports prior to meeting with Mr. Rang?

9   A.    Yes.

10  Q.    Do these reports also inform about how you're going to

11  conduct your assessment or what sort of tests you're going to

12  give?

13  A.    To some extent.  I mean, certainly, if somebody has had a

14  lot of testing before, you need to be careful about scheduling

15  in novel tests and tests that they would have practice on.

16  Also -- so, yes, I mean, previous testing always sort of

17  informs what we're going to do moving forward.  But I'm also

18  going to do tests that -- first of all, sometimes that I

19  typically do because it helps me to understand any client or

20  that are specific to understanding the kinds of things that I

21  am seeing as patterns for Robert in terms of his previous

22  difficulties that are going to kind of be able to answer the

23  specific referral question.

24  Q.    Ultimately, you met with Mr. Rang?

25  A.    Yes.

1    Q.    How many times?

2    A.    Once.

3    Q.    How long was that meeting, if you remember?

4    A.    I probably have it written down.

5          It looks like -- I think we were four hours.

6    Q.    Okay.

7    A.    10:30 to 2:30, about, together.

8    Q.    So prior to meeting with him, after having reviewed these

9    documents, what was your goal in your meeting with him?  What

10   were you trying to accomplish?

11   A.    I was -- first of all, I wanted to accomplish what his

12   intellectual level was.  And, again, I was meeting him in the

13   context of he was in a detention center, and he was awaiting

14   trial and that's a stressor.  And I didn't -- you never know

15   how something like that might affect somebody's cognitive

16   abilities.  So I wanted to see if there was consistency in the

17   way he was presenting in my evaluation with what I would have

18   expected based on his background.  Now I've forgotten your

19   question.  I'm sorry.

20   Q.    That's okay.  I'll ask another one.

21         What tests did you -- were you -- did you come --

22   sorry.  What tests were you prepared to use when you met with

23   Mr. Rang?

24   A.    Tests of intellectual function.  I chose the Wechsler

25   Adult Intelligence Scale IV.  He had never had that before, and

1    it's the most updated version of the most standard measure of

2    intelligence that we have in our field.

3         I wanted to look at his memory, his ability to sort of

4    take in information, process it, and retain that information

5    over a period of 30 to 40 minutes. So I chose a few memory

6    measures.

7         The Wechsler Intelligence Scale, I chose an earlier

8    version of it because it had repetition of some of the stories,

9    and I wanted to see what his learning was like in the

10   California Verbal Learning Test.

11        I wanted to look at aspects of his executive

12   functioning so how is Robert able to think sort of in a

13   flexible manner. Can he solve novel problems? Can he read

14   ambiguous situations? So I chose a number of various standard

15   measures of executive functioning.

16        Then I also picked a number of developmentally

17   oriented tests that look at someone's ability to process more

18   complex language and social language.

19   Q.   Did you perform all those tests when you met with him?

20   A.   I did.

21   Q.   Just to jump ahead, you ultimately reported the results of

22   all those reports in a report, right?

23   A.   I did.

24   Q.   Now, when you met with him, before giving him any tests,

25   did you talk to him a little bit?

1    A.    Yes.

2    Q.    What do you talk about when you do an assessment, when you

3    meet someone?

4    A.    One of the biggest things is to -- again, it's always

5    going to be based on the referral question and the presenting

6    issue.  Since Robert -- as I understood it, we're looking at a

7    developmental issue.  We talked a lot about development.  What

8    was school like for him?  Did he have special classes?  What

9    kind of help did he get?  How did he find it?  What were the

10   things that were easy for him, hard, to get a little bit more

11   of his developmental background.  We also talked a little bit

12   about just current snapshot of his symptoms.  But mostly I

13   focused on development because that was really key to sort of

14   best understanding him and, like I said, just sort of get a

15   snapshot of how he's feeling on the day of the evaluation as

16   that was relevant.

17   Q.    With respect to development, what did he tell you that you

18   found relevant in terms of your assessment?

19   A.    He had special education services beginning -- this is

20   what I'm getting from Robert but that beginning about in the

21   third grade he was in separate classrooms; that he was able to

22   get through school with special education services.  He worked

23   with his dad for a number of years; but when his dad retired

24   and he tried to work in competitive employment, that was

25   difficult for him.  He had trouble staying focused at Wal-Mart

1    and in other factory positions.

2         Robert talked a lot about some of the struggles that

3    he had with behavioral regulation as a child and some issues

4    with -- that sometimes he could be angry and yell at his

5    parents or be sort of -- you know, just argue with his friends

6    but that that was something that -- I don't know if I would say

7    it was a struggle but that we were talking about how he handles

8    those kinds of things.

9         So I was just trying to get a sense of what kinds of

10   things were struggles for him when he was growing up and just

11   what his educational environment was.

12   Q.   Did what he report to you -- was that consistent with what

13   you had read about him in the reports?

14   A.   Yes, absolutely.

15   Q.   So after you talked to him for a little bit and got that

16   background, did you start performing some testing?

17   A.   Yes.

18   Q.   I don't know if you remember the order.  What's the first

19   test you gave him?

20   A.   I would say that I don't remember the order.  I know that

21   I always start with -- there's three tests that I always start

22   with because, you know, I bring a whole bunch of tests, but

23   sometimes the choice of one test might be dependent on

24   something else.

25        So I always start with a span memory test where I have

1    him repeat digits forward and then reverse digits and sequence

2    digits just to get a source of his intentional -- his

3    attentional engagement with the test.  There's also a validity

4    measure built into that test as well so I can get a sense of

5    whether or not somebody's effort appears to be straightforward,

6    and it will help me pick some of the memory tests, what the

7    length of them should be.  Then I usually go with a knowledge

8    test.

9    Q.   Can I stop you and ask you a question?

10   A.   Yeah.

11   Q.   That sounds like something you sort of get an immediate

12   result for?

13   A.   Yes.

14   Q.   And so in this case, what were the results of that

15   testing?

16   A.   His performance was in the borderline range and -- with a

17   span of four forward and three backward and five sequencing,

18   and his effort appeared valid.

19   Q.   What does "borderline" mean?

20   A.   So borderline is the term that, as psychologists, we use

21   when -- all of our tests are norm referenced.  We're always

22   comparing somebody to a normative sample of people in their age

23   range, sometimes their educational level as well.

24        From these, we mathematically derive scores that get a

25   sense of how that person is doing relative to their peers.  The

1    best way to understand it is by percentile rank, which

2    generally is a percent of people that someone does better on on

3    a given test.  Based on the percentile rank score, we

4    understand that to be average within the range of what most

5    people do, sometimes above average, sometimes below average.

6    Once a score gets below the ninth percentile, it's sort of in

7    the what we call borderline impaired, or some people call it

8    mildly impaired range.

9    Q.   I should say you wrote a report that captured all of this?

10   A.   Uh-huh.

11   Q.   Right?

12        MR. TENNEN:  I'm just going to approach.

13   Q.   Here's a copy of the report that you wrote.

14   A.   Yes.

15        MR. TENNEN:  I guess I would move it into evidence or

16   at least mark it as ID.  You're obviously hearing from her.  I

17   don't know if it matters, but if it's something you wanted to

18   look at while she's testifying.

19        THE COURT:  This is the report that's attached --

20   that's already been submitted?  Or is this different?

21        MR. TENNEN:  Oh, no.  So -- sorry.  What was submitted

22   under seal, Exhibit C, by Jen Pucci is actually one of the

23   reports that has been marked for ID.  This is the report that

24   Dr. Leveroni herself authored and has all the results of the

25   tests that she --

1      THE COURT:  Let's mark it as an exhibit then.

2      MR. TENNEN:  For that and the two IDs, I would ask

3   that those be submitted under seal.  I'm sorry.  I didn't think

4   forward about it, but one of them already has been.  And Dr.

5   Leveroni's report and the other one, for the same reasons, I

6   would ask that those be held under seal.

7      THE COURT:  Those will be held under seal.

8      MR. TENNEN:  Okay.  Thank you.

9   Q.   We talked about the first test, the --

10  A.   The digit span test or the attention span test.

11  Q.   So it sounds like that may have affected what other tests

12  you gave him that day, the results of that?

13  A.   I basically -- mostly for the memory testing, because we

14  have lists that we like people to learn to look at what their

15  learning curve looks like.  Some of them are nine items; some

16  of them are 12 items; some of them are 16 items.  We usually

17  like to use what somebody's attention span is to pick the most

18  appropriate list for their attentional abilities.

19  Q.   What other tests did you give him?  If it's not in order,

20  just --

21  A.   I don't know the order.  But I gave him a full Wechsler

22  Adult Intelligence Scale.

23  Q.   She will ask, so can you just spell Wechsler for her?

24  A.   Yes.  W-e-c-h-s-l-e-r.

25  Q.   Is that sometimes colloquially referred to as an I.Q.

1    test?

2    A.   Yes.  It's colloquially referred to as an I.Q. test and,

3    by psychologists, a WAIS, W-A-I-S, so that's probably the

4    easiest to refer to it.

5         I did a cognitive screening measure just to get a

6    sense of Robert's orientation to time and place.

7         I did -- from memory tests, I did the logical memory

8    subtest of the Wechsler Memory Scale and the California Verbal

9    Learning Test, the nine-item version of it.

10        From a language perspective, I did something called

11   the Wide Range Achievement Test to look at his reading level,

12   and I picked some subtests from something called the

13   Comprehensive Assessment of Spoken Language.

14        I also picked a judgment test from something called a

15   Neuropsychological Assessment Battery, to look at his ability

16   to assess mostly the questions about safety; something called

17   the Wisconsin Card Sorting Test, which is a problem solving and

18   reasoning test, which looks at someone's -- the flexibility of

19   someone's thinking when the rules are changing; and the

20   Trailmaking Test, which is a test of more complex attentional

21   functions.  It requires somebody to hold more than one idea in

22   their head and shift quickly back and forth.

23   Q.   Did you give him some sort of emotional or behavioral

24   functioning test?

25   A.   I did.  I did the Beck Depression Inventory with him which

1    -- basically, it's a questionnaire that asks about different

2    groups of systems that can be associated with depression to get

3    a sense of what his experiences were like at that time.  And I

4    did something called the Brief Symptom Inventory 18 which

5    requires him to report on the symptoms that he is experiencing

6    at this time.

7    Q.   Was he able to take all the various tests that you gave

8    him?

9    A.   He was; he was.

10   Q.   Are any of those tests -- do they provide immediate

11   results, or is that something you have to go back and score?

12   A.   I have to go back and score them all.

13   Q.   So other than the first test you gave him for memory, was

14   there anything else you could take away from your interview

15   with him that day with respect to the testing?

16   A.   I'm not sure I understand the question.

17   Q.   Were you able to get any results or make any conclusions

18   about his functioning that day when you met with him?

19   A.   Absolutely.  I mean, all the tests need to be scored; but

20   if you do this every day, you have a sense, based on working

21   with somebody, how they're doing, you know, what -- you know,

22   as well.

23   Q.   So that day, what was your sense?

24   A.   You know, my sense was that -- I also make a lot of

25   observations.  My sense was that Robert was very engaged in

1    what we were doing.  He's very socially appropriate.  He's very

2    -- you know, engages in reciprocal conversations that were

3    appropriate, not intrusive or -- but he asks appropriate

4    questions.  He shows normal gestures, normal eye contact.  He

5    looks you in the face when he talks to you.  He nods when he's

6    listening to you to signal that he's paying attention.

7         I know I was meeting him at a time where he was very

8    -- he was forthright about emotionally how he was feeling.  He

9    had some insight into his own behavior, and he was -- he wasn't

10   guarded, you know, in any way about sort of sharing that

11   information with me.  That's kind of what I noticed about him

12   just sort of working with him.

13        He also seemed -- I wouldn't say eager to please, but

14   he was -- he wanted to do -- he appeared to want to do a nice

15   job and appeared reasonably engaged in the testing.  There were

16   measures that were familiar to him and, you know, he was very

17   cooperative.

18   Q.   Go ahead if there's more.

19   A.   That's what I observed, yeah.

20   Q.   Were you able to draw any conclusions that day, before you

21   got the testing results, about any cognitive limitations that

22   he may have had?

23   A.   Yeah.  So, you know, it was clear that there were some

24   things that were extremely hard for Robert.  Overall, the more

25   complex the task was, the more difficult it was for him.  But,

1    in general, Robert did very well on things that were

2    straightforward or things you could have learned in school.  So

3    he was able to add in his head.  He was able to read at an

4    average level.  He knew the meanings of some words.  He could

5    sort of engage in those things.

6         But one you got away from sort of the rubric of what

7    someone would have learned in school or taught him, he really

8    didn't have a good approach to solving problems.  So the more

9    abstract a question was, the more it required him to think

10   about the meaning behind the obvious, the harder it was for

11   him.

12        It was particularly evident on some of the tests of

13   executive functioning where he would need to not just solve a

14   problem based on what he thinks.  He also needed to solve a

15   problem based on the feedback he was getting about what was

16   going right and what was going wrong.  He would need to be able

17   to analyze not just what's in front of him but also what's

18   happening in front of him.  And, you know, he was at the first

19   percentile on that test.  He really couldn't do it.  He

20   couldn't process all the different ways to solve the problem.

21   And in the face of rule change, he couldn't shift his behavior

22   and figure out what was going on.  That was evident -- even

23   without scoring up that test, it was evident that that was

24   something that was very hard for him.

25   Q.   Now, ultimately, when you went back and scored all the

1    tests -- I'm not going to have you go through each one and give

2    me all the scores.  But can you just maybe summarize a little

3    bit what you were able to deduce about his cognitive

4    limitations after having scored the various tests?

5    A.   So Robert's full scale I.Q., which is in a summary scale

6    of all the subtests on the intellectual battery that I gave

7    him, fell in the fourth percentile.  It was a full-scale I.Q.

8    of 74, which is in what we call the borderline range.  Again,

9    at the fourth percentile, meaning better than -- or at the

10   level of -- 4 percent of people perform at that level.

11   Q.   You just used the word "borderline," and that's come up.

12   Can you just explain what you mean by that?

13   A.   Yeah.  So I think, in the old days, you know, it probably

14   would have been referred to as borderline mentally retarded,

15   but we don't really use that terminology anymore.  But it

16   basically means it's not frankly impaired or deficient, but

17   it's really going in that direction, and it's certainly not

18   within the average range.

19   Q.   Okay.  So you were telling us some of the results of that

20   I.Q. test.

21   A.   Right.  As I told you, when I look at his relative

22   strengths, his relative strengths were consistently in things

23   that we call crystalized knowledge, like I said, able to

24   perform some math, able to read; able to -- he knows a few

25   facts about the world.  He knows the meanings of words.  He's

1  able to solve -- like, to complete visual puzzles.  So, you

2  know, if there's a -- put together blocks to look like a

3  picture, that was in the low-average range, or to complete --

4  to be able to synthesize visual information.  These are the

5  things that he did relatively well.

6         His straightforward attention was low-average or what

7  have you.  But, as I said, once the complexity turned up, his

8  scores were a little bit lower with borderline scores second

9  percentile for a reasoning task where he just had to find a

10  pattern and find the missing piece.  He wasn't able to navigate

11  that test almost at all.

12         Abstract -- verbal abstract reasoning, where he had to

13  find -- you know, to be able to articulate the relationship

14  between words was very low, at the fifth percentile.

15         His ability to understand social conventions and rules

16  and expressions was very low, at the fifth percentile.  So

17  things like, if we said, Why does a person need a license to

18  practice some professions, you know, just understanding that

19  they need the license but not able to figure out the why of it,

20  how that protects the public or how that assures someone's

21  qualifications.  He really wasn't able to sort of produce that

22  level of knowledge.

23         From a language perspective, he was able to follow

24  commands.  So if I told him to do something, he was able to do

25  that, and he seemed to follow conversations just fine.  He

1   answered all of my questions appropriately.  His conversation

2   was on topic.  If I asked him a question and we were talking

3   about school, we continued to talk about school.  But when I

4   broke down his language and really tried to understand his

5   ability to break down words and more social and nuanced aspects

6   of language, he was sort of in the borderline range for some

7   aspects of that, and most of his scores were well below his

8   chronological aim.  So, for example, I asked him to give me two

9   meanings for a sentence.  Like an example might be if I said,

10  It is light.  What are two ways to understand that statement,

11  you know, that it's something is not heavy or the illumination

12  in the room.  He really had tremendous difficulty with that,

13  scoring at the borderline range, at the 11-year-old grade

14  equivalent or an age equivalent of 11.

15          His ability to understand the meaning of unfamiliar

16  words from the context of a sentence, so when he doesn't know a

17  word, can he guess what it might mean based on the context of

18  the sentence.  Again, his score is at the fourth percentile and

19  at an age equivalent of 13.

20          And so even though he seemed to be following the

21  interview and he was able to follow commands, when you really

22  look at his ability to sort of -- deeper at his ability to sort

23  of understand what was being said to him, he certainly had

24  these liabilities.

25          I'm not done.  Is that okay?

1    Q.   No.  That's okay.

2    A.   I looked at memory, you know, both for something that's

3    contextual, like the length of a paragraph, with a beginning, a

4    middle and an end and his ability to sort of learn something

5    over time.  And with something that was brief and simple and

6    that was repeated, which is the list of nine words, he

7    performed quite well.  His learning was average.  He learned

8    eight of the nine words; and ten minutes later, he remembered

9    all eight.  So when it was broken down in the simple format and

10   given to him over multiple trials, he did quite well.

11        But when I read him stories that were not very long,

12   his scores were very low, fifth percentile.  But more than

13   that, it was really striking that he didn't even understand the

14   meaning of the stories.  So, for example, the first story I

15   read him was about a woman who was a cook and who was robbed,

16   and the police took up a collection to help her.  And Robert

17   understood that there was a woman who was a teacher who did

18   something wrong but the police let her go.  So it's not just

19   that he didn't remember very much about the story.  He didn't

20   understand the sorry .  He didn't understand the meaning of it.

21   He didn't even get the gist of it.  I thought it was pretty

22   striking, again, this disconnect between what he's able to do

23   with straightforward language versus what he was able to do

24   with embedded language and contextual language.

25   Q.   At one point earlier on you had mentioned that these tests

1  have what they call validity scales.  What does that mean,

2  first of all?

3  A.   So there are aspects of functioning that -- you know that

4  are hard, and then there are things that might look hard but

5  they're really easy, or there are ways in which we expect

6  somebody to be consistent in their behavior.  One thing that we

7  do is we look at whether somebody's consistent in their

8  behavior and whether or not they're able to pass a very easy

9  measure that doesn't look easy because, if they're not, that

10 might suggest to us that perhaps they're not putting full

11 effort.

12 Q.   In this case, what did the -- were there any issues with

13 the validity of these examinations?

14 A.   So I had two embedded validity measures in the testing,

15 and his performance was above cutoff for reduced engagement or

16 reduced effort on both of the measures.

17 Q.   Meaning that you can trust that these tests are valid?

18 A.   Right.

19 Q.   Were your conclusions consistent with what you had seen

20 for some of those records that you were provided?

21 A.   They were wholly consistent with the records.  The testing

22 was more extensive and more detailed in ways that the

23 educational record and the disability record were not.  They

24 were mostly focusing on I.Q. and academic functions.  And this

25 took it a step further, looking at more aspects of brain

1     functioning.  But for those tests that were common, they were

2     wholly consistent with them.

3     Q.    One of the things you talked about was -- I think you said

4     he had -- I'm paraphrasing, and if you're wording it

5     differently, please correct me -- a difficulty with abstract

6     thinking?

7     A.    Yes.

8     Q.    I want to focus on that a little bit.  First of all, is

9     that something that can be measured to an age range, like he

10    has that ability to a certain level that we would expect?

11    A.    In children, we could; in adults, we don't do it that way

12    because we assume that it is -- that it is a function.

13    Obviously, reasoning does fluctuate over the lifetime a bit,

14    but it's a little bit more stable in adults.  So with the

15    measures that I gave him, I wouldn't be able to log it with an

16    age range.

17    Q.    In your experience, someone who has that problem, how does

18    that sort of translate in the day-to-day world?

19    A.    Well, I think, you know, being concrete in your thinking,

20    it's sort of -- to some extent, it might depend on what the

21    rest of their profile looks like.  If somebody is concrete in

22    their thinking, they may have difficulty navigating social

23    situations.  They may have difficulty solving problems.  They

24    may have difficulty sort of making decisions, you know, that

25    are informed or that are -- consider all aspects of the

1   situation.  They may be naive, and sometimes they're vulnerable

2   to undue influence because they can't problem solve what's

3   going on with somebody else.

4   Q.   You talked a little bit about -- I don't know if it was

5   the same test or something different, where you noticed an

6   inability for him to sort of see different meanings for words.

7   A.   Yeah.

8   Q.   Is that -- are we talking about the same thing here?  Is

9   that related to the abstract thinking, or is that something

10  different?

11  A.   It can be related.  It also could be separate.  You could

12  have somebody who has fine abstract thinking but has a problem

13  with language processing per se.

14       In Robert's case, I think that his language processing

15  is more normal but that he's having difficulty -- the

16  difficulty he's having is that the abstract thinking problem is

17  interfering.  So in his case, I think it's related.

18  Q.   Now, as the result of all this testing, do you diagnose

19  him with anything?  Is this something that's diagnosable, or is

20  this just sort of observations about his cognitive abilities?

21  A.   I did not, but I suppose he would -- you know, mild

22  intellectual disability or mild -- I think it's probably more

23  than mild cognitive impairment but -- would be an appropriate

24  diagnosis.  He carries a diagnosis of ADHD and bipolar disorder

25  because of his behavior regulation issues in childhood, but I

1    did not do an examination to determine if he still met criteria

2    for bipolar disorder.

3    Q.   For the testing you did and sort of the assessment that

4    you did, is there any relevance that he has a diagnosis of ADHD

5    or bipolar disorder?  Does it affect any of that?

6    A.   No.

7    Q.   Are the problems he had, is that something that you as an

8    expert can sort of -- can you explain how or why he has these

9    problems, how they started, where they took root?

10   A.   You know, that sounds like a very complicated scientific

11   question, but they're developmental in nature.  Everybody has

12   strengths and weaknesses.  Some people have learning disorders.

13   And the why of that, from a genetic or, you know, environmental

14   perspective is a little complex, but I would liken this to sort

15   of a learning disorder.  This is his pattern of strengths and

16   weaknesses.  This is his cluster of things that he struggles

17   with.

18        My guess is it has something to do with perinatal

19   development and with brain development.  I mean, it doesn't

20   appear to be related to an educational deficit or social

21   problems in the home or what have you.  It seems to be

22   something that's intrinsic to Robert, that he had adequate

23   education and stability in his home.

24   Q.   Are these problems things that can be treated or cured in

25   any way?

1    A.   Well, it's a developmental disability and it's part of

2    him, so "cure" isn't really a good model for understanding it.

3    I think treated, we look at mitigating symptoms.  We look at

4    compensation.  We look at teaching people ways to break down

5    information, solve problems a little bit differently.  We like

6    to think that we can help people function as independently as

7    possible, but, you know, it varies in terms of how much we're

8    able to help people with their independent functioning versus

9    not.

10   Q.   Is any of that helped through medication, or is it some

11   other form of treatment?

12   A.   I can't think of a medication that would help or that

13   would be --

14   Q.   Okay.  Specifically in this case.

15   A.   For a learning disability or for this kind of a cognitive

16   processing difficulty, I can't think of a medication that would

17   help.  For a psychiatric diagnosis, that's something different,

18   but, no.

19   Q.   Okay.

20        MR. TENNEN:  One moment, your Honor.

21   Q.   I guess, just to wrap it up, did you -- other than the

22   documents you had and the testing you did and your conversation

23   with Mr. Rang, was there anything else that informed your

24   assessment in this case?

25   A.   No.

1    Q.   Okay.  I didn't ask you when, but when is it that you

2    evaluated him?

3    A.   I believe August 14 of 2015.

4    Q.   So a little over a year ago?

5    A.   Yeah.

6    Q.   Is there anything in your assessment that you think would

7    change?  You know, it's a one-year-old assessment.  Does that

8    change anything in terms of your ability to draw these opinions

9    about Robert today?

10   A.   Given that this is the developmental process and that it

11   appears long-standing based on the records that were available

12   to me, no.

13   Q.   Okay.

14        MR. TENNEN:  Nothing further, your Honor.

15        THE COURT:  Just to be clear where we are with

16   exhibits, I have marked Exhibit 1, 2, and 3 at this point.

17        MR. TENNEN:  I'm happy to mark them as exhibits.

18        THE COURT:  They're marked.  They haven't been -- I'm

19   not sure whether they're formally -- there's a need to formally

20   admit them.  You have the testimony of this witness.  The first

21   two I think are important to show these are the things she

22   looked at, but I certainly can't accept them for their truth.

23   They're old.  The witnesses aren't here.  But I understand this

24   is what she looked at to make her evaluation.

25        MR. TENNEN:  I wasn't asking you to.  I had asked for

1    those to be marked as ID, just having her identified it.  Her

2    report, since she's testifying, I don't know how much --

3              THE COURT:  I don't know that you need it beyond that.

4              MR. TENNEN:  But I wanted it to be in the record in

5    some form.

6              THE COURT:  Any objection to the report coming in?

7              MS. PARUTI:  No.

8              MR. TENNEN:  I also thought, as she's going through

9    scores, it might be helpful for you to see it.

10             THE COURT:  The report is in, and the other two are

11   simply marked for identification.

12             MS. PARUTI:  Thank you.  I'm sorry, your Honor.  Which

13   is A and B or --

14             THE COURT:  I don't know which one between 1 and 2.

15   Hold on one minute.

16             1 is the 2010 --

17             MS. PARUTI:  Okay.  Thank you.

18             THE COURT:  -- disability and 2 is the --

19             MR. TENNEN:  Just the Panther Valley school.

20             THE COURT:  The Panther Valley one.

21             MS. PARUTI:  Thank you very much.

22             THE COURT:  And 3 is her report.

23   (Exhibit No. 1 marked for identification.)

24   (Exhibit No. 2 marked for identification.)

25   (Exhibit No. 3 received into evidence.)

1    CROSS-EXAMINATION BY MS. PARUTI:

2    Q.   Good morning, ma'am.

3            So one thing you didn't actually testify to during

4    your direct examination is the conclusion that you drew, which

5    was presumably the whole purpose of your interaction with Mr.

6    Rang, is that correct?

7    A.   Yeah.

8    Q.   Okay.  Do you remember what your conclusion was?

9    A.   I have --

10   Q.   Do you have it in front of you?

11   A.   Yeah.

12   Q.   Just looking at that, if you can take a look at that.  The

13   last sentence of your report, you write, "In my opinion, they,"

14   the cognitive difficulties that you just testified about, "are

15   of a severity and pattern to interfere with his ability to

16   participate in an interrogation procedure without counsel

17   present."

18           Now, did you review the interview that Mr. Rang had

19   with police?

20   A.   No.

21   Q.   Okay.  Did you review the police reports or any police

22   reports about the reason he spoke with the police?

23   A.   Nope.

24   Q.   Okay.  Did you review any of the text messages that he

25   wrote back and forth with a nine-year-old child involved in

1    this case?

2    A.    No.

3    Q.    No.  Did you listen to the recording of Mr. Rang's

4    two-hour-plus interview with the police?

5    A.    Nope.

6    Q.    Okay.  But you met with him on one occasion in August of

7    2015?

8    A.    Yup.

9    Q.    Okay.  You said you spent about four hours with him that

10   day?

11   A.    Uh-huh.

12   Q.    That was in a detention facility?

13   A.    Yes.

14   Q.    Okay.  And you said that his demeanor at some point he

15   seemed to be a little stressed or he reported being a little

16   stressed?

17   A.    His demeanor wasn't stressed.

18   Q.    What was his demeanor?

19   A.    His experiences of depressions, but his demeanor was not

20   stressed.

21   Q.    Okay.  So when he was talking to you, he appeared to be

22   comfortable to you?

23   A.    Yes.

24   Q.    And how did you know that?

25   A.    Because I -- we were having a conversation.  He wasn't

1    sweating.  He wasn't speaking rapidly.  He wasn't agitated.  He

2    was calm.  He was smiling.  He was making appropriate social

3    conversation.  He was -- basically, his interactions didn't

4    show any evidence of anxiety or agitation.  It's -- as a

5    trained psychologist, it's sort of what we're trained to do.

6    Q.   Okay.  So fair to say you were confident in your

7    assessment that he did not appear to be stressed during your

8    interview with him?

9    A.   No.

10   Q.   And he appeared to be interacting with you appropriately

11   as you described on direct examination?

12   A.   Yes.

13   Q.   Okay.  And you didn't have any reason to believe at any

14   point during that interview that those signals you were reading

15   for him -- or of him that he was sending to you by his behavior

16   in the way he interacted with you were any way influenced by

17   his cognitive ability?

18   A.   I'm not sure what --

19   Q.   Do you understand what I mean?

20   A.   No, I don't understand your question.

21   Q.   So you were interacting with him for four hours?

22   A.   Right.

23   Q.   And you had never met him before?

24   A.   Right.

25   Q.   But you're a trained neuropsychologist and you work

1  clinically, right?

2  A.   Yeah.

3  Q.   So you're confident that you weren't misreading the

4  signals that he was sending you?

5  A.   Well, I mean, I think there's always room for somebody to

6  misread signals; but from my judgment of his mental status and

7  his behavior, he seemed to be -- it did not seem that stress

8  was a factor.

9  Q.   Okay.  Now, you said that during that four-hour block that

10  you were with him you administered a series of tests.  Are all

11  of the tests administered verbally, or are some of them reading

12  and writing?  How does that work?

13  A.   They're all interactive and administered verbally.

14  Q.   And so how long -- of the time you were together, how much

15  of that time was you administering the test to him versus just

16  having conversation with him?

17  A.   I would estimate three hours.

18  Q.   Okay.  So 75 percent of your interaction with him was

19  related to test-taking?

20  A.   Yes.

21  Q.   Okay.  Now, you said in your report, if you have it,

22  looking at Page 1 and then also at that last paragraph of the

23  report -- I think it's five pages, Page 5 -- you said that --

24  you opined that everything we've talked about impacts his

25  ability to participate in an interrogation.  What do you mean

1  by "participate"?

2  A.   Well, if you assume that to participate you need to be

3  accurately understanding the questions that are asked of you

4  and you need to be able to accurately understand the context

5  and the implications of those things.  So the question I was

6  asked really -- I wasn't asked to evaluate an interrogation.  I

7  was asked to evaluate his core ability to understand and

8  communicate and the way in which he did that and whether that

9  would represent a liability.

10        And so what I mean by that is his ability to

11  understand complex language, his ability to understand dual

12  meanings, his ability to accurately be able to frame back and

13  understand what was being presented to him, and his ability to

14  understand socially nuanced information and to be able to

15  understand what the implications of his answers might be for

16  him, that's really what I was -- what I'm referring to when I

17  say that -- make that statement.

18  Q.   Okay.  So it's more of like a hypothetical assessment?

19  You didn't actually assess whether or not he understood the

20  questions that were asked of him in that interview?

21  A.   I didn't -- it wasn't about those specific questions.  It

22  was about his capacity to understand in that situation.

23  Q.   So are you saying that this man sitting in front of you

24  can never have a conversation with somebody, understand what's

25  being asked of him, and then respond appropriately?

1    A.    That's absolutely not what I'm saying.

2    Q.    Okay.

3    A.    What I'm saying is that a situation -- I mean, we don't

4    interrogate children without a guardian present.  His ability

5    to understand very complex situations is limited, just like his

6    previous disability examiner determined that he was not

7    competent to manage his finances.  It doesn't mean he can't go

8    to the store with a $10 bill and purchase something and do the

9    math.  It doesn't have the same implications for his ability to

10   participate in financial planning and to follow a budget, you

11   know, or what have you.

12         Similarly, just like he is perfectly able to have a

13   conversation, a casual conversation with somebody, his ability

14   to understand complex situations, his ability to break down

15   language and understand nuance, is reduced, and that's a

16   vulnerability.  So if he were having a conversation with

17   somebody who were trying to take advantage of him -- and please

18   understand that's not what I'm saying about the

19   interrogation -- that would be a tremendous vulnerability.

20         I think you have to look at the situation.  It's not

21   that he can't have a conversation with me about the movie he

22   saw or the weather.  That's very different than being able to

23   understand the implications of his -- of what somebody is

24   saying, to understand words that have more than one meaning as

25   it refers to being admissible in court.  That's a very

1      different situation.

2      Q.    And just to be very clear, you're not a legal expert?

3      You're not here to evaluate whether or not his particular

4      statement should be admissible?

5      A.    No.

6      Q.    Right?

7      A.    I'm here to talk about his core cognitive abilities and

8      how that relates to his abilities in that situation or in any

9      situation really.

10     Q.    So if you had been tasked with the purpose of evaluating

11     whether or not he actually did appear to understand the

12     questions that were asked of him, you would have looked at --

13     listened to the recording or read the transcript, correct?

14     A.    Yes, but just listening to the recordings or reading the

15     transcripts wouldn't give me any ability to understand that

16     question without performing a comprehensive examination of his

17     cognitive functioning.  I mean, I'm not -- my job is never to

18     read a transcript and read someone's answers and figure out --

19     that's not really -- you don't need a neuropsychologist to do

20     it.  What you need a neuropsychologist to do is to understand

21     whether someone has the core cognitive capacities.

22     Q.    Right.  And so -- and you haven't been asked to do that.

23     So that's why you didn't actually look at any of the materials

24     germane to whether or not this gentleman could have

25     participated, to use your term, in an interrogation because, I

1    mean, he did participate in an interrogation, correct?

2    A.    Right.

3    Q.    And he -- you said that he did better when the thinking or

4    the talking and the communication was less abstract, correct?

5    A.    Uh-huh.

6    Q.    Okay.  Fair to say that if somebody was talking to this

7    gentleman, based on your knowledge of him, it would be in Mr.

8    Rang's best interests for that person to be speaking in shorter

9    sentences?

10   A.    I don't think shorter really gets at it.  He doesn't have

11   a difficulty with the span of his attention that is the

12   limiting factor.  There are people for whom that's the case

13   where their working memory is so short or they've got an

14   auditory processing disorder where sort sentences would do it.

15   That's not really where his deficit lies.  His deficit lies in

16   the interpretation of the meaning of what somebody is saying.

17   Q.    For example, if somebody asked him a concrete question

18   that doesn't have any level of abstraction in it, you would be

19   confident, based on interaction with him and your evaluation of

20   him, that that's something that, I believe you said, he did

21   quite well with?

22   A.    Right, if it was very concrete.  But if there's more than

23   one meaning to a word or if the word is ambiguous or if he

24   doesn't understand a word, then, no.

25   Q.    For example, Did you send a text message, you would agree

1    with me that that's a pretty concrete statement, not really

2    room for interpretation of what that means?

3    A.    Yes.

4    Q.    And you said, I think, that that's the type of question

5    that his cognitive difficulties or deficiencies wouldn't really

6    impact his ability to hear that or read it -- you said his

7    reading level was average -- and then understand it and then

8    answer that appropriately, correct?

9    A.    If it was very straightforward and it was delivered not in

10   the context of a paragraph.  It was just a simple question and

11   it was straightforward and there was no dual meaning, it wasn't

12   asked in various different ways, there was no nuance to the

13   language, there was no ambiguity to the language, he could

14   probably understand that.  The sky is blue.  Is the sky blue?

15   Yes.  But if there's a dual meaning to that or there's -- then,

16   no.

17   Q.    Okay.  Now, you identified a couple of records that we've

18   marked here for identification as Nos. 1 and 2.  1, you said,

19   was an evaluation from the Panther Valley School District.  Do

20   you have copies of those in front of you?

21   A.    Uh-huh.

22   Q.    Looking at that one, if you would, please, that's a report

23   from 2005, correct?

24   A.    Uh-huh.

25   Q.    That's -- did you have a chance -- you said you reviewed

1    it, but have you recently had a chance to actually look at

2    that?

3    A.    No.

4    Q.    If you want to take a second to look through that, it's

5    just a few pages long.  I just want to be very clear about what

6    it is you're considering here when you're testing the validity

7    of your evaluations based on the consistency with prior

8    evaluations.  So just let me know when you've had a second to

9    look at that.  I'll direct your attention actually to that

10   first -- that first paragraph.  I think most of the information

11   you'll need is there.

12   A.    Okay.  I've looked at it.

13   Q.    Okay.  And so is it fair to say that this appears to be

14   some sort of documentation supporting his reevaluation for his

15   IEP?

16   A.    Uh-huh.

17   Q.    And fair to say that this actually -- this document

18   appears to report prior testing, is that correct, done in 1999?

19   A.    Yup.

20   Q.    Okay.  So in 1999 -- I'm also not good at math, but I

21   think that was 17 years ago-ish.  So he would have been ten

22   years old at that time, right?

23   A.    Right.

24   Q.    At that time, as a ten-year-old, it appears that he was

25   also classified in the borderline range, correct?

1    A.    Yup.

2    Q.    Which you defined for us as being mildly -- or indicating

3    mild impairment, right?  Okay.

4          There's no point -- based on your review of the

5    records here and your own testing, there was no point at all

6    where you classified him as being anything lower on the scale

7    than borderline, correct?

8    A.    I did not measure him to be lower on the scale than

9    borderline.  I don't think it's accurate to say that there's no

10   point at which he was lower than that.

11   Q.    So the 2010 evaluation --

12   A.    Right.

13   Q.    -- if you'll look at that, that's No. 1.

14   A.    Yup.

15   Q.    Does that report classify him as something lower than

16   borderline?

17   A.    The full scale I.Q. from that of 67 would be in the

18   impaired range or the deficient range.

19   Q.    What is 67?  What does that indicate to you?  How should

20   we interpret that?

21   A.    They interpreted it as in the borderline range of mental

22   abilities.  Strictly speaking, it's in the impaired range or

23   the deficient range.

24   Q.    So you're disagreeing with the classification or the

25   conclusion that this particular doctor came to?

1   A.   Well, you know, I'm not disagreeing necessarily.  I think

2   that there's -- I think the problem with summary scores is they

3   don't always capture something.  His verbal I.Q. was in the

4   borderline range.  His performance I.Q. was in the impaired

5   range.

6   Q.   So really it's up for -- there's room for interpretation;

7   is that what you're saying?

8   A.   Strictly speaking, the ranges are not up for

9   interpretation.

10  Q.   Okay.

11  A.   But there's variability.  We're talking about variability

12  within the standard error of measures of these tests.

13  Achieving a score of 70 versus a score of 68 may very well --

14  is very well within the standard error of measurement error on

15  this test.  So it's not that whether or not you classify based

16  on this score as being borderline versus impaired.  It's

17  whether those are meaningfully different scores.  They're not.

18  Q.   Fair to say -- actually, let me ask you:  Did you speak

19  with Dr. O'Connell, the author of that report?

20  A.   No.

21  Q.   Did you speak with anybody listed in the IEP document?

22  A.   No.

23  Q.   Exhibit 2.

24       I mean, this is obvious, but, just for the record, you

25  weren't present for either of those evaluations, correct?

1    A.   No.

2    Q.   You talked about his job history, Mr. Rang's job history

3    with him.  You said he didn't really hold employment.  He would

4    not be able to focus, I think is what you said?

5    A.   This is what he told me.

6    Q.   Okay.  He didn't say anything about his inability to do

7    the job, did he?

8    A.   He told me that he had -- his terms of employment were

9    short.  I can look up exactly how short, but, no.  He said

10   specifically -- he said that he had worked for his dad in his

11   HVAC company and that he helped him out, carrying heavy

12   equipment and running cords for lights and tightening nuts,

13   things like that.  He said when he was 18 his father retired,

14   so he stopped working with his dad.

15        He said, after that he tried several jobs including

16   working at Wal-Mart for six months and working in factory jobs

17   for two or three months at a time.  He said he had difficulty

18   sustaining employment -- those are my words, not his -- because

19   he got bored and could not get into it.  He's been on

20   disability since 2012.  So that's what he told me.

21   Q.   Okay.  But he didn't tell you at any point that he's not

22   able to work?

23   A.   He did not tell me that he was not able to work.

24   Q.   He told you -- I think on direct you talked a little bit

25   about some of the medications that he had taken.  If not, I'll

1   direct your attention to Page 2 of your report.

2   A.   Right.

3   Q.   He told you that he was on different medications for mood

4   and behavior from the ages -- from about five till he was 19 or

5   20?

6   A.   Yes.

7   Q.   And he was able to accurately report that to you in your

8   estimation?

9   A.   He said that he did not recall the medications that he was

10   on, stating there were about 13 different kinds.   He remembered

11   the name of two of them, which is lithium and Abilify.

12   Q.   He talked to you about decision-making that he went

13   through to ultimately stop taking the lithium, correct?

14   A.   No, he didn't.

15   Q.   He didn't tell you that he had stopped three years prior

16   so that he could see if he could control himself because he was

17   concerned about the side effects?

18   A.   Yes.   That's what he told me.

19   Q.   So he was able at that point to identify a cause and an

20   effect and then make an informed decision about that for

21   himself and then report that back to you years later; is that

22   fair to say?

23   A.   Yes.

24   Q.   It's fair to say, in that particular example, he

25   demonstrated for you that he was able to weigh the pros and

1    cons of a particular situation.  He was able to analyze his own

2    reaction to an external influence.  And he was at some point

3    self-aware or in some way self-aware in the fact that he was

4    able to identify and describe for you his feelings at the time?

5    A.    Right.

6    Q.    And why he's making these decisions?

7    A.    I had said I found him to be straightforward and to be

8    self-aware.  Whether -- I mean, you'd really need to ask his

9    doctor whether there were dangerous side effects and whether

10   this was a good treatment decision for him.  So I really can't

11   speak to that.

12   Q.    Because you didn't talk to his doctor, correct?

13   A.    Right.  I think, if you want to get a sense of whether

14   that was a good decision medically, I think you would need to

15   talk with a doctor or his doctor.

16   Q.    Well, nobody's here evaluating his decisions that he's

17   making about his medication.  We're really looking at whether

18   or not he's able to process information.  And he was able to --

19   I know -- I can tell from you that you don't agree with the

20   decision but --

21   A.    No.

22   Q.    -- he was able to describe for you his thought process.

23   And it's fair to say, whether or not you agree with his

24   ultimate decision, that shows that he had a thought process

25   that objectively makes sense?

1       MR. TENNEN:  Objection.

2   A.   Okay.  Yeah.  I'm just going to say, first of all --

3       THE COURT:  Hold on.  There's an objection.  I don't

4   think this is a particularly helpful line of questioning.  It

5   might be better if you move on.

6       MS. PARUTI:  That's fine, your Honor.

7       THE WITNESS:  So should I not answer?

8       THE COURT:  Correct.

9   Q.   You didn't review -- are you aware that Mr. Rang was

10  administered Miranda rights?

11  A.   No.

12  Q.   Okay.  Do you know what Miranda rights are?

13  A.   Yes.

14  Q.   Okay.  And you didn't review either the oral recitation by

15  listening to the recording -- correct?

16  A.   I think we established that I did not listen to the

17  recording or have any access to any of that.

18  Q.   Okay.  And you didn't review the written document that he

19  signed after reading, correct?

20  A.   Right.

21  Q.   Okay.  And you have no basis at this point to believe that

22  any part of his interaction -- his actual, not hypothetical

23  interaction -- with the police in 2014 was ambiguous in any

24  way?

25  A.   No.

1   Q.   Okay.  And you have no basis to believe that his actual

2   interaction with the police involved complex language, do you?

3   A.   At the level of which he's functioning, what you and I

4   might consider complex language, I have no reason -- I have no

5   knowledge of what that interaction entailed.  I do know when

6   somebody is this deficient in their ability to understand

7   complex language, what a typically developed person might

8   consider to be normal discourse is not the same.

9        I think -- I don't know -- I don't have access to any

10  of those transcripts, but I think you need to consider the --

11  his -- it's considering his cognitive level of what he's able

12  to understand.  I don't think that that's something that would

13  be obvious to somebody who's typically developed and not a

14  psychologist in terms of what -- at what level his

15  understanding breaks down.

16  Q.   Okay.  But we already established that if questions were

17  simply worded that might be something that --

18       THE COURT:  If you've already established something --

19  A.   But I think --

20       THE COURT:  There's no question pending.  If you've

21  already established something, I think we can move on.

22       MS. PARUTI:  Thank you.

23  Q.   Obviously, you did not treat this defendant?

24  A.   No.

25  Q.   You said you are mainly -- at this point in your career,

1    you're mainly -- while you do have a clinical practice, you

2    mainly oversee others who you're training to develop a clinical

3    practice, correct?

4    A.   No.  I mainly see patients.

5    Q.   I'm sorry.  I misinterpreted.

6    A.   Yeah.  You misinterpreted.  I see about 200 patients a

7    year.

8    Q.   Mr. Rang was not one of them?

9    A.   He was one of the clients that I saw.

10   Q.   You saw him, but you don't treat him on a regular basis?

11   A.   No.  I do assessments on a regular basis.

12   Q.   Okay.

13   A.   This is what I do.

14   Q.   You said the history that Mr. Rang provided to you was

15   consistent with earlier reports that you had received or read

16   about him?

17   A.   Generally, yes.

18   Q.   Okay.

19            MS. PARUTI:  May I have a moment, your Honor?

20            THE COURT:  Certainly.

21            MS. PARUTI:  I have no further questions at this

22   point.

23            THE COURT:  Any redirect?

24            MR. TENNEN:  Briefly.

25   REDIRECT EXAMINATION BY MR. TENNEN:

1    Q.    You were asked a lot of questions about his ability to

2    make decisions.

3    A.    Uh-huh.

4    Q.    Are you saying that, given his cognitive limitations, he's

5    not capable of making any decision?  Is that what you're

6    saying?

7    A.    No.

8    Q.    But based on your assessment of him, do you have an

9    opinion about whether some decisions or certain decisions are

10   difficult for him to make?

11   A.    Yes.

12          MS. PARUTI:  Objection.  It is so broad.

13          MR. TENNEN:  I'm about to --

14          THE COURT:  At this point not particularly helpful.  I

15   think her testimony was very clear, and I don't need you to

16   reiterate the testimony.  I think it stood clearly on its own

17   terms.  You're welcome to ask follow-up but let's --

18          MR. TENNEN:  I will just -- I do just want to follow

19   up on that one.

20   Q.    Can you explain how his -- what kinds of decisions his

21   limitations affects?

22   A.    I want to be clear.  This wasn't an evaluation for a

23   competency to make decisions, and that's a complex question.

24   There's a vulnerability in somebody who has limited processing

25   of complex thought and language and flexibility in their

1     thought any time they're making a decision that has significant

2     implications moving forward.

3             So when we assess decision-making capacity, our

4     question is always decisions -- it really hinges on what the

5     decisions are.  I can use the medical as an example because

6     that's one that the attorney brought up.  It's not that Robert

7     can't make decisions.  It's just that -- based on his pattern

8     of performance on the testing and the way in which he processes

9     complex information, he may not be considering the breadth of

10    consequences to a certain decision that someone else might.

11            So it's not that he's unable to make a decision, he's

12    unable to come to a decision or unable to consider things in a

13    decision.  He just may not have access to the breadth of

14    information that a person without his deficits would have in

15    going about making that decision.

16            MR. TENNEN:  I'll leave it at that.

17            THE COURT:  Thank you very much.

18            THE WITNESS:  Thank you.

19    .  .  .  END OF EXCERPT.)

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3

4            I certify that the foregoing is a correct transcript

5   of the record of proceedings in the above-entitled matter to

6   the best of my skill and ability.

7

8

9

10

11

12   /s/Cheryl Dahlstrom

13   Cheryl Dahlstrom, RMR, CRR

14   Official Court Reporter

15

16   Dated:  June 9, 2017

17

18

19

20

21

22

23

24

25