1                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
2

3

        THE UNITED STATES OF AMERICA        )
4                                           )
                                            )
5       vs.                                 )   CR No. 15-10037-IT
                                            )
6                                           )
        ROBERT RANG                         )
7

8

        BEFORE:  THE HONORABLE JUDGE INDIRA TALWANI
9

10

                        DAY FIVE OF JURY TRIAL (REDACTED)
11

12

        APPEARANCES:
13

            OFFICE OF THE UNITED STATES ATTORNEY (By:  David Tobin,
14          AUSA, and Anne Paruti, AUSA), One Courthouse Way, Boston,
            Massachusetts 02210.  On behalf of the Government.
15
            SWOMLEY & TENNEN, LLP (By:  Eric B. Tennen, Esq.), 50
16          Congress Street, Boston, Massachusetts 02109.  On Behalf
            of the Defendant.
17

18

                    John Joseph Moakley United States Courthouse
19                              Courtroom No. 8
                              One Courthouse Way
20                             Boston, MA 02210
                            Friday, June 30, 2017
21                              9:04 a.m.

22

                        Cheryl Dahlstrom, RMR, CRR
23                          Official Court Reporter
                    John Joseph Moakley United States Courthouse
24                      One Courthouse Way, Room 3510
                             Boston, MA 02210
25            Mechanical Steno - Transcript by Computer

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

MICHAEL CONNELLY

  By Mr. Tobin     4           60
  By Mr. Tennen          20           68

CATHERINE RANG

  By Mr. Tennen    70
  By Ms. Paruti         99

NICOLE RANG

  By Mr. Tennen   110          120
  By Mr. Tobin        116

M██ A██

  By Ms. Paruti   121


E X H I B I T S

| No. | Description | In Evd. |
|---|---|---|
| 12 | Handwritten notes recovered on 12/29/14.. | 5 |
| 4-1 | Photo of PlayStation 3................... | 11 |
| 5-1 | Photo of Rang bedroom................... | 12 |
| 13-2 | Verizon Excel spreadsheet............... | 15 |
| 13-3 - 13-4 | Summary charts of phone numbers......... | 16 |
| 16 | Facebook page.......................... | 142 |
| 14-1, 14-2, 14-5, 14-6, 14-11 | Letters between Rang and M██ A██...... | 166 |

1                          P R O C E E D I N G S

2              THE COURT:  Good morning.  And we're just getting the

3      jury lined up.  Any other matters we need to address?

4              MR. TOBIN:  I don't think so, your Honor.

5              THE COURT:  Timeline, what are we looking at?

6              MR. TOBIN:  Well, we're going to -- we have a little

7      bit more with Inspector Connelly; and, of course, there will be

8      cross-examination of Inspector Connelly.  I believe at that

9      point, to ensure that they get to testify today, I presume

10     we'll break and have the defendant's mother and sister testify.

11     We will have *Minor A*'s mother M████ here to testify.  I do

12     believe we will have some time for her before we break for the

13     day.

14             THE COURT:  Okay.  And then just in terms of timing

15     for the rest of the trial since we need to figure out when

16     we're going to do a charge conference.

17             MR. TOBIN:  Of course.  Of course, we resume on

18     Wednesday.  If we haven't finished with *Minor A*'s mother M████,

19     we will do so.  Then the government's last and final witness

20     will, of course, be *Minor A* himself.  Then, of course, at that

21     point --

22             THE CLERK:  All rise for the jury.

23     (The jury entered the courtroom at 9:04 a.m.)

24             THE COURT:  Good morning.

25             THE JURY:  Good morning.

1          THE COURT:  Mr. Tobin, you may continue.

2          MR. TOBIN:  Thank you, your Honor.

3          MICHAEL CONNELLY, Previously Sworn

4  CONTINUED DIRECT EXAMINATION BY MR. TOBIN:

5  Q.    Inspector Connelly, I'd like to begin by clarifying

6  something from yesterday.  You will recall at the end of the

7  day you were reviewing for us, for the jury, Exhibit 9-10 and

8  9-11, Skype messages from rrang to a *Minor C*, the ones that

9  involved repeated requests to masturbate; do you remember

10 those?

11 A.    Yes, I do, sir.

12 Q.    Just so it's clear, earlier there was evidence that *Minor*

13 *A* had a young friend named *Minor C*, is that accurate?

14 A.    Yes, it is.

15 Q.    The *Minor C* that was the subject of rrang's requests to

16 masturbate on Exhibits 9-10 and 9-11 was not that *Minor C*,

17 *Minor A*'s friend, is that accurate?

18 A.    That's correct.  That's a separate *Minor C* mentioned in

19 the Skype chats.

20 Q.    Thank you.

21          MR. TOBIN:  If we could ask the juror -- not the

22 juror.  Excuse me, oh, my goodness.  If we could have the

23 witness, Inspector Connelly, alone look at Government Exhibit

24 12 for identification, please.

25 Q.    Do you recognize Government Exhibit 12 for identification?

1    A.    I have the ELMO on my screen, sir.

2            MR. TOBIN:  I'm sorry.  I don't know why.  How do I

3    get you -- thank you.

4    A.    I have it, sir.  Yes, I recognize it.

5    Q.    What is Government Exhibit 12 for identification?

6    A.    This is the first page of a collection of handwritten

7    notes that were recovered from Mr. Rang's bedroom on December

8    29, 2014, during the execution of the search warrant.

9    Q.    Notes that you would ultimately take and bring back to

10   Boston for use in this investigation and ultimately in this

11   trial?

12   A.    That's correct, sir.

13   Q.    And you've had a chance to look at all of the multipages

14   that make up Government Exhibit 12 for identification, is that

15   true?

16   A.    Yes, I have.

17   Q.    Thank you.

18           MR. TOBIN:  Your Honor, I'd ask that Government

19   Exhibit 12 for identification be moved into evidence as

20   Government Exhibit 12.

21           THE COURT:  Is there an objection?

22           MR. TENNEN:  No.

23           THE COURT:  Exhibit 12 is admitted.

24   (Exhibit No. 12 received into evidence.)

25           MR. TOBIN:  Thank you, your Honor.  If we could please

1   now show the ladies and gentlemen of the jury Government

2   Exhibit 12, the first page.  Give them just a few seconds to

3   review that.

4   Q.   Well, for the sake of the record, can you tell us what is

5   on the first page generally?

6   A.   The first page is a series of handwritten notes on a piece

7   of looseleaf paper with essentially a shopping list and their

8   price.  It appears to be a form of budget and an accounting of

9   money of how much things would cost with pluses and minuses on

10   the right-hand side of the page.

11          MR. TOBIN:  Can we go to the second page of Exhibit

12   12, please.

13   Q.   What does that appear to be?

14   A.   This is another page of bills and accounting entitled,

15   "Bills for November," in the top, with listings for mom, TC,

16   TV, and cell, all the apparent dollar amounts next to it,

17   followed by *Minor A's* membership underneath it right here.

18   Q.   So you have just underlined an entry of *Minor A*'s

19   membership?

20   A.   Yes.

21   Q.   Is that accurate?

22          And next to that there appears to be a two and a

23   period.

24   A.   It actually looks like two-zero.  In the next column it's

25   plus 20.

1    Q.    Plus 20.  Okay.  Thank you.

2          MR. TOBIN:  If we could have the third page of this

3    exhibit, please.

4    Q.    Again, what does -- what is that?

5    A.    This is a separate piece of paper with handwritten notes

6    on it, with the same kind of budgeting and accounting of bills,

7    including mom, TV, TC, cell, oil change.  And then below -- two

8    below that is *Minor A*'s PSN membership.

9    Q.    Is there a number or a dollar amount next to *Minor A*'s PSN

10   membership?

11   A.    Yes, $18.  And below that is two PSN card, with $10 next

12   to it.

13   Q.    What is PSN again, if you know?

14   A.    I believe it's PlayStation Network.

15         MR. TOBIN:  If we could have the next page of this

16   exhibit, please.

17   Q.    What is that?

18   A.    This is the front page of a blue notebook that was

19   recovered in Mr. Rang's bedroom on that same day during the

20   execution of the search warrant.

21   Q.    The preceding exhibits that the jury has just seen was

22   looseleaf paper found in the room?

23   A.    Yes.  They were individual pieces of paper.

24   Q.    Now we're looking at what was in the notebook, is that

25   accurate?

1    A.    That's correct.

2          MR. TOBIN:  If we could go to the next page, if you

3    would, please.

4    Q.    What is this?

5    A.    This is another series of handwritten notes with a to-do

6    list and an accounting.

7          MR. TOBIN:  And the next page in the notebook, please.

8    Q.    And at the very top, what does it say?

9    A.    It says, "*Minor A*'s address," underlined.

10   Q.    What is the address below it?

11   A.    �full block▉, Plymouth, Mass.

12   Q.    Is that, in fact, *Minor A*'s address?

13   A.    Yes, sir, it is.

14   Q.    Below that is there some other notation?

15   A.    There is.

16   Q.    What is it?

17   A.    It says, "Austin's address."

18   Q.    Is there an address there?

19   A.    266 Sandlick Road, Princeton, Kentucky.

20         MR. TOBIN:  The next page, please.  A little more

21   difficult to see.  Can we zoom in on the top entry if we could,

22   please.

23   Q.    What does that say?

24   A.    This is a piece of paper that was an individual sheet that

25   was found inside a pocket of that particular blue notebook.  It

1    lists *Minor A*'s home address and phone number with the same ███

2    ███████████, Plymouth, Mass. and an associated phone number of

3    774-413-███.

4    Q.    Have you seen that phone number in the course of this

5    trial previously?

6    A.    Yes, sir, I have.

7    Q.    What number is that?

8    A.    That's the house phone for ████████████████, the residence

9    of *Minor A* as well as his grandmother and other people in his

10   family.

11         MR. TOBIN:  Could we go to the next entry on that

12   page, please.

13   Q.    What is that?  Read it first, if you would.

14   A.    It's entitled, "*Minor A*'s PS3 account names!", and it's

15   underlined.  Underneath that is *Minor A DOB*; another user name,

16   xzpamajx2; and a third user name, echo_default.

17         MR. TOBIN:  And the next entry on that page, if we

18   might.

19   Q.    Can you read that to us please?

20   A.    A separate heading entitled, "M████ A███ jail info," which

21   is underlined, and the below name of M████ A███, MCI

22   Framingham, P.O. Box 9007, Framingham, Mass. 01704.

23   Q.    And then the -- below there's a line.  Below that is there

24   some additional notation?

25   A.    There is.  And below it is written, "Jail's phone number

1    508-532-5100"?

2             MR. TOBIN:  There's an entry below that, is there not?

3    May we see that?  Thank you.

4    Q.   What does that say?

5    A.   It's a separate heading entitled, "*Minor A*'s email and

6    pass for *Minor A DOB*," which was the user name above on that

7    same sheet of paper.  Under it says, "Account (email,

8    *Minor A*@yahoo.com)," and a password underneath that.

9    Q.   And then below that there's something additionally, is

10   that accurate?

11   A.   It is.  It's -- it has *Minor A*'s email and pass for the

12   second account listed in that same piece of paper, with the

13   email of *Minor A*@yahoo.com and another alphanumeric password.

14            MR. TOBIN:  I believe there's one final page in this

15   sequence.  May we have that.  Could you blow that up, please.

16   Q.   What does that say?

17   A.   It says, "Money goal to be saved by June to go see *Minor

18   A*," and a dollar amount of $1,300, which is circled.

19   Q.   "To go see *Minor A*"?

20   A.   Yes, sir.

21   Q.   Was there any other word on that page?

22   A.   No, sir.

23   Q.   The word M███ appear on that page?

24   A.   It does not.

25   Q.   I'd like to show you what has been marked --

1           MR. TOBIN:  Just for the witness, Photo 4-1, please --

2      or Exhibit 4-1, a photo.

3      Q.   Is it on your screen as of yet?

4      A.   Yes, it is.

5      Q.   Do you recognize what that is?

6      A.   I do.

7      Q.   What is it?

8      A.   This is a photograph taken during the execution of the

9      search warrant on December 29, 2014, at Mr. Rang's residence.

10     Q.   What does it depict?

11     A.   This is a photograph of a PlayStation 3 gaming console as

12     we observed it in Mr. Rang's bedroom.

13     Q.   Is it a fair and accurate depiction of the way that

14     appeared on that day?

15     A.   Yes, sir, it is.

16          MR. TOBIN:  Your Honor, may 4-1 be admitted into

17     evidence at this time as Government Exhibit 4-1?

18          MR. TENNEN:  No objection.

19          THE COURT:  4-1 is admitted.

20     (Exhibit No. 4-1 received into evidence.)

21     Q.   That was his bedroom?

22     A.   Yes, it was.

23          MR. TOBIN:  May we go now to Government Exhibit 5-1

24     for identification just for the -- just for the witness.  Thank

25     you.

1    Q.    Do you recognize what is the subject matter or what 5-1

2    for ID is?

3    A.    Yes, I do.

4    Q.    What is it?

5    A.    This is another photograph taken during the execution of

6    that search warrant.

7    Q.    What does it depict?

8    A.    It displays a table with a big television and a separate

9    PlayStation 3 gaming console with a label on the top of it

10   listing K1ng, or King, Rang, which was also found in Mr. Rang's

11   bedroom.

12   Q.    Is it a fair and accurate depiction of the way it appeared

13   on the date of the search warrant?

14   A.    Yes, it is.

15        MR. TOBIN:  Your Honor, may 5-1 be admitted into

16   evidence, please?

17        MR. TENNEN:  No objection.

18        THE COURT:  5-1 is admitted.

19   (Exhibit No. 5-1 received into evidence.)

20        MR. TOBIN:  May it be published to the jury?

21        THE COURT:  Yes, it may.

22        MR. TOBIN:  May I have just a moment, your Honor?

23        May I approach, your Honor?

24   Q.    I'm going to show you what has previously been marked as

25   Exhibits D and B for identification.  Are you familiar with

1    what those are?

2    A.    Yes, sir, I am.

3    Q.    What are they?

4    A.    Exhibit D is a CD or a DVD with the United States

5    Attorney's Office, District of Massachusetts, and on it is the

6    full forensic report created by the Cellebrite forensic tool of

7    the analysis of Mr. Rang's iPhone in a PDF format.

8    Q.    What's on Exhibit B?

9    A.    That was Exhibit B.

10   Q.    I'm sorry.  What's on Exhibit D, the other one in your

11   possession?

12   A.    Exhibit D is another disk, United States Attorney's Office

13   District of Massachusetts, which contains the full forensic

14   report in PDF format using Magnet Forensics Internet Evidence

15   Finder, that second tool that we used to analyze Mr. Rang's

16   iPhone.

17   Q.    May I take these back, please?

18   A.    Please.

19   Q.    One relatively short series of questions left to ask you.

20   I'm going to ask --

21        MR. TOBIN:  May we show the witness Government Exhibit

22   13-2, please.

23   Q.    Do you recognize what is Government Exhibit 13-2?

24   A.    Yes, I do.

25   Q.    What is that?

1     A.    This is an Excel spreadsheet displaying the subscriber

2     information which the government received from Verizon Wireless

3     pursuant to a grand jury subpoena in this case.  This

4     particular document is derived from Government Exhibit 13-1,

5     which is the entire Verizon subpoena return.

6     Q.    You said this is an excerpt from that.  Specifically what

7     does -- is included in this excerpt?

8     A.    This is Verizon's business records which were produced to

9     the government, detailing a search of two particular phone

10    numbers, the first column in that spreadsheet being the

11    searched value, are the phone numbers 570-449-████, and the

12    second phone number of 570-516-████, which were both subscribed

13    to by Robert Rang at ███████████████ in Coaldale,

14    Pennsylvania.

15          MR. TOBIN:  Your Honor, may this Exhibit 13-2 be

16    admitted into evidence?  Actually, I think it's already in

17    evidence in the sense that I think Scott Kelley already got

18    these records in, but may this be, I suppose, separately

19    admitted because it does have a separate number.

20          MR. TENNEN:  I guess I thought it was in evidence,

21    too, from the prior one so just -- if your Honor recalls, I had

22    made an objection to the whole CD.  So if this is a part of

23    that, I would just -- that same objection applies to it.

24    That's all.

25          THE COURT:  Same objection noted and it is, again,

1    overruled, and 13-2 comes in.

2    (Exhibit No. 13-2 received into evidence.)

3          MR. TOBIN:  Thank you.  If that may be published to

4    the ladies and gentlemen of the jury now.

5    Q.   Now that the ladies and gentlemen of the jury are able to

6    see 13-2, can you, again, just briefly explain what this is?

7    A.   This spreadsheet was provided by Verizon Wireless in

8    request to our seeking of information regarding those phone

9    numbers.  It lists the search value as the phone number; the

10   account number being the internal Verizon account number for

11   it; last name; first name; address, including the city, state

12   and zip code.  The search value, again, is the same as the

13   phone number in the next column; type of phone number.  And

14   then it has some other additional information after that.

15   Q.   What is the effective date for the top number that ends

16   with 7842?

17   A.   9/30/14.

18   Q.   September 30, 2014?

19   A.   That's correct, sir.

20   Q.   What is the effective date for the below number, the

21   earlier date?

22   A.   December 9, 2013, both indicating that they were prepaid.

23         MR. TOBIN:  If we can go to 13 -- well, your Honor,

24   13-3 and 13-4 are a compilation of call records.  Again,

25   they're both in, as previously noted, though I have marked them

1    separately for convenience.

2            THE COURT:  Just so we're clear so that the jury is

3    not confused here, what is in is a disk.

4            MR. TOBIN:  Correct.

5            THE COURT:  And these are printouts from the disk?

6            MR. TOBIN:  It is, your Honor.  Thank you.

7            THE COURT:  So, yes.  13 - same objection --

8            MR. TENNEN:  Yes, please.

9            THE COURT:  -- as for the disk.  And 13-3 and 13-4 are

10   admitted.

11   (Exhibit Nos. No. 13-3 and 13-4 received into evidence.)

12           MR. TOBIN:  If we could show the witness -- thank you.

13   If we could show everybody 13-3.

14   Q.   What is 13-3?

15   A.   13-3 is a summary chart prepared by the government meant

16   to summarize the voluminous records provided on that disk in

17   13-1.  This specifically isolates the calls back and forth

18   between Mr. Rang's cell phone number and three additional

19   numbers.  I'm sorry, in this case, in two additional numbers

20   which are relevant in this investigation.

21   Q.   What are the two additional numbers?

22   A.   One of the numbers is 774-413-███, which we've seen

23   multiple times as the house phone of *Minor A* and his family.

24   Q.   And what is the other number?

25   A.   I don't recall the number off the top of my head, but the

1    other number is the cell phone at the time of *Minor A*'s mother,

2    M████ A███.

3            MR. TOBIN:  Let's go, if we might, to 13-4 and let

4    everyone see that.

5    Q.   What is 13-4?

6    A.   13-4 is a separate summary chart prepared by the

7    government for this case to summarize those same voluminous

8    records.  This is the second phone number listed in 13-2, the

9    7842 number, which was subscribed to by Mr. Rang.  These detail

10   the calls to *Minor A*'s house, *Minor A*'s mother's cell phone,

11   and to *Minor A*'s iPod through the TextNow application.

12   Q.   Have you had an opportunity to study the summary charts?

13   A.   Yes, sir, I have.

14   Q.   Have you had an opportunity, in studying the summary

15   charts, to count the various categories of calls you've just

16   made reference to?

17   A.   Yes, sir, in approximate numbers.

18   Q.   Can you tell us, based on these records, which are

19   available or will be available to the jurors, how many times

20   there was contact between the -- a phone in the name of Robert

21   Rang and M████ A███, *Minor A*'s mother?

22   A.   Mr. Rang's phone called M████ A███ phone approximately

23   15 times over the course of these records.

24   Q.   Can you tell us, based on your review of these records,

25   how many times Mr. Rang's phone called the residence of *Minor A*

1   and his grandmother D████?

2   A.   Approximately 28 times in the time period of -- I believe

3   it's end of April 2014 through October 29, 2014.

4   Q.   Do these records also reflect incoming calls to the Robert

5   Rang numbers?

6   A.   Yes, they do.

7   Q.   Have you been able to look through these and determine

8   approximately how many times that the M████ house phone in

9   Plymouth called Mr. Rang?

10  A.   Yes, sir.

11  Q.   How many times, approximately?

12  A.   Approximately 140 times over that time period.

13  Q.   Can you tell us approximately how many times the rrang

14  number contacted the phone number that was ultimately possessed

15  by *Minor A*?

16  A.   The bottom portion of this spreadsheet indicates two calls

17  highlighted in yellow which were made by Mr. Rang's cell phone

18  directly to the TextNow application phone number which was

19  recovered on *Minor A*'s iPod.

20  Q.   When were those two calls made?

21  A.   On October 29, 2014.

22  Q.   When did *Minor A* get TextNow based on the earlier

23  evidence?

24  A.   October 26, 2014.

25  Q.   So he got his phone essentially or that number on the

1    26th?

2    A.    Yes, sir.

3    Q.    And on the 29th what did the defendant do to it?

4    A.    He called it twice.

5          MR. TOBIN:  If I may have just a moment?

6          Actually, perhaps one more question.

7    Q.    On these records, 13-3 and 13-4, the phone records, you

8    went through and you counted up various phone calls as you've

9    just described, is that accurate?

10   A.    Yes, sir.

11   Q.    If you look at the records, though -- and we have 13-4 on

12   the screen -- one call, or a single call -- is it accurate that

13   one call or a single call may have more than one line entry?

14   A.    Yes, that's correct, sir.

15   Q.    Why is that?

16   A.    Because this record is based on Verizon business records,

17   and they have data that comes in from multiple different

18   points.  For example, the first column in this spreadsheet is

19   entitled, "Network Element Name."  That specifies the

20   individual piece of Verizon hardware which acts as a switch.

21   So a cell phone call is made through a cellular provider.  It

22   hits a cell tower, and the call is transferred to a switch.

23   Depending on where someone is geographically, it can hit off of

24   more than one switch, and there are switches on both the

25   receiver's end and the sender's end.  So it's an analysis based

1    on the dates and times, the call durations, and the call

2    numbers to and from.

3    Q.   When you say it's an analysis based on those factors,

4    that's how you determined what one -- a single call or the

5    instance of a single call?

6    A.   That's correct, sir, and also why I identified approximate

7    numbers.

8    Q.   So a single call might have used three switches, for

9    instance?

10   A.   Yes, sir.

11        MR. TOBIN:  I don't have any other questions.  Thank

12   you.  Please remain seated.

13        THE COURT:  Mr. Tennen.

14        I made an editorial comment earlier on, and I probably

15   shouldn't be doing it.  But I will be fair on both sides.

16   Again, you had an example of a lawyer saying there's one

17   question, and there's actually more than one question.

18   CROSS-EXAMINATION BY MR. TENNEN:

19   Q.   Good morning, Inspector Connelly.

20   A.   Good morning, sir.

21   Q.   Just to follow up on one of the questions you were just

22   asked to make sure I understood it correctly, did you indicate

23   that when you did the analysis of all the phone calls there

24   were approximately 140 phone calls from the house phone in

25   Plymouth to the cell-phone records or to the Verizon phone that

1   you had subpoenaed?

2   A.   Yes, sir, to both of those numbers.

3   Q.   Can you say the last --

4   A.   To the both -- to the two numbers, both subscribed to by

5   the defendant.

6   Q.   Right.  So the older number and the newer number?

7   A.   Correct.

8   Q.   And do you recall when those calls may have begun, when

9   the earliest date was, approximately?

10  A.   I believe -- we didn't subpoena the entire content; but

11  from the subpoenaed records, I believe it was the end of April

12  2014.

13  Q.   Okay.  Through?

14  A.   Through October 29, 2014.

15  Q.   Okay.  And during the course of your investigation, you

16  subpoenaed records from different companies, right?

17  A.   Yes, sir.

18  Q.   That's a normal course of -- something you'd normally do

19  in an investigation such as this, right?

20  A.   Absolutely, sir.

21  Q.   For example, subpoenas to Verizon for phone records,

22  right?

23  A.   Correct.

24  Q.   You sent a subpoena or -- during the course of this

25  investigation, a subpoena was sent to Verizon for some internet

1    records, right?

2    A.    That's correct.

3    Q.    And what was -- what was the record being sought in that

4    subpoena, if you recall?

5    A.    If I remember correctly, I believe that was the IP address

6    that was associated with the Skype user phantomx or

7    phantomx666jr1 so we could determine who that individual was.

8    Q.    Okay.  And you sent -- actually, no.

9          Did you send any subpoenas to PlayStation -- or Sony,

10   I should say?

11   A.    They were sent in this case, yes, sir.

12   Q.    Did you receive any information back that was utilized in

13   any way?

14   A.    No, sir.  We received no response.

15   Q.    Okay.  And in -- did you send subpoenas for any of the

16   information that might be contained in the iPod -- in *Minor A*'s

17   iPod?

18   A.    Not that I recall, sir.

19   Q.    Okay.  So, for example -- I don't know.  Maybe did you try

20   and subpoena records from, let's say, Apple that made the iPod?

21   A.    No, sir, not that I recall.

22   Q.    What about TextNow?

23   A.    I believe there was a subpoena sent to TextNow, and I do

24   not believe we received a response.

25   Q.    So the subpoena to TextNow, for example, you were, let's

1   say, trying to see if you could -- if they had any information

2   about messages that were sent or received from an account?

3   A.   Messages, subscriber information, typical things like

4   that, yes.

5   Q.   You did not receive any information with respect to that,

6   right?

7   A.   That's correct.

8   Q.   And when -- as far as you know, is there any other way you

9   could have -- or any other subpoenas you could have sent to try

10  and get information about that contained within that iPod?

11  A.   I'm not sure I understand your question, sir.  I'm sorry.

12  It seemed like a broad type of question.  I wasn't sure what

13  you were getting at.

14  Q.   Did you think of any other companies you might send a

15  subpoena to to get that information?

16  A.   The information contained on the iPod?

17  Q.   Yes.

18  A.   We could have sent a subpoena, but we had the actual iPod

19  and its forensic contents.  We weren't looking to figure out

20  where it came from or what it contained because we had that

21  already.

22  Q.   With respect to the subpoena to Verizon regarding the cell

23  phone from Mr. Rang's house, did you obtain any information

24  from them regarding text messages?

25  A.   No, sir, I don't believe so.

1    Q.   Did you try and subpoena that?  Did you try and obtain

2    that information via subpoena?

3    A.   Inspector Kelley was the one who sent the subpoena.  I

4    don't remember what was listed in the attachment offhand.

5    Q.   Fair to say that is information that is sometimes

6    available from telephone providers, right?

7    A.   It is sometimes.  However, text messages are very limited

8    in the amount that you can get.  In my experience, because the

9    volume of information is so great and the amount of messages

10   being sent back and forth, more oftentimes than not, if a

11   cellular provider saves them, which most don't these days, it's

12   typically only a week's worth.  And you would have to send

13   preservation letters and have an ongoing basis like that.

14   Q.   Were any preservation letters sent in this case?

15   A.   Not that I recall, sir.

16   Q.   During the course of your investigation, some names came

17   up with that may have been associated with some of the

18   different telephone numbers that also came up during the

19   investigation, right?

20   A.   Yes, sir.

21   Q.   So, for example, at one point D███ A███ had given

22   information to someone -- I think it was probably before you

23   were on the case -- that there was a name Adam Sturtevant that

24   was popping up with the telephone number that she had

25   previously reported, right?

1    A.    Yes, sir.  She reported that to Trooper Smith.

2    Q.    That was before you came on the case, right?

3    A.    Yes, it was.

4    Q.    At any point did anybody -- did you or did anybody in this

5    investigation try and send a subpoena or figure out if there

6    was a real person named Adam Sturtevant?

7    A.    We can't subpoena a name.  What we did do is we sent a

8    subpoena for that particular number which was listed in the

9    caller ID, which was, I believe, the 7842 number subscribed to

10   by Robert Rang.  So it wasn't Adam Sturtevant; it turned out to

11   be the defendant.

12   Q.    At some point at the beginning of the investigation,

13   someone in the Plymouth -- either in the Plymouth Police

14   Department or the Mass. State Police did sort of what they call

15   a national comprehensive report for that phone number, right?

16   A.    That was Detective Lieutenant Gomes of the Plymouth Police

17   Department.  I remember the report.

18   Q.    All right.  And you remember -- so you've seen that

19   report, right?

20   A.    Yes, sir, at some point, not in the last couple days, but,

21   yes, I've seen it.

22   Q.    Fair enough.  There was a name associated with that phone

23   number of Julio Vera, right?

24   A.    Either Vera or Vieira, something to that effect.

25   Q.    There was an address associated with Julio Vieira of

1    somewhere in Cressona or Pottsville, Pennsylvania?

2    A.    That's correct, sir.

3    Q.    Those are towns that are next to Coaldale, Pennsylvania,

4    right?

5    A.    Yes.

6    Q.    At any point did anyone attempt to speak to Julio Vieira?

7    A.    No, sir, because the public record search that was

8    conducted lists an --

9    Q.    It's an yes-or-no question.  Did anyone attempt to speak

10   with is Julio Vieira?

11   A.    No, sir, I did not.

12   Q.    At some point at least by the time you had spoken with Mr.

13   Rang, you had information that other persons may have had

14   access to his accounts or devices, right?

15   A.    That's what Mr. Rang reported to me, yes, sir.

16   Q.    And so during the interview, which we all heard yesterday,

17   he mentioned -- even gave you a name of somebody who may have

18   had access to his devices or accounts, right, Chris Weirich?

19   A.    I'm not sure if he said he had access.  I know he said he

20   gave his phone to certain of his friends to make phone calls.

21   But he also said that he was the one that sent the messages,

22   not his friends.

23   Q.    Okay.  Did you at any point attempt to speak with Chris

24   Weirich?

25   A.    No, sir.

1    Q.    Did you at any point attempt to investigate who may have

2    had access to his devices or accounts?

3    A.    After he confessed, no, sir.

4          MR. TENNEN:  Move to strike the characterization of

5    that statement, your Honor.

6          THE COURT:  It's stricken.

7          THE WITNESS:  Understood, your Honor.

8    Q.    So after you interviewed Mr. Rang, did you attempt to find

9    out whether anybody else -- or who may have had access to his

10   devices or accounts?

11   A.    No, sir, I did not.

12   Q.    In addition to saying that people may have had access to

13   his phone, he did say that other people may have had access to

14   his passwords and user names, right?

15   A.    At various points through -- yeah, there was a number of

16   different communication platforms, so, yes, he did bring that

17   up.

18   Q.    In the investigation itself you did see some evidence of

19   that when you were finally able to start comparing some of the

20   results, right?

21   A.    Yes.  I did see evidence of his user accounts on another

22   device.

23   Q.    For example, on *Minor A*'s iPod, right?

24   A.    Correct.

25   Q.    There was an email associated with one of Mr. Rang's -- or

1    Mr. Rang that was on *Minor A*'s iPod, right?

2    A.    That was an account -- or a user information, which was an

3    Apple iTunes store login, which was that email of Mr. Rang's.

4    Q.    And also when you looked at the PlayStations, you could

5    see that there were various user names on all of the devices,

6    right, both, *Minor A*'s and Mr. Rang's, right?

7    A.    Yes, sir.  Each device had multiple users from each other.

8    Q.    Did you attempt to figure out who all the different users

9    were in the PlayStations?

10   A.    I believe, from the interviews that were conducted, we had

11   identified -- of, I think, the eight or nine that were there, I

12   think we knew who probably seven or eight of them were.  They

13   were either *Minor A*'s or Mr. Rang's.

14   Q.    And for the ones you didn't identify, do you know who

15   those might belong to?

16   A.    I'm not even certain which ones.  I'd have to look back at

17   them, sir.  There might be one or maybe two which we didn't

18   happen to ask any of the parties about.

19   Q.    When you went to Mr. Rang's house, his family was there,

20   right?

21   A.    That's correct.

22   Q.    Some of his family was there, right?

23   A.    Yes, sir.

24   Q.    Did anybody at any point attempt to interview any of them

25   about any of the issues in this case?

1    A.    Not that I'm aware of, no, sir.

2    Q.    And after you left the house that day, at any point did

3    anyone go back and try and make any contact with his family to

4    interview them about any of the issues in this case?

5    A.    No, sir.

6    Q.    You have some training in forensic analysis, right?

7    A.    I have user-level training.  I'm not a forensic analyst

8    myself, but I do use forensic tools.  It's part of my job.

9    Q.    You don't have the training, for example, that Inspector

10   Scichilone spoke about, right?

11   A.    Neither Mr. Scichilone nor Ms. Cruza.  They're both

12   forensic analysts.  I'm simply an investigator.

13   Q.    But you are sort of generally familiar with electronics

14   and user names and passwords and things like that, right?

15   A.    Yes, sir, through my investigations and training and

16   experience, yes, sir.

17   Q.    Okay.  So you know, for example, that if somebody has

18   someone's user name and password, they can use that account on

19   any device, right?

20   A.    That's a very broad statement.  It would depend on what

21   kind of user name and what kind of device.

22   Q.    Okay.  So if they have someone's user name or password

23   that's capable of being used on different devices, they could

24   do that, right?

25   A.    Yes, sir.

1    Q.    That is, a user name and password is not limited to one

2    person, right?

3    A.    No, sir.

4    Q.    Anybody who happens to have that information, right?

5    A.    Yes.  If you have the lock and the key.  That lock and key

6    can be used in multiple places.

7    Q.    That's a good analogy.  I appreciate that.

8          So, for example, if someone had Mr. Rang's user name

9    and password for PlayStation -- let's start with that -- they

10   would be able to use that information on any PlayStation

11   device, right?

12   A.    As long as it's the same version, I believe, yes, sir.

13   Q.    Okay.  So let's say PS3 are the machines we're dealing

14   with in this case, right?

15   A.    Yes, sir.

16   Q.    So someone could use Mr. Rang's user name and password on

17   any PlayStation 3 if they had the information, right?

18   A.    Yes, sir.  It's a function that PlayStation refers to as

19   game sharing, I believe.

20   Q.    If somebody were to do that, were to use Mr. Rang's --

21   somebody who is not Mr. Rang were to use his user name and

22   password on a different device, anything that happened on the

23   device would basically look like it's coming from that account,

24   right?

25   A.    I believe so.  I'm not certain what information is saved

1    in the account and what information would be saved on the

2    particular device.  I'm just not familiar with that level of

3    specificity.

4    Q.   That was going to be my next question, which is, there

5    might be information saved on the device, and there might just

6    be information saved sort of on the internet about the account,

7    right?

8    A.   There might be.  I don't know the specifics of that, sir.

9    Q.   Okay.  Have you ever investigated a case that dealt with

10   gaming devices before?

11   A.   I have worked on cases involving other gaming systems but

12   as the case agent, no.  I'm not a gamer either.  I'm not very

13   familiar with --

14   Q.   Okay.  Other gaming systems, meaning this is the first

15   time you've dealt with a PlayStation?

16   A.   With PlayStation 3 specifically, yes, sir.

17   Q.   Did you consult with anyone, for example, Inspector -- and

18   I'm going to pronounce it wrong again -- Scichilone, is that

19   right?

20   A.   Yes.  I've spoken to Mark Scichilone on this.

21   Q.   About PlayStations and how information is saved or stored?

22   A.   We discussed this particular case and the results that

23   were received but not about how the PlayStation network works

24   or anything like that.

25   Q.   Okay.  And did you do any independent investigation about

1    that?

2    A.   No, sir.

3    Q.   I want to ask you some questions about some of the

4    exhibits that have already been entered.

5         MR. TENNEN:  And since they're already entered, would

6    it be okay if I just used the screen to show everybody?

7         THE COURT:  That's fine.

8    Q.   So I'm going to start with --

9         MR. TENNEN:  Is it on?  The overhead.  No, the

10   document is -- I see it on the little screen here.  There we

11   go.

12   Q.   So this is Exhibit 3-2, and the first page is just sort of

13   thumbnails, and then the next pages are bigger versions of

14   what's on the first page, right?

15   A.   Yes, sir, that's correct.

16   Q.   Okay.  And these were part of the extraction report from

17   *Minor A*'s iPod, right?

18   A.   That's correct.

19   Q.   These were images that were saved within the iPod, right?

20   A.   Correct.

21   Q.   I think you talked a little bit about they're a screen

22   grab or a screen capture, right?

23   A.   That's what it appears to be, yes, sir.

24   Q.   Did you, by the way, show him any of these to identify at

25   any point?

1   A.    I don't recall showing these to him, sir.

2   Q.    Okay.  So this is one of the ones that you found there,

3   right?

4   A.    Correct.

5   Q.    And you already talked a little bit about it.  I just want

6   to point out some things.  By looking at this, can you tell

7   when it was screen-grabbed?

8            THE COURT:  Mr. Tennen, I think the record would be

9   clearer if you could identify it as the third page or --

10            MR. TENNEN:  Sure.  Thank you.  I appreciate that,

11   your Honor.  This is actually the third page of the Exhibit

12   3-2.

13   Q.    By looking at this, you can tell when it was

14   screen-grabbed, right?

15   A.    Not with any degree of certainty.  You need to look at the

16   metadata on the original device to determine that.

17   Q.    Okay.  Well, at least in terms of -- there's a date of

18   Monday, October 27th, right?

19   A.    Yes, sir.

20   Q.    So chances are it couldn't have been done before that,

21   right?

22   A.    True.

23   Q.    And the little symbol up here is the Wi-Fi symbol, right?

24   A.    Yes, it is.

25   Q.    That indicates that this iPod, at this point when this

1    picture was taken, was connected to Wi-Fi, right?

2    A.   It may be.  You can't determine that without looking at

3    the actual device because that symbol will be illuminated if,

4    for example, you're at Starbucks.  You connect to the Wi-Fi.

5    The Wi-Fi signal will pop up, but there are secondary steps

6    that you have to go through to actually connect to the

7    internet.

8    Q.   Fair enough.  That symbol indicates that if it's connected

9    to Wi-Fi it can send and receive information, right?

10   A.   In that hypothetical, sir.

11   Q.   It's not, for example, on airplane mode, is what I'm

12   getting at.

13   A.   That's correct.

14   Q.   And the text in the middle is sort of typical of what text

15   looks like when it pops up and a device is not turned on,

16   right?

17   A.   Yeah, if it's not unlocked.  That's the notifications

18   view.

19   Q.   Typically, if more than one message comes while it's

20   locked, they'll start sort of piling up one right after the

21   other, right?

22   A.   It may.  I don't recall at this point because this is an

23   old generation iPod.  And from two and a half years ago, I

24   don't remember what Apple software configuration was at the

25   time.  It very well may be.  I simply don't recall.

1    Q.    You don't know when this image was taken?

2    A.    We would have to look at the metadata in the device

3    itself.

4    Q.    All right.

5    A.    Which I believe is noted on the first page of the exhibit.

6    Q.    So this data right here?  I'm showing you now the first

7    page of the exhibit.

8    A.    Yes, sir.

9    Q.    So if it says "created," is that when it would have been

10   created, 10/27/2014, around 9:17?

11   A.    They're not absolute certainties.  Created, modified, and

12   access dates do have some wiggle room, for lack of a better

13   word, to them because they will change based on whether you're

14   looking at them on a native device or on a separate volume.  It

15   appears to me -- again, I'm not a forensic examiner.  Just from

16   a user's level, it appears that, because these three dates are

17   the same and the times are similar, it was in the vicinity of

18   10/27/14 at 9:17 p.m.  But without looking at the actual route

19   of the forensics to verify that, I couldn't say definitely.

20   Q.    You can certainly say it wasn't created after Tara Cruza

21   made the extraction report, right?

22   A.    Absolutely, sir.

23   Q.    You certainly can say it wasn't created before 10/27 at

24   9:17, right?

25   A.    Yes, sir.

1    Q.   So sometime between that time period, at least, we can

2    narrow it down?

3    A.   Yes, sir.

4    Q.   Probably closer to 10/27 at 9:17?

5    A.   Yes, sir.

6    Q.   And that message is also seen on some of the messages that

7    you were able to get in the extraction report that just lists

8    the messages themselves, right?

9    A.   That's correct, sir.

10   Q.   And so if I show you the first page of Exhibit 3-6, right

11   here at the top, that's the message that we see in the picture,

12   right?

13   A.   Yes, sir.

14   Q.   At least in terms of when that message came in, 10/27/2014

15   at 9:00, right?

16   A.   Yes, sir.

17   Q.   And you see the phone number and the name there, right?

18   A.   Yes, I do.

19   Q.   Okay.  Now, I'm going to show you, back to Exhibit 3-2,

20   Page -- the last page, which is Page 5.  Similar to the picture

21   we just saw, right?

22   A.   Yes, sir.

23   Q.   Once again, the Wi-Fi thing at least indicates that if

24   it's connected to Wi-Fi it can send and receive messages,

25   right?

1    A.    Yes, sir.

2    Q.    It's not in airplane mode?

3    A.    Correct.

4    Q.    The date of this screen is Friday, October 31st, right?

5    A.    That's correct.

6    Q.    And if you go back to the first page, as best as we can

7    tell, that image says it was created on 10/31/2014 at 9:00?

8    A.    Yes, sir.

9    Q.    A.m., right?

10   A.    Correct.

11   Q.    And, like you said, that's probably an estimate of around

12   the time it may have been taken, right?

13   A.    Yes, sir.

14   Q.    And that was before Tara Cruza did her extraction report,

15   right?

16   A.    That's correct.  Trooper Smith actually took this

17   screenshot.

18   Q.    You anticipated my next question, which is, who took the

19   screenshot.  And you're saying Trooper Smith took this

20   screenshot?

21   A.    Yes, sir, as is memorialized in his reports of this

22   investigation.

23   Q.    Do you know if he turned the device on at all while he had

24   it in his possession?

25   A.    I don't know, no, sir.  I know it was on because it would

1    have had to have been on for him to take that screenshot.  I

2    don't know whether it was on when he received it or not.  I

3    couldn't say.

4    Q.    Okay.  And did he -- do you know if you turned it on or

5    off taking the screenshot?

6    A.    No, sir.

7    Q.    Sometime after taking the screenshot, however, he -- the

8    device got sent or -- not sent but given to Tara Cruza, right?

9    A.    Approximately an hour later, yes, sir.

10   Q.    This message that you see on this screen, you didn't see

11   that message in any of the messages that were recovered from

12   *Minor A*'s iPod, right?

13   A.    I don't recall, sir, no.

14   Q.    Just to summarize or -- not summarize but just to refresh,

15   Exhibits 3-5 were messages that were taken from *Minor A*'s iPod

16   that were in deleted or unallocated space, right?

17   A.    That's correct, sir.

18   Q.    Exhibit 3-6 were messages taken from *Minor A*'s iPod that

19   were on the TextNow app or not deleted basically, right?

20   A.    Yes, sir.

21   Q.    And Exhibit 3 -- and they're chronological, right, meaning

22   Exhibit 3-5, you have the earliest message, and Exhibit 3-6 at

23   the end has the latest message, right?

24   A.    That's correct, sir.

25   Q.    And the last page of Exhibit 3-6, which I'm showing you

1    now, if you go to the bottom, the last entry there is from

2    10/30/2014 at 12:34 a.m., right?

3    A.    Yes, sir.

4    Q.    There's no messages from October 31st, right?

5    A.    Well, the October 31st is the day that that screen capture

6    was taken.  We don't know what date it was sent because that's

7    a notifications view.

8    Q.    If it -- let's put it this way:  The last message in the

9    -- in Exhibit 3-6 is not the message from the screen grab; we

10   know that, right?

11   A.    That's correct, sir.

12   Q.    And if this last message from 10/30 was the last message

13   sent, that would have been the only message appearing on the

14   screen at some point, right?

15   A.    Yeah, that makes sense, sir.

16   Q.    Okay.  So where in these records is this message?

17   A.    That message would be contained in Exhibit B in the entire

18   forensic report.  I've seen it in the portable case.  That must

19   have been an oversight on my part that I didn't individually

20   select that.  And this image is a textual message which is seen

21   on the forensics.  It was not included in that particular

22   string of TextNow applications because the tool didn't extract

23   that automatically.  But I have seen that message elsewhere in

24   the forensics in this case.  So it was on the iPod.  It just

25   wasn't in that particular exhibit.

1    Q.   I'm going to show you Exhibit 9-3, and this is messages --
2    not messages.  This is information from the extraction report
3    from the iPhone taken from Robert Rang's house, right?
4    A.   Yes, sir, it is.
5    Q.   And these are just three of the many contacts that were in
6    his phone, right?
7    A.   Yes.  These are the three that I selected for this trial.
8    Q.   For example, Chris Weirich was one of the persons in his
9    contacts, right?
10   A.   That's correct.
11   Q.   The name that he gave you when you interviewed him?
12   A.   Yes, sir.
13   Q.   So that's -- that was in the report.  It's just not -- it
14   doesn't happen to be on this specific exhibit?
15   A.   That's correct.
16   Q.   And do you see there's dates when they were modified?  You
17   see those?
18   A.   Yes.
19   Q.   So the one associated with TextNow was modified 10/31, for
20   example, right?
21   A.   Yes, sir.
22   Q.   And then the other ones were modified 10/1, right?
23   A.   Yes, sir.
24   Q.   And then there's a little thing there that says "times
25   contacted"; you see that?

1    A.   Yes.

2    Q.   And for all three of them it says, "Times contacted,

3    zero," right?

4    A.   Yes.

5    Q.   Now, as part of your investigation or at some point in the

6    investigation, either you or someone else had an ability to

7    interview -- let's start with M███ A███, right?

8    A.   Yes.

9    Q.   And she was interviewed, at least initially, prior to you

10   coming onto the case, right?

11   A.   That's correct, sir.

12   Q.   And then after you came onto the case and sort of in the

13   lead-up to trial, you've had a chance to have conversations

14   with her, right?

15   A.   That's correct, sir.

16   Q.   And during the course of just reviewing the file and

17   interviews and stuff like that, you, for example, were shown

18   letters between Mr. Rang and M████, right?

19   A.   That's correct.

20   Q.   And some of them you got from her -- not you but in the

21   investigation was retrieved from her, right?

22   A.   Correct.

23   Q.   When they went out to interview her at the jail, right?

24   A.   I believe those letters at the jail were received from

25   Framingham, but, yes, they were addressed to her from Mr. Rang.

1    Q.    When you say "received from Framingham" --

2    A.    I believe some of the letters were given to us in response

3    to a grand-jury subpoena as -- the corrections officers turned

4    them over rather than from M███ herself.

5    Q.    But they got them essentially from M███ at some point?

6    A.    Yes, sir.

7    Q.    Meaning that she had held onto those letters, and then

8    through a chain they got passed to you?

9    A.    Well, either -- yes, but I don't want to mischaracterize

10   it.  I don't know whether the letters were intercepted by the

11   corrections officers prior to them being delivered to her or

12   whether they retrieved them from her cell.  I just don't know.

13   Q.    But at some point she had said that she had letters and

14   had received them and had read them, right?

15   A.    Yes, sir.

16   Q.    For example, your interview with her was in November of

17   2014, right?

18   A.    Yes.

19   Q.    Subpoena may have been sent around the same time?

20   A.    I believe it was shortly thereafter, yes, sir.

21   Q.    Before the subpoena, there wouldn't have been any letters

22   that were intercepted by Framingham, right?

23   A.    I don't know what either Inspector Kelley or Trooper Smith

24   spoke to Framingham about.  I don't know of any but I can't

25   say.

1    Q.   Before October 28th, let's say, there certainly wouldn't

2    be any reason for Framingham to intercept any letters, right?

3    A.   Correct.

4    Q.   So any letters prior to that would have made it into her

5    possession, right?

6    A.   I would assume so, yes.

7    Q.   When they got to your possession, they came through her?

8    A.   Yes.

9    Q.   At some point she provided a couple of more letters -- at

10   some point recently she provided a couple more letters that she

11   still had in her possession?

12   A.   Yes.  She said she found them recently and turned them

13   over to us.

14   Q.   And she was released from the jail at some point --

15   actually, I don't know.  Do you know when she was released from

16   jail?

17   A.   I believe it was in the neighborhood of March of 2015, but

18   that's my best recollection.

19   Q.   Okay.  And the letters that she turned over were after

20   that, right, the more recent letters that she turned over?

21   A.   I didn't look at the letters that she turned over at the

22   time.

23   Q.   I just mean in terms of when she turned them over.  It was

24   after --

25   A.   Yes.  That was only a matter of weeks ago.

1    Q.   So she had those -- those were letters she had received

2    while she was incarcerated?

3    A.   Correct.

4    Q.   And so, in addition to just -- in addition to the letters

5    and talking to her, you were aware, obviously, that she had

6    been communicating with Mr. Rang, right?

7    A.   Yes.

8    Q.   And that she was aware that Mr. Rang was playing

9    PlayStation with *Minor A*, right?

10   A.   Yes.

11   Q.   And she was aware that he would buy *Minor A* gift cards,

12   right?

13   A.   Yes.

14   Q.   And she was aware that he would call the home, right?

15   A.   Yes, sir.

16   Q.   In fact, she herself told you about speaking to him,

17   right?

18          MR. TOBIN:  Objection as to what a third party stated

19   outside of court.

20          MR. TENNEN:  It's --

21          THE COURT:  I'm going to allow it.

22   A.   I'm sorry.  Could you restate the question, sir?

23   Q.   That you were aware that she said she actually spoke to

24   Mr. Rang sometimes from her house, right?

25   A.   Yes.  I believe she said she spoke to him on her cell

1    phone rather than on the house phone, but, yes.

2    Q.   So from on her cell phone.

3         And that her and Mr. Rang, you were aware, had contact

4    on Facebook, right?

5    A.   Yes.

6    Q.   And when she was -- actually, one more thing.  When you

7    went to Mr. Rang's house, among the papers that you seized were

8    also letters from M█████ to him, right?

9    A.   Correct.

10   Q.   At least up until that time period, right?

11   A.   Yes, sir.

12   Q.   I'm just going to actually show you those.

13            MR. TENNEN:  May I approach, your Honor?

14            THE COURT:  Yes.  But I don't think those are in yet.

15            MR. TENNEN:  No, they're not.  I'm just going to show

16   those to him.

17            THE COURT:  Do they have exhibit numbers?

18            MR. TENNEN:  They do not.

19            THE COURT:  Can we -- can you show counsel?

20            MR. TENNEN:  I already have.  I'm sorry.

21            MR. TOBIN:  Your Honor, I have no objection to the

22   witness looking at them; but if they're going to be offered

23   into evidence, I will object to that.

24            MR. TENNEN:  So I want to get an ID first.

25   Q.   Can I just have you identify what those are?

1    A.    Yes, sir.  I've seen these before.

2    Q.    Just what are they?

3    A.    These are letters that were found inside the blue notebook

4    in Mr. Rang's bedroom, if my memory is correct.

5             MR. TENNEN:  I would move them into evidence, your

6    Honor.

7             THE COURT:  You're objecting?

8             MR. TOBIN:  If this is the time for me to object to

9    the documents.

10            THE COURT:  This is -- I'm marking them as Exhibit 18.

11    I'm sorry?  19 for the record.  I don't know how much longer

12    you have with this witness, but if this is something we can

13    address at 11 --

14            MR. TENNEN:  We can address it later.  I'm not going

15    to ask him any questions about it.

16    Q.    By the way, did you have any connection whatsoever to

17    M███ A███ or her family prior to this investigation?

18    A.    No, sir.

19    Q.    When Ms. A███ was interviewed in -- on November 7, 2014,

20    she was obviously told things about this investigation, right?

21    A.    Yes, sir, I believe so.

22    Q.    And in the course of your investigation, you found

23    information that after that she continued to communicate with

24    Mr. Rang, right?

25    A.    I believe there were letters that were sent back and forth

1    after the interview took place, but I don't have an independent

2    memory of how many or the contents of those.

3    Q.   I'm not asking you about that, just the fact that they

4    continued to communicate, right?

5    A.   Yes.  I'm aware that that happened.

6    Q.   For example, the letters I just showed you, some of them

7    postdate her interview on November 7th, right?

8    A.   I didn't observe the dates, I'm sorry.  But I'll take your

9    word for it, sir.

10   Q.   Do you know whether or not they were communicating through

11   any other means after her interview on November 7th?

12   A.   I do not know, no.

13   Q.   Did you at any point ask her that?

14   A.   I did not ask her that, no.

15   Q.   You were also given some information, in fact, when you

16   interviewed Mr. Rang that at some point in November he says he

17   went out to try and visit M████ while she was incarcerated,

18   right?

19   A.   Yes, sir.

20   Q.   And he was unsuccessful in doing so.  They didn't let him

21   visit her, right?

22   A.   Yes, sir.

23   Q.   And he says he came back to -- he went back to

24   Pennsylvania after that, right?

25   A.   Yes, sir.

1    Q.    During the course of your investigation, did you find any

2    information that while he went on that trip he made any attempt

3    to go visit *Minor A* in Plymouth?

4    A.    No, sir.

5    Q.    I'm going to ask you some questions about the day you went

6    to execute the search warrant at Mr. Rang's house, okay?

7    A.    Yes, sir.

8    Q.    Would you say, more or less, he was cooperative when you

9    got there?

10   A.    Yes.

11   Q.    And throughout the course of your time with him, he was

12   cooperative?

13   A.    Yes.

14   Q.    And complied with whatever instructions you and others

15   gave him, right?

16   A.    Yes, sir, that's correct.

17   Q.    Same with the family, the family was cooperative with all

18   of you, right?

19   A.    Yes, they were.

20   Q.    And complied with whatever instructions they were given,

21   right?

22   A.    Correct.

23   Q.    Is it fair to say there were about seven or eight

24   different kinds of law enforcement officials that went into the

25   house that day?

1    A.    There were postal inspectors.  There was a trooper from

2    Massachusetts, Trooper Smith; and there were Pennsylvania State

3    Police troopers providing technical assistance there so three

4    different types, I suppose, of law enforcement.

5    Q.    Totaling about seven or eight?

6    A.    Eight to ten, somewhere in that neighborhood.

7    Q.    Everyone was dressed in some kind of uniform that

8    identified them as law enforcement, right?

9    A.    Yes, either in tactical vests, raid jackets, uniforms, all

10   things of that nature.  There was no question who we were.

11   Q.    And armed?  People were armed?

12   A.    Yes.

13   Q.    That's protocol, right?

14   A.    Yes, sir.

15   Q.    And in entering the house, firearms were drawn, right?

16   A.    My firearm was drawn, and I believe others were, yes, sir.

17   Q.    You were not actually the first person through the house,

18   right?

19   A.    I was the first person at the door.  I was not the first

20   person through the remainder of it.  The execution of a search

21   warrant is a fluid process, and where you start in the very

22   beginning is oftentimes very different once you cross that

23   first threshold.

24   Q.    Fair to say there were other law enforcement officials

25   that went upstairs and encountered Mr. Rang prior to you

1    encountering him, right?

2    A.    That's correct, sir.

3    Q.    By the time you encountered him, he was already handcuffed

4    in his bedroom or what you came to find out was his bedroom,

5    right?

6    A.    That's correct.

7    Q.    He was basically sitting on the bed in his bedroom, right?

8    A.    Either standing -- yeah, sitting, standing, something like

9    that.

10   Q.    Surrounded by other law enforcement officials, right?

11   A.    Well, there were two other officers in the room.  We

12   weren't standing around him in a circle.

13   Q.    I didn't mean in that way.  I mean other officers standing

14   with him, right?  He wasn't alone?

15   A.    Yes, that's correct.

16   Q.    And at least from the moment that you saw him there, fair

17   to say he was no longer able to have any contact with any of

18   his family members, right?

19   A.    I mean, he could have yelled down the hall if he wanted to

20   but, no, sir.  He didn't ask to speak to them nor did he.

21   Q.    And shortly thereafter is when you, him and Trooper Smith

22   went up to the attic, right?

23   A.    At some point shortly after that, yes, sir.

24   Q.    And during the course of your interview of him, he

25   mentioned to you something about having ADHD and bipolar,

1    right?

2    A.    Yes, sir.

3    Q.    At any point did you have any other information about that

4    from any other source?  During the interview, I should say.

5    A.    During -- I'm sorry.  I don't understand the question.

6    Could you rephrase it?

7    Q.    I'll rephrase it.  While you were interviewing him, so

8    during the -- what we heard in court, at any point did anyone

9    other than Mr. Rang convey any information to you about him

10   having ADHD, bipolar, or any other conditions?

11   A.    I did receive a communication from another inspector who

12   had come up the stairs to advise me that there was a potential

13   that Mr. Rang could be violent, and he wanted to alert us to

14   that fact, which he had received from a family member of Mr.

15   Rang downstairs.

16   Q.    That's how the information came to you, in that form?

17   A.    Yes.

18   Q.    Who was that inspector?

19   A.    Inspector Mike Corichelli came up the stairs.  He was in

20   the stairwell and just alerted me to that.  He was there for a

21   minute or two.  But Mr. Rang was cordial.  He was polite.  We

22   sat down and just talked just like we heard on the tape.  So I

23   didn't have any concerns about that.

24   Q.    At one point he told you he used to take medications,

25   right?

1    A.    Right.

2    Q.    And that he no longer did, right?

3    A.    That's correct.

4    Q.    Do you have any training or experience whatsoever with

5    ADHD, bipolar, the medications that people take for them, the

6    effects they have when they're on or off of them?

7    A.    I've had experience in my prior employment as an emergency

8    medical technician but not in a clinical setting or in any sort

9    of diagnosis or anything like that.

10   Q.    Do you have any experience interviewing or working with

11   persons who have cognitive disabilities?

12   A.    I have interviewed other people with cognitive

13   disabilities, but I do not have formal training in that, no,

14   sir.

15   Q.    At one point he told you that his -- his words, mind

16   wasn't working a hundred percent, right?

17   A.    Yes.  That was early on in the interview.  He said he'd

18   just woken up.

19   Q.    Is that what you took that to mean?

20   A.    Yes.  And I followed it up by telling him that if there

21   was something that he didn't understand, if he didn't

22   understand a question, he was to stop us and told us -- ask us

23   another way.  We're not trying to trick him.  He seemed to say

24   that he had just woken up.  He had just been in the bathroom.

25   And that was early on in the interview.  I wanted to make sure

1    he understood all of our questions, which is why we kept

2    telling him to slow down and to make sure we were understanding

3    each other during the course of the interview.

4    Q.   You did have to tell him to slow down many times, right?

5    A.   Yes, sir.

6    Q.   You could sort of hear in the interview that he would talk

7    very fast at some points, right?

8    A.   Yes, he would speak quickly sometimes.

9    Q.   And get off topic a little bit, right?

10   A.   Yes.  He would focus on one particular part of a question

11   and would start answering just that, and we would ask him to

12   stop and go back and listen to the entire question, and then he

13   would provide the answer to that.

14   Q.   At one point -- actually, a couple points he would ask you

15   what's going to happen now, right?  What are the next steps,

16   right?

17   A.   Correct.

18   Q.   At one point you said that at the end of the day you make

19   some phone calls; if you clear the matter up, he would be let

20   go, no problem, right?

21   A.   Yes.

22   Q.   That wasn't exactly true?

23   A.   Well, yes.  If we found out that he wasn't the person who

24   was communicating with *Minor A*, then that would have been the

25   end of our encounter with him.  It worked out a different way

1    here.

2    Q.   When you went into the interview, you told him, Look, we

3    already know 99 percent of what we need to know, right?

4    A.   Yes.  I told him that.

5    Q.   At that point you believed you knew 99 percent of what you

6    needed to know, right?

7    A.   No.  I told him that, though.

8    Q.   Okay.

9    A.   I was still seeking a fair amount of information from Mr.

10   Rang.

11   Q.   When you went to interview him, you had believed -- you

12   believed that he was the person who had sent these messages,

13   right?

14   A.   Yes, I did.  I was still looking for corroborative

15   evidence, yes, sir.

16   Q.   When he told you that he wasn't -- initially, when he said

17   he didn't do this, you didn't believe him, right?

18   A.   That's correct.

19   Q.   When he basically told you things that you didn't believe

20   were true, you confronted him with that?  You told him, I don't

21   believe that.  I don't believe that's how it happened.  Right?

22   A.   Yes, that's correct, sir.

23   Q.   And that happened for a while, maybe for the first half of

24   the interview, right?

25   A.   Yes.

1    Q.   When he told you something that you believed was correct,

2    you told him that too, right?

3    A.   When he told me something that I could independently

4    verify, something outside of "auto correct," then, yes.

5    Q.   Well, things -- when he told you things that confirmed

6    your theory about how this happened, you told him that, right?

7    You basically indicated that you thought he was being truthful

8    when he explained those things, right?

9    A.   Yes.  When he told me what his phone number was and I

10   could show him that that was his phone number on that

11   particular chart that I showed him, that was me being

12   appreciative that he was telling me the truth as opposed to the

13   other versions of events of auto correct and my friend did it

14   and I was trying to be mean to a kid, which were just not

15   believable at all.

16   Q.   Those are things that, in theory, could be corroborated,

17   right?

18   A.   Anything is possible, sir.  My job was to make a

19   reasonable determination of what happened.

20   Q.   Meaning you had in your mind how this happened, and you

21   told him when you thought he was telling you or agreeing with

22   your version of things or not, right?

23   A.   When he told me the truth, I told him so.

24             MR. TENNEN:  Move to strike that last answer.

25             MR. TOBIN:  Objection.  Move to strike.  I don't know

1    why.

2         THE COURT:  I think the question -- let's withdraw the

3    question, withdraw the answer, and try it again.

4    Q.   When he told you what you believed was the truth, you

5    conveyed to him that you believed he was telling you a correct

6    answer, right?

7    A.   Yes.

8    Q.   When he told you something that you did not believe was

9    the truth, particularly towards the first half of that

10   interview, you also made that known to him, that you didn't

11   believe what he was saying, right?

12   A.   When he told me something unbelievable, yes, I informed

13   him of that, sir.

14   Q.   At one point he asked you about whether this conversation

15   would just stay between the three of you, meaning you, him, and

16   Trooper Smith, right?

17   A.   Yes, and he followed it up by asking me, Are you --

18   Q.   It's just a yes-or-no question.

19   A.   My apologies.  I thought you were asking me to explain.

20   Yes, he did ask me that.

21   Q.   He asked you if it would get back to his parents, right?

22   A.   Yes, sir.

23   Q.   And you said your role there is to protect his privacy,

24   not to tell his parents about anything, right?

25   A.   That's correct.

1    Q.   You said the only person you would convey the information

2    to is -- I don't know if you used the word prosecuting attorney

3    or prosecutor, something like that, right?

4    A.   Yes.  I told him that's where this tape would go to as I

5    was required to give it to them.

6    Q.   You're not really required to protect his privacy, right?

7    A.   I don't believe that I'm allowed to speak about the

8    contents of an investigation to a third party who is not part

9    of that investigation.  It may not be a legally binding policy,

10   but that's something that I adhere to because I have to.  It's

11   a confidential investigation.

12   Q.   In terms of protecting his privacy, you are certainly

13   allowed to share with prosecutors and others the information

14   that he tells you and gives you, right?

15   A.   Yes, as I explained to him.

16   Q.   You know that if there's some trial it might come out in a

17   public forum such as this, right?

18   A.   Yes, sir.

19   Q.   Fair to say that it was after that part of the

20   conversation, that is, when he asked you about if it stays

21   between the three of you and the responses you gave to him

22   about that, that he began to give answers that you believed

23   were true, right?

24   A.   I honestly don't recall where in the two and a half hours

25   that was.

```
 1           MR. TENNEN:  Can I have one second, your Honor?

 2           THE COURT:  Yes.

 3           MR. TENNEN:  I have nothing further.

 4           THE COURT:  You want to speak about that exhibit then?

 5   Go to sidebar.

 6   (SIDEBAR CONFERENCE AS FOLLOWS:

 7           MR. TOBIN:  Yes, your Honor.  My brother was kind

 8   enough to tell me this morning that he was going to attempt to

 9   get those in, perhaps even yesterday.  Thank you for that.

10           I don't know of a legal basis you can get that in

11   under the Rules of Evidence because they are out-of-court

12   statements.  They're being offered presumably for the truth of

13   the matter asserted.  So I asked him why are you -- I don't

14   know why he's trying to get them in, but he has not stated a

15   legal basis that permits them to come in.  These are letters of

16   the defendant.  They're statements of the defendant.  And this

17   may not be fair, but this has been the rule forever

18   practically.  We, the government, can get in the statement of a

19   party -- I'm sorry.  I'm sorry.  I misspoke.  I misspoke.

20           These are not letters from the defendant, a party

21   opponent.  These are letters from M███.  Nonetheless, the

22   principle remains the same.  They're out-of-court statements.

23   They come from a person who's not in court.  I don't know how

24   they come in.  There's no basis for them to come in.  You can't

25   just bring in a letter unless there's a reason it's not
```

1    hearsay.

2            THE COURT:  Is she coming in to testify?

3            MR. TOBIN:  She is coming in to testify.

4            THE COURT:  Is there any reason we want to decide

5    whether there is, after she testifies, a basis to bring them

6    in?

7            MR. TENNEN:  I was fine with that.  I don't think

8    their objection was who I got it in through.  I had it ID'd and

9    offered it at this point.  I originally said I'll have him ID

10   and I'll ask her about it.

11           THE COURT:  The rules of whether it comes in or not

12   will depend on what she testifies to.  It may be we can reserve

13   this question until she comes.

14           MR. TOBIN:  I think we can.  I agree with the Court.

15   For instance, if she says something that's contrary to what she

16   wrote in the letter, then presumably it could come in to

17   impeach her.  But if we're going to wait until she testifies,

18   we can defer the issue until then.

19           MR. TENNEN:  I can also say the reason I'm looking to

20   put them in is not for the truth of the matter but state of

21   mind.  These are letters that -- well, they don't all postdate.

22   Some are before and some are after her interview, and she had

23   information about this.  I think either one or two are after.

24   Just to sort of show that the tone of the letters, that she

25   continued to communicate with him.

```
1        THE COURT:  Let's do this.  Why don't you give me a
2   copy of the letter that you would have with a proposed exhibit
3   list.  I'm going to keep them out at this point through this
4   witness.  When M███ A███ testifies, if you want to introduce
5   it at the time, I will be better prepared to address the
6   issues.
7        MR. TENNEN:  Just so you know, there is one portion
8   that I redacted that just is, like, a reference to 2010, so if
9   you see a redaction, that's what that is.
10       MR. TOBIN:  Thank you, Judge.
11       THE COURT:  Thank you.
12   .  .  .  END OF SIDEBAR CONFERENCE.)
13       THE COURT:  Any redirect, Mr. Tobin?
14       MR. TOBIN:  Thank you, your Honor.
15  REDIRECT EXAMINATION BY MR. TOBIN:
16  Q.   Sir, you were asked on cross-examination if you had any
17  experience with individuals who possibly were bipolar, ADHD or
18  had cognitive issues or cognitive disabilities.  I want to
19  touch upon that for a moment.  How long did you serve as an
20  EMT?
21  A.   Over the course of several companies in the city of
22  Boston, probably about five, five and a half years.
23  Q.   Does that include times when you were an ambulance driver?
24  Is that accurate?
25  A.   For lack of a better term, yes, sir.
```

1    Q.   And did you deal with the general public who were in

2    distress repeatedly over those five years?

3    A.   Yes, sir.

4    Q.   Let me ask you:  During that time did you have contact

5    with individuals that had cognitive disabilities?

6    A.   Yes, sir, I did.

7    Q.   You became familiar with working with them?

8    A.   Yes.

9    Q.   Did you deal with people who were seemingly bipolar and/or

10   ADHD?

11   A.   Yes, sir.

12   Q.   You were also asked during cross-examination about whether

13   you had received any information from any other person in the

14   house about the defendant being bipolar, ADHD, or having

15   cognitive disabilities.  Do you remember those questions?

16   A.   Yes, I do.

17   Q.   Did you learn directly from family members or indirectly

18   from anyone else while there in the house questioning this

19   individual about bipolar, cognitive disabilities or ADHD?

20   A.   No, sir.  I learned of those from Mr. Rang.  The only

21   outside information I received was from Inspector Corichelli to

22   alert me to the defendant's possibility of violence.

23   Q.   When you say you learned of those from the defendant,

24   you're referring to what, bipolar and ADHD?

25   A.   Yes, when he told me on the recorded statement which we

1    heard here in court.

2    Q.   And only bipolar and ADHD did he bring up?

3    A.   That's correct, sir.

4    Q.   You were asked on cross-examination about the statement

5    you made to the defendant -- several statements you made to the

6    defendant, one of which was he asked if you were going to talk

7    or tell his parents.  Do you recall that?

8    A.   Yes, I do.

9    Q.   Did you tell his parents what he had said to you?

10   A.   No.  I provided his parents a copy of the search warrant

11   and the inventory at the conclusion of our warrant.

12   Q.   Who did you tell the defendant you would brief or tell

13   about the talk?

14   A.   I told him I would talk to them about and provide a copy

15   of the interview to the prosecutors, in this case the United

16   States Attorney's Office.

17   Q.   The office where I work?

18   A.   Indeed, sir.

19   Q.   Did you do that, provide information to the -- sorry.  Did

20   you provide information to the prosecutors as you said you

21   would?

22   A.   Yes, I did.

23   Q.   When you arrived at the residence, what were you wearing?

24   A.   I was wearing, I believe, jeans and a T-shirt and a

25   ballistic vest with police markings and indicia as well as a

1    badge on the front of it.

2    Q.   A ballistic vest, is that another term for a bulletproof

3    vest?

4    A.   Yes, sir.

5    Q.   And did you have the bulletproof vest on throughout the

6    duration of your stay in the house?

7    A.   No, sir.

8    Q.   What happened to it?

9    A.   Prior to the interview, for one thing for my own comfort,

10   both myself and Trooper Smith returned to my car, took off the

11   vest and everything else, and I put on a fleece.  And we went

12   back into the house to conduct the interview with Mr. Rang

13   since he stated he was willing to speak with us.

14   Q.   You testified on cross-examination that when you and the

15   other officers entered the residence to execute the warrant you

16   had weapons drawn, is that accurate?

17   A.   Yes, sir, it is.

18   Q.   Why do you draw weapons when entering a house you have not

19   been in before?

20   A.   Because the execution of a warrant, breaching that

21   threshold of a place in which we're going into, is the most

22   dangerous thing that we do.  We're going in there based on a

23   court authorization to investigate and try and gather evidence

24   of a crime.  On the other side of that door very frequently are

25   criminals, any number of whom have tried to do harm to us, be

1    it in the form of weapons, physical attacks, any number of

2    different things.  We have no idea what we're walking into.  So

3    for our protection and safety, that's a standard method how we

4    conduct warrants.

5    Q.   Now, did you continue to have your weapon drawn for the

6    entire duration that you were in the house?

7    A.   No, sir.

8    Q.   When did you reholster it, if that's the right term?

9    A.   Once the protective sweep was completed minutes after we

10   were done.  We checked the first floor, the second floor, and

11   the third floor, accounted for all individuals.  And our

12   assessment was that there was nothing immediately dangerous.

13   Weapons were holstered.  A number of people took off their

14   vests and began the process of slowly and methodically

15   conducting a search of that residence.

16   Q.   I believe you were asked some questions on

17   cross-examination about Exhibit 9-3.

18        MR. TOBIN:  Could we please show just -- I suppose

19   it's in evidence.  Let's show everyone 9-3.  Can we blow that

20   up?

21   Q.   For the record, what is on Exhibit 9-3?

22   A.   This is the UFED extraction report which I prepared

23   detailing the selected items from the contact section of the

24   defendant's iPhone.

25   Q.   There are modified dates there, is that not accurate, for

1    each of those?

2    A.   Yes, there is.

3    Q.   What does the modified date mean?

4    A.   The modified date is simply --

5         MR. TENNEN:  Objection.

6    Q.   Well, do you know what the modified date means?

7    A.   Yes, sir.

8    Q.   Do you know that from your training and experience as an

9    investigator?

10   A.   Yes, sir.

11   Q.   Have you dealt with records like this in the past?

12   A.   Yes, I have.

13   Q.   How frequently do you do that in these cases?

14   A.   Every single case.

15        THE COURT:  Go ahead.

16        MR. TOBIN:  Thank you.

17   Q.   What does the modified date mean?

18   A.   The modified date is a record which a computer or any kind

19   of digital device keeps for the last time that something in

20   that file was changed.  And a change can be something as simple

21   as, if you open up a contact on an iPhone and you select

22   update, just by means of example, if you look at something and

23   go, I hit the wrong button and you hit cancel, that could be a

24   change to that contact.  It doesn't mean that anything was

25   added or deleted.  It also happens by means of antivirus

1    software checking files.  There's a number of different ways.

2    It's not a gospel data point that you can use for that's the

3    last time it was used.  That's simply the brief version.

4    Q.   So looking at Babe *Minor A*, which is 1, and *Minor A* M,

5    which is 2, it has the modified dates, but it also has "times

6    contacted, zero."  So if we're looking at the top one, Babe

7    *Minor A*, modified October 31st, times contacted zero, does that

8    mean he contacted that number zero times after it was modified

9    or zero times in total, if you know?

10   A.   I do know and no, sir.  The times contacted is a bit of a

11   misnomer because we're dealing with an ios file system, which

12   is what Apple uses across all of their products.  These systems

13   are very good at determining when it connects to other Apple

14   devices.  It's not very good at determining whether it connects

15   to an Android device or through a third-party application.  So

16   this is recording, by and large, the number of times that the

17   software could have captured, and there's a number of reasons

18   why it either may or may not have been captured.

19        So, for example, in the case of Babe *Minor A*, there

20   wouldn't be any times listed as contact because all of that

21   contact was done through the third-party TextNow application.

22   In the case of Line 2, in *Minor A* M, he's calling a house

23   phone, not another Apple device, so it wouldn't show up in

24   Apple's native's format, things of that nature.

25             MR. TOBIN:  I was going to say this is my last series

1     of questions, but I'll learn not to say that.

2     Q.   You were asked essentially on cross-examination that on

3     *Minor A*'s phone was what purported to be a screenshot of a

4     message from the Rang phone, "I am crying without u," October

5     31st.  And you were asked by the defense attorney, Well, why

6     don't we see that on the text on *Minor A*'s phone?  I just want

7     you to explain that.

8          First of all, have you actually seen in the evidence

9     in this case, "I am crying without u," message from Rang to

10    *Minor A*?

11    A.   Yes, I have, sir.

12    Q.   Where did you see it?

13    A.   I saw it in a separate section in the UFED portable case

14    as I reviewed the evidence in this matter.

15    Q.   On Exhibit B for identification?

16    A.   Yes, sir.  It's on that.

17    Q.   All right.  Why did that not make it into the excerpt of

18    the texts that the jury has spent significant periods of time

19    looking at?

20    A.   I'm honestly not sure, sir.  My best guess, based on my

21    training and experience with this tool, is that all of the

22    searches -- because it comes up, basically, in the left-hand

23    column of the UFED reader, is all of the categories of data:

24    contacts, images, web history, things of that nature.  Each one

25    of those headings has a particular computer algorithm that's

1    automatically drawing the information from the whole guts of

2    the device as you described them and sorting them for me.

3         A forensic examiner can go in and manually go through

4    the individual ones and zeros to find that, but that's not what

5    my role is, and that's not how I use it.  If a particular

6    forensic tool puts it in chats as opposed to SMS messages or

7    multimedia messages, it's something that I -- it would not be

8    included in that simple textual recitation.  Quite frankly, I

9    should have included it for the exhibit, and it was an

10   oversight on my part.

11        MR. TOBIN:  Thank you, sir.  I have no further

12   questions.

13        THE COURT:  Are you --

14        MR. TENNEN:  Yes, sorry.  I don't want to characterize

15   how long I'm going to be.

16   RECROSS-EXAMINATION BY MR. TENNEN:

17   Q.   When you first encountered Mr. Rang at his residence the

18   day you executed the search warrant, at that point you still

19   had your tactical vest on, right?

20   A.   Yes, sir.

21   Q.   When you talk about you and Trooper Smith and others kind

22   of changing, for lack of a better word, that was after at least

23   that encounter with Mr. Rang, right?

24   A.   Yes.  We had a brief conversation in his bedroom while he

25   was handcuffed.  I then left, subsequently took off my vest,

1    did a number of other tasks, and then came back in.

2    Q.   The other law enforcement officers that were in the room

3    with him prior to you going there also still were in uniform,

4    for lack of a better word?

5    A.   Yes, sir.  They were wearing police indicia, things like

6    that, correct.

7    Q.   Vests or -- similar to you, right?

8    A.   Yes.

9    Q.   And when you say you and others at some point holstered --

10   is maybe the word you used -- holstered your firearms, meaning

11   that some people still had firearms just on their side while

12   they were conducting the search, right?

13   A.   Yes, that's true.

14   Q.   What about you and Trooper Smith while you were

15   interviewing Mr. Rang?

16   A.   When I was interviewing Mr. Rang, my firearm was

17   holstered, and that was concealed underneath the fleece that I

18   was wearing at the time.  Trooper Smith also had his weapon

19   holstered, his police indicia and ballistic vest removed.  I

20   believe he had a jacket on or a windbreaker on while we were

21   talking to him.

22             MR. TENNEN:  Thank you.

23             MR. TOBIN:  No further questions, your Honor.

24             THE COURT:  You may step down.

25             THE WITNESS:  Thank you, your Honor.

1          THE COURT:  Ready for --

2          MR. TENNEN:  Yes.

3          THE COURT:  We're going to -- to accommodate witness

4     schedules, we are going to take a witness out of order.  So if

5     you want to call your --

6          MR. TENNEN:  Two witnesses.

7          THE COURT:  Two witnesses out of order.

8          MR. TENNEN:  The first one is Catherine Rang, your

9     Honor.

10          CATHERINE RANG, Sworn

11          THE CLERK:  Please state your name for the record.

12          THE WITNESS:  Catherine Rang.

13          THE CLERK:  Thank you.  You may be seated.

14     DIRECT EXAMINATION BY MR. TENNEN:

15     Q.   Good morning, Ms. Rang.

16     A.   Good morning.

17     Q.   Where do you live?

18     A.   143 Second Street, Coaldale, Pennsylvania.

19     Q.   Who do you live there with?

20     A.   My husband and my daughter.

21     Q.   How are you related to Robert Rang?

22     A.   That's my son.

23     Q.   Do you work?

24     A.   Yes.

25     Q.   What do you do?

1   A.   I work with special needs students.

2   Q.   How long have you done that?

3   A.   Seventeen years.

4   Q.   Is that in the Coaldale area?

5   A.   It's all the schools in Carbon County and Lehigh County.

6   Q.   Okay.  How old is Robert?

7   A.   Twenty-seven.

8   Q.   Where did he grow up?

9   A.   In New Jersey, until he was four, and then Pennsylvania.

10  Q.   Okay.  Is that in the Coaldale area?

11  A.   Yeah.

12  Q.   So him and you lived in Coaldale pretty much from his age

13  four to the present, right?

14  A.   Yes.

15  Q.   And growing up, who lived in the house with you and him?

16  A.   Myself, my husband, and I have five children altogether,

17  counting Robert.

18  Q.   Just first names, what are their names?

19  A.   Heather, Robert, Thomas, Nicole, and Allison.

20  Q.   After you moved to Coaldale, you said, when Robert was

21  about four years old?

22  A.   About four, yeah.

23  Q.   Did he start attending school at that point in the

24  Coaldale area?

25  A.   He started preschool, yes.

1    Q.   During the course of him attending school, were there ever

2    any problems that he had?

3             MS. PARUTI:  Objection.

4             THE COURT:  It's pretty overbroad.

5             MR. TENNEN:  Sure.

6    Q.   At some point while Robert was attending schools, did you

7    have to try and get some special services for him to be able to

8    participate in school?

9    A.   Yes.

10   Q.   Can you describe that a little bit?

11            MS. PARUTI:  Objection.

12            THE COURT:  I'm going to allow it.  Go ahead.

13   A.   By the time he was in third grade, he was put into special

14   education classes.

15   Q.   What's a special education class?

16   A.   You're not in a regular classroom setting.  You're in a

17   special classroom with children like him.

18   Q.   Okay.

19   A.   Anybody with a disability now, it's more mainstreamed.

20            MS. PARUTI:  Objection.  It's beyond the scope of the

21   question.

22            THE COURT:  So we do this in a little bit of a formal

23   process.  He's going to ask you a question.  You can only

24   answer as far as the question goes.

25   Q.   And if you hear a lawyer get up and say objection, just

1    pause your answer, okay?

2    A.    Okay.

3    Q.    What kind of services did he receive through those classes

4    -- or through that placement, I should say?

5    A.    With every single subject in school.

6    Q.    Just describe --

7    A.    English.

8    Q.    -- generally the kind of services.

9    A.    Math, English, science, all your subjects that he would

10   attend school for.

11   Q.    Right.  But what were the actual services or

12   accommodations that were made for him?

13   A.    There would have to be a one-on-one teacher with him.  It

14   was, like, a smaller classroom setting.  So there was, like, a

15   teacher.  And if he went out of that classroom to go to

16   different classrooms for special subjects, the teacher would

17   have to accompany him there.

18   Q.    Any other services beyond what was in the classroom?

19   A.    From the time he was little, from the time he went to --

20   he was three, he went to MHMR, which is Mental Health Mental --

21          MS. PARUTI:  Objection.

22          THE COURT:  I'll see you at sidebar.

23   (SIDEBAR CONFERENCE AS FOLLOWS:

24          MS. PARUTI:  Your Honor, I have a concern with this

25   witness and what she's actually going to be testifying to on a

1    few different grounds.  One, counsel has elicited that he

2    received special education services, which is fine.  I think

3    that could be somewhat relevant.  The purpose for which it's

4    admissible, which is in evaluating all the facts and

5    circumstances surrounding his interview 20 years later, I would

6    not expect that counsel would be able to have Mrs. Rang go

7    through each of the different diagnoses that were offered by

8    different either caregivers or evaluators throughout the course

9    of his life because, one, she's not allowed to interpret them,

10   especially where her -- we do have a witness on the defense

11   witness list, Dr. Pivovarova, who will be allowed to do that

12   and will be allowed to actually interpret the information in an

13   admissible format as an expert witness.  As a lay witness, she

14   can't talk about information she learned from other people who

15   actually made those diagnoses.  And she certainly can't

16   interpret them to give any sort of information or opinion to

17   the jury about how that -- how those diagnoses actually affect

18   the defendant's ability to, I assume, in this case, understand

19   what was happening during the interview 20 years later.

20             THE COURT:  So I'm going to let this witness -- I'm

21   going to instruct the jury that she's not giving a medical

22   diagnosis.  I will allow this witness to testify to her

23   observations and also to -- not what she was told as in that

24   these things were, in fact, true but what her understanding

25   was, as a parent, of what was going on and what she observed.

1    I think the theory in evaluating the interview is permitted to

2    have that background understanding of how his experience has

3    been observed in understanding things.

4         MS. PARUTI:  Okay.  So I'll just -- the Court can note

5    I'll have that ongoing objection.  I'll only stand to object if

6    she's going to give information -- if that goes outside the

7    scope of that ruling, for example, that she's reporting

8    specific numbers for what his I.Q. was.  That's something that

9    she has no way to independently observe herself.

10        THE COURT:  Okay.  But, again, I mean, it's really

11   hard to corral a person's wording between what you would agree

12   is on one side or another side of the line and what you would

13   agree on another.  I think the way is to instruct the jury that

14   it's not being offered for a diagnosis but to help them

15   understand what she is reporting about her observations of him.

16   She is allowed to report on --

17        MS. PARUTI:  Okay.

18        THE COURT:  Mr. Tobin, you're furrowing your brow.

19        MR. TOBIN:  I'm sorry.  I'm not furrowing my brow.

20   The Court is going to allow her to talk about her observations,

21   the relevance 20 years later.  What I found more difficult to

22   accept is I don't think she should be able to say, Oh, yes,

23   when he was five, he saw a doctor who told me that he was

24   mentally retarded or something like that.  All of those kinds

25   of diagnoses are going to come in through the doctor, and you

1    had indicated perhaps that it would be important because of

2    what she knew.  I don't think that's really relevant.  If she

3    can say he was slow, great.  But to start talking about doctors

4    told her 20 years ago, I would respectfully suggest is really

5    unnecessary and not appropriate.

6                THE COURT:  If we were not having a doctor, we would

7    have a more fulsome argument here, but I don't think it's going

8    to matter that much.  And I will instruct the jury, and I

9    will --

10               MR. TOBIN:  Very good.  Thank you, Judge, and thank

11   you for letting me speak.

12   .  .  .  END OF SIDEBAR CONFERENCE.)

13               THE COURT:  Mr. Tennen is going to be asking a number

14   of questions about Ms. Rang's observations of her son.  She is

15   not testifying here as a medical professional.  She's not

16   giving you the definitive word on whatever she's being told

17   that you should take for the truth of the underlying

18   information.  You will hear other witnesses, and you can decide

19   on whatever matters come in there.

20               But she's just -- this is primarily to give some

21   context of her observations of her son.  That's really all that

22   you're taking from her, is what she's observing, not what the

23   professionals -- not the truth of what the professionals did or

24   did not tell her.

25               So with that, again, and that is the focus of these

1    questions, is your own observations.

2    Q.   So I think when we left off I was just asking you about

3    some of the different services that Robert had he was little.

4    You talked a little bit about some special education classes.

5         Did he receive other services outside of special

6    education classes?

7    A.   Yes, when he was four, when he started preschool.  He was

8    seeing a child psychiatrist and a psychologist from the time he

9    was four.

10   Q.   What was your understanding of why he was seeing them?

11   A.   He definitely had disabilities.  He is ADHD, bipolar, and

12   intellectually disabled.

13        THE COURT:  Again, the diagnoses that are being

14   asserted are not -- that's not something that this witness can

15   be the one to testify to for you.  So I think that's -- take

16   that as that's what she was told.  And now, if you want to get

17   into observations, that would be --

18        MR. TENNEN:  Yes.

19   Q.   So in listening to the judge -- right, my next question

20   is:  Just in terms of what you saw, what did you see that made

21   you think that he might have disabilities?

22   A.   From the time he was in kindergarten, he couldn't do the

23   work.  He didn't get promoted from kindergarten to first grade.

24   He had to go to pre-first because he could not do the work.  He

25   couldn't sit still to do the work.  Always had trouble making

1    friends.  There was a lot of different issues in school.

2    Q.   Okay.  What about outside of school?  What about just in

3    your interactions with him or within the family home or things

4    like that?

5    A.   Like I said, he never really went outside to play with

6    friends because he didn't make friends very well because he was

7    always too immature to have friends.  And he got bullied a lot.

8         MS. PARUTI:  Objection.

9         THE COURT:  I'll allow it.

10   Q.   Do you -- I'm sorry.

11   A.   He always had to buy his friends, he felt.  That's what he

12   did.

13   Q.   Now, you started mentioning another acronym of services,

14   MHMR?

15   A.   MHMR.  It's Mental Health Mental Retardation.

16   Q.   What sort of services did he get from that organization?

17   A.   Counseling.

18   Q.   And starting around what age?

19   A.   Four.

20   Q.   Until?

21   A.   He saw a psychiatrist until he graduated high school at

22   19.

23   Q.   Was that through the same organization?

24   A.   No, not all the time, no.  He went to a private

25   psychologist and psychiatrist later on in life.

1   Q.   And the MHMR, did he continue to get services through that

2   organization then throughout his childhood?

3   A.   Yes.  Later on, as he got older, it was an agency called

4   Service Access Management, same thing but for older kids.

5   Q.   Okay.  So after high school, basically?

6   A.   Yes.

7   Q.   He started working with that agency?

8   A.   Yes.

9   Q.   What kind of services would they provide?

10  A.   They'd come to the house, and it was -- they would

11  evaluate him every time they came.  It would be something for

12  later on in life.  Like, when I'm not around, who would take

13  care of him?  He certainly couldn't live on his own.

14  Q.   Why do you say that?  What sorts of things could he not do

15  on his own?

16  A.   He can't handle money.  He can -- I guess you can say he

17  can cook simple things in a microwave.

18  Q.   In terms of money, did he ever have a source of income

19  that you knew about?

20  A.   Yes.  He received S.S.I. and Social Security.

21  Q.   How long did he receive that?

22  A.   From the time he was little until he was arrested.

23  Q.   Who would manage that money for him?

24  A.   I would.

25  Q.   Through -- from the time he was little through 2014?

1    A.   It was a Social Security doctor that said he couldn't --

2    he had to be evaluated by one of them.

3             MS. PARUTI:  Objection, move to strike.

4             THE COURT:  Stricken.

5             MR. TENNEN:  Yeah.  I'll maybe lead a little bit.

6    Q.   So he was receiving those benefits from the time he was

7    four until about 2014?

8    A.   I think from the time he was five.  He started

9    kindergarten and that's when he started.

10   Q.   But the money was sent to you to manage for him?

11   A.   Yes.

12   Q.   That's something you did up until the time he got

13   arrested?

14   A.   Yes.

15   Q.   Meaning that you controlled putting it into a bank account

16   and distributing to him, things like that?

17   A.   It went to pay -- later on in life, it went to pay his

18   bills that he had.  I would pay them, and whatever was left

19   would be distributed to him.

20   Q.   As far as you're aware, did he ever take medications?

21   A.   Yes.

22   Q.   When did he start taking medications?

23   A.   When he was four.

24   Q.   How long did he take medications for?

25   A.   Until he graduated high school.

1    Q.   Do you know which medications he took?

2    A.   The last set, I mean, because he had multitude --

3              MS. PARUTI:  Objection.

4              THE COURT:  Yeah, I --

5              MR. TENNEN:  Okay.  Fair enough.

6    Q.   In terms of the special education, is that something that

7    would be reevaluated from time to time?

8    A.   Yes.  Every year going in he had what they call an IEP.

9    Q.   Which stands for?

10   A.   Individual Educational something.

11   Q.   Okay.  Program maybe?

12   A.   I forget.

13   Q.   Is that something that every year they would review that

14   to assess what services he needed?

15   A.   Yes.

16   Q.   Now, just in terms of your interactions with him so not

17   about services or interactions with doctors or anything like

18   that, just in your own observations -- and let's talk sort of

19   later in life so, you know, from the point he graduated high

20   school to the point that he was arrested, all right?

21   A.   Okay.

22   Q.   Talk a little bit about how you -- did you have any

23   problems ever communicating with him?

24   A.   You would have to explain stuff that he could understand.

25   You can never give him multiple-step directions and expect him

1  to get to that finish point that you asked him to.  You had to

2  always break everything down for him, and even then sometimes

3  the outcome never was what you were looking for.

4  Q.   Is that essentially true for your interactions most of his

5  life?

6  A.   Yes.

7  Q.   Did he ever -- as far as you know, was he ever able to

8  maintain employment?

9  A.   Time to time.  I want to say the longest, I believe, he

10  held a job was five months, and that was just pushing carts at

11  Walmart.

12  Q.   Okay.  Now, let's go to, let's say, between -- in the

13  years leading up to 2014.  Did he have a PlayStation?  Did he

14  like to --

15  A.   Yes.

16  Q.   How long, if you recall, was he into playing games?

17  A.   Quite a few years, I'd say.

18  Q.   Okay.  How often would he play?

19  A.   You mean at one time, like, for -- or --

20  Q.   In the course of a week or in the course of a day, how

21  often would he play?

22  A.   I'd say a couple times a week at least.

23  Q.   Would he ever play with other people?

24  A.   Yes.

25  Q.   I guess what I mean by that, would he ever play with other

1    people present with him, physically present with him?

2    A.    Yes.

3    Q.    Would this happen --

4    A.    His friends would come to our house.

5    Q.    To the house, all right.

6    A.    Yes.

7    Q.    And they would play up in his bedroom?

8    A.    Yes.

9    Q.    Do you know the names of any of the friends that would

10   play with him?

11   A.    There were two different Chrises, Jose.

12   Q.    Is one of the Chrises Chris Weirich?

13   A.    Chris Weirich, Chris Schweibinz, and Jose Carnish (ph).

14   Q.    If you know, how long had he known these persons or been

15   friends with them?

16   A.    Since he was younger in school.

17   Q.    These were classmates of his?

18   A.    Yes, special ed.  They were all in special ed together.

19   Q.    How often would he play with other people present in the

20   house?

21   A.    Pretty much all the time when he played.

22   Q.    By the way, who bought the PlayStations for him, if you

23   know?

24   A.    My other -- when his one broke, my son, my other son Tom,

25   he put it on his credit card, and Robert had to pay him back,

1    and I did that out of his money.

2    Q.   Would he ever -- did you ever see him taking his devices

3    out of the house?

4    A.   Yes.

5    Q.   How often would that happen?

6    A.   I --

7    Q.   As best -- you could say you don't know, as best as you

8    can think.

9    A.   I don't know.  Sometimes it would be gone for a week at a

10   time he wouldn't have it back.

11   Q.   Okay.  In the -- let's say in the months of October,

12   November, December of 2014, if you can recall, was he working

13   during that time period?

14   A.   Yes.

15   Q.   Do you know what he was doing?

16   A.   He was a delivery driver for Crown Fried Chicken, I

17   believe it was called.

18   Q.   Do you have any idea how often he would work?

19   A.   He worked a lot of hours there.  For those couple months,

20   it was -- I want to say he probably started in September.  It

21   was either September, October.

22   Q.   Okay.

23   A.   Because they were just opening then.  And it was right

24   around Christmastime or right after Christmas that he stopped

25   working there.

1   Q.   When you say a lot of hours, let's start sort of on a

2   daily -- how many days of the week, more or less, would he

3   work?

4   A.   Almost every day.

5   Q.   How many hours a day would he work?

6   A.   Quite a few.  They were open till, like, 2 in the morning.

7   He would go in around 11, 12, and then he would be there till

8   sometimes 2 in the morning.

9   Q.   So 11, 12 in the afternoon?

10  A.   Yes.

11  Q.   During that time period, he was doing that almost daily?

12  A.   Yes.  They were open seven days a week.

13  Q.   I want to ask you some questions about the day when they

14  came to conduct the search of your house.  Were you there that

15  day?

16  A.   Yes.

17  Q.   Who else was in the house that day?

18  A.   My husband and my daughter Allison.

19  Q.   At some point in the morning, did you hear noise related

20  to that?

21  A.   Yes.  It was around 8:00 in the morning, and I had been

22  sleeping.  It was Christmas break so I was off of work.  You

23  could hear a lot of commotion.

24  Q.   Where were you when you heard that?

25  A.   I was in my bedroom.

1    Q.    Is that on the second floor?

2    A.    Yes.

3    Q.    Is that on the same floor in which Robert had a bedroom?

4    A.    Yes.

5    Q.    And then there were other bedrooms on that floor too?

6    A.    It was my bedroom, my son Tom's bedroom, my daughter

7    Allison's bedroom, Robert's bedroom, and the bathroom.

8    Q.    When you heard this commotion, as you describe it, what

9    did you do?

10    A.    I opened my door and came out.

11    Q.    What did you see?

12    A.    There was a bunch of people coming up the stairs.  The

13    first cop that was there had his gun drawn, and he told me to

14    show him my hands.  And I had just woken up so I said, What

15    for?  Like, he startled me.

16    Q.    Yeah.

17    A.    I remember him just saying, Just show me your hands, and I

18    did.  Then he told me to go downstairs.  I said, Well, before I

19    do, can I wake up my daughter?  I didn't want them going in

20    there and waking her up.  She would be scared.  So I did.  And

21    I remember them asking where Robert's room was.  So we -- I --

22    actually, we told them that it was -- where it was, and they

23    continued down the hallway.  I woke up my daughter.  And then

24    they told us we had to go downstairs.

25    Q.    About how many persons did you see coming up the stairs in

1    that time?

2    A.    A lot of them.  I want to say six, seven, eight.

3    Q.    Did they all have firearms drawn?

4    A.    No.  I could only see the first person when he came up.

5    Q.    All right.  How did they look?  What were they wearing, if

6    you remember?

7    A.    You could tell they were cops or -- you know.

8    Q.    Law enforcement of some kind?

9    A.    Yes.

10   Q.    So you were instructed to go downstairs?

11   A.    Yes.

12   Q.    With your daughter?

13   A.    Yes.  My husband was already downstairs.

14   Q.    All right.  Where did you go when you were downstairs?

15   A.    Into the living room.

16   Q.    Were you able to remain there?

17   A.    Yes.

18   Q.    Were you able to -- this is just a yes-or-no question --

19   see or hear anything that was going on upstairs while you were

20   in the living room?

21   A.    No.

22   Q.    Now, were you able to see law enforcement in your house

23   while you were in the living room?

24   A.    Yes.

25   Q.    Where were they generally?

1    A.    Some were in the living room.  Some were -- at the time it

2    was the computer/playroom for my grandkids, and then the rest

3    were upstairs.

4    Q.    Now, at any point did you -- did you go upstairs --

5    A.    Yes.

6    Q.    -- after you were in the living room?

7    A.    I asked to use the bathroom.  I hadn't gone since I woke

8    up.  And there was -- somebody accompanied me upstairs.  They

9    checked the bathroom to make sure it was all right, and then

10   they let me use it.

11   Q.    Okay.  While you were up there, were you able to see

12   Robert?

13   A.    Yes.

14   Q.    What did you see?

15   A.    Through the bedroom door.

16   Q.    Just what did you see?

17   A.    He was handcuffed near his bed.  He was sitting on the

18   bed.

19   Q.    Were there other people with him?

20   A.    Yes.

21   Q.    About how many?

22   A.    I'd say three, four.

23   Q.    Okay.  After that, did you go back downstairs?

24   A.    Yes.

25   Q.    And then at any point did you go -- I'm sorry.  You went

1    back downstairs, right?

2    A.   Uh-huh.

3    Q.   And then at any point did you go back upstairs again?

4    A.   I had to use the bathroom again.

5    Q.   About how long was -- after they had gotten there was

6    that?

7    A.   Maybe an hour.

8    Q.   So what did you do when you went back upstairs?

9    A.   I went to the bathroom.  Of course, they had to make sure

10   somebody went up and make sure the bathroom was still okay.  At

11   that point I noticed Robert wasn't in his bedroom.  I saw there

12   was a lady.  She was the only lady there.  I don't know her

13   name.

14        MS. PARUTI:  Objection to what's coming next.

15        THE COURT:  I think you may be beyond where the

16   question is.  And let's keep going.

17        MR. TENNEN:  Sure.  I can --

18   Q.   So while you were up there, other than the person who

19   escorted you to the bathroom, did you see anybody else?

20   A.   Yes.  There was a lady, and I don't know her name.  But

21   she was the only one there.  All the rest were men.  And she

22   was standing in front of the --

23        THE COURT:  That was just the question.  Now you need

24   to wait until the next question.

25   Q.   Was this one of the law enforcement people that had come

1    in that day?

2    A.    Yes.

3    Q.    Where was she standing?

4    A.    Near the attic door, with her foot on the attic door.

5    Q.    So to go up to the attic, there's actually a door that can

6    close?

7    A.    Yes.

8    Q.    So you saw her standing there with her foot on the door?

9    A.    Yes.

10   Q.    Did you say anything to her when you saw her?

11   A.    Yes, I did.

12           MS. PARUTI:  Objection.

13           THE COURT:  Question:  Did you say anything?  That's a

14   yes-or-no question.

15   A.    Yes.

16           MR. TENNEN:  I am going to now ask her what she said

17   though.

18           MS. PARUTI:  Objection.

19           THE COURT:  So this is not being -- whatever she said

20   may or may not have been true, and you're not being asked to

21   decide whether it was true or not.  The question is just what

22   she said for what effect it may or may not have had on anyone

23   else.  This is a statement out of court.  You're not normally

24   allowed to have that introduced.  But it's not for whether what

25   she said was true or false.  It's simply what the impact of

1    what she said was or wasn't.

2    Q.   Now you can answer the question.  What did you tell that

3    person?

4    A.   I just asked them how come Robert was in the attic.  I

5    just clearly stated, It's unheated.  There's no heat in the

6    attic.  How come he's up there?

7    Q.   Okay.  Was that the extent of it?

8    A.   Pretty much.

9    Q.   And you went back downstairs?

10   A.   Yes.

11   Q.   At some point did you speak to anyone else again regarding

12   Robert?

13   A.   Yes, quite a few times.

14   Q.   Okay.  Let me just ask it this way:  Just, specifically,

15   at any point did you talk to anyone about any of the conditions

16   that Robert had?

17   A.   Yes, quite a few times.  I said, you know, I feel

18   uncomfortable with people talking to him and questioning him by

19   himself.  I mean, in reality, he has the mental capability of a

20   12-year-old.

21   Q.   These are the words that you used to convey --

22   A.   I told them he was mentally retarded.

23   Q.   Okay.

24   A.   Even though that's not the proper wording for it, that is

25   what I said.

1    Q.   I know you don't know names.  But can you describe a

2    little bit who you told or where you told them?

3    A.   One was the lady.

4    Q.   Okay.

5    A.   At least to two other men, and one was in the living room,

6    between my living room and my -- what then was the

7    computer/playroom.  And then one was upstairs.

8    Q.   Okay.  Was this at different points during that morning?

9    A.   Yes.

10   Q.   Was this -- but when was the first time you mentioned that

11   to somebody, let's say, in relation to your first trip to the

12   bathroom?

13   A.   Within 15 minutes of them being there.

14   Q.   Okay.  So was that before or after you went to the

15   bathroom, if you remember?

16   A.   Before I went to the bathroom the first time.

17   Q.   This is while you were downstairs you told somebody?

18   A.   Yes.

19   Q.   And then, when you went upstairs to the bathroom, you

20   mentioned something again to the woman who was holding the

21   door?

22   A.   Yes.

23   Q.   And then sometime after that when you went downstairs you

24   mentioned it again?

25   A.   And there was a gentleman downstairs.  When I said it to

1   him, he said, I'll let them know.

2            MS. PARUTI:  Objection.  Move to strike.

3            THE COURT:  So I'm going to strike that because it's

4   beyond the question.  We'll deal with the objection during the

5   break.  It is break time.

6            THE CLERK:  All rise for the jury.

7   (The jury left the courtroom at 11:02 a.m.)

8            THE COURT:  Mr. Tennen, I understand why you are

9   asking -- let's go to sidebar.

10           MR. TENNEN:  I was going to go back to my seat.

11           THE COURT:  Let's do it at sidebar.

12   (SIDEBAR CONFERENCE AS FOLLOWS:

13           THE COURT:  I've allowed her statements to the law

14   enforcement officers because those aren't being offered for the

15   truth.  They're being offered for information that was relayed

16   to law enforcement.

17           What is the purpose that you're offering the law

18   enforcement statement back to her?

19           MR. TENNEN:  I didn't.  All I asked her is what she

20   told them.  She continued to answer.  I can only control her so

21   much.

22           THE COURT:  You're not asking --

23           MR. TENNEN:  I wasn't.  I just asked her who she told

24   and get all that down.

25           THE COURT:  Okay.

1    .  .  .  END OF SIDEBAR CONFERENCE.)

2          THE COURT:  I have one more question.  I have a couple

3    questions on the exhibits before we go on our break.  The disk

4    that you've given as an exhibit, is that something that is a

5    readable thing, that the jurors would have opportunity to read?

6          MR. TOBIN:  Well, your Honor, they are in PDF, which

7    means they're readable.  I believe, if you're referring to

8    exhibits for identification B --

9          THE COURT:  I'm not.  I'm referring to -- there is a

10   disk that was --

11         MR. TENNEN:  The Verizon subscription information?

12         THE COURT:  Right.  Is that a disk that is --

13         MR. TOBIN:  Yes, your Honor, it is readable.

14         THE COURT:  Okay.  And that disk just has phone

15   numbers on it, is that correct?

16         MS. PARUTI:  It has call -- it's call logs.  There's

17   no content about communications.

18         MR. TOBIN:  But I believe there's also subscriber

19   information on it which has been introduced or at least a

20   portion of it or introduced as a paper exhibit.

21         THE COURT:  But the photographs aren't on it?

22         MR. TOBIN:  No.

23         THE COURT:  That was just one thing I wanted to make

24   sure before it's back in front of the jury, and I will forget

25   next week.

1          The other question is:  You introduced exhibits that

2     were the extraction reports that look like something generated

3     by this program.  And those were all admitted.

4          MR. TOBIN:  Well, they were admitted for

5     identification.

6          THE COURT:  No.  The extraction reports are, for

7     example, 9-3.

8          MR. TOBIN:  Yes, yes, of course.

9          THE COURT:  They're printouts and they look like a

10    printout that comes off of this document.  But you also, at the

11    end of the testimony, had what looks like an Excel spreadsheet

12    that's different colors and --

13         MR. TOBIN:  Yes.

14         THE COURT:  That's not a computer-created report.  It

15    was a report created by Mr. Connelly, correct?

16         MR. TOBIN:  Well, it was created by the United States

17    Attorney's Office.

18         THE COURT:  So my question really is:  Should that be

19    a chalk rather than an exhibit?

20         MS. PARUTI:  If it's admitted as a summary chart under

21    Federal Rules of Evidence 1006, it can be admitted and should

22    be because it's used to -- there's no annotation there.  It's

23    just data that's culled from a larger volume of information.

24         THE COURT:  That was my concern.  There is annotation,

25    which is all the coloring on the chart.

1          MS. PARUTI:  The coloring is annotation, but the --

2     there's no, like, interpretation.  So there's no assignation --

3     there's no assigning, for example, a contact name to the 774

4     number.  There's no -- and I think the case law -- when the

5     case law talks about annotation, I think it's really the courts

6     are more concerned with the government importing more

7     information, the content information.

8          THE COURT:  I guess the information that you're

9     inputting is simply the color coding but -- and so the color

10     coding is only to make it visually easier to follow?

11          MR. TOBIN:  Yes.

12          MS. PARUTI:  Correct.

13          MR. TOBIN:  In fact, initially, we had a chart:

14     yellow stands for this; blue stands for this; green -- we took

15     that out, I think, for the concern and the suggestion you're

16     making.  That was removed.

17          THE COURT:  It doesn't appear that there is additional

18     content on the page, only the shading?

19          MR. TOBIN:  I believe -- not I believe.  That is

20     accurate.

21          THE COURT:  So you didn't make this objection.  I just

22     was concerned the chalk, because of the coloring, that it may

23     be a different item.  But if that's all it is --

24          MR. TENNEN:  So I had seen that they had taken out the

25     descriptions of it.

1          THE COURT:  Okay.

2          MR. TENNEN:  Because I had seen the ones with

3     descriptions.  So that, I wasn't bothered by.  My issue with

4     summary things was the spreadsheet that he had made of the

5     messages before but not with that.

6          THE COURT:  Okay.  And then just the last thing to

7     think about is, not that it has to happen in the next 20

8     minutes, but I have allowed, over the defendant's objections,

9     all of the documents where there's a chain-of-custody question.

10    My understanding of that status of the chain-of-custody

11    question is it's for the jury to evaluate what they think of

12    that chain of custody.  That said, the parties may want to

13    submit a proposed instruction on what you want me to say about

14    chain of custody.

15         MR. TOBIN:  Yes, your Honor.  Thank you.

16         THE COURT:  Break time.

17         THE CLERK:  All rise.  Court is in recess.

18         MR. TENNEN:  Your Honor, do you want a copy of the

19    letters?

20         THE COURT:  Thank you.

21    (Recess taken at 11:08 a.m.)

22    (The Court entered the courtroom at 11:28 a.m.)

23         THE COURT:  Anything else we need to deal with before

24    the jury?

25         MR. TOBIN:  No, your Honor.

1          THE COURT:  Ms. Rang, you can come back up to the

2     witness box.

3     (The jury entered the courtroom.)

4          THE COURT:  Go ahead, Mr. Tennen.

5     Q.   Mrs. Rang, before the break I was asking you questions

6     about what you said to law enforcement on that day.  And that's

7     all I'm interested in, right, so just things that came out of

8     your mouth, not out of their mouth, okay?

9     A.   Okay.

10    Q.   Maybe just to clear up the last question because I think

11    it got cut off.  I think you were talking about what you said

12    the third time you spoke to somebody.  What do you recall you

13    saying to that person?

14    A.   That I didn't feel comfortable with them speaking with

15    him, and the gentleman said he would --

16    Q.   No, no, no, so just what you said.

17    A.   That I didn't feel comfortable with them speaking with

18    him, him being mentally retarded, by himself.

19    Q.   At any point when you spoke to any of the law enforcement

20    officials there, did you tell anybody that Robert was violent

21    in any way?

22    A.   No.

23    Q.   Or had violent tendencies, anything like that?

24    A.   No.

25    Q.   If you can recall, how long were you down in the living

1    room before you left that day?

2    A.    I left earlier than they did.  My daughter had a doctor's

3    appointment.  I want to say it was near 12.

4    Q.    And so they allowed you to leave?

5    A.    Yes.  My husband was still there.

6    Q.    You left with your daughter?

7    A.    Yes.

8    Q.    So at that point your husband was there and so were all

9    the other law enforcement that were still there?

10    A.    Yes.

11    Q.    At that point did you see Robert or was he still upstairs?

12    A.    He was still upstairs.

13        MR. TENNEN:  Thank you.  I have no further questions,

14    your Honor.

15        THE COURT:  Ms. Paruti.

16        MS. PARUTI:  Thank you.

17    CROSS-EXAMINATION BY MS. PARUTI:

18    Q.    Good afternoon, Mrs. Rang.

19    A.    Good afternoon.

20    Q.    So you said you worked with special ed students for how

21    many years?

22    A.    Seventeen.

23    Q.    Seventeen years.  What's your actual job at the school or

24    schools that you work at?

25    A.    I am a job coach.  I take the students out to businesses,

1    teach them skills; hopefully, one day when they graduate, some

2    of them will be employed.

3    Q.    Okay.  And so you're working with what age population?

4    A.    Fourteen to 21.

5    Q.    And has that been for the whole 17 years that you've

6    worked in that field?

7    A.    Yes.

8    Q.    One thing, just for the court reporter, even though you

9    know what I'm going to ask you, you have to wait till I stop

10   talking so that she can record everything, okay?

11   A.    Okay.

12   Q.    Thanks.  Actually, I'm having trouble hearing you, so if

13   you can just talk into the microphone, that would be helpful.

14   A.    Okay.

15   Q.    Thank you.

16            And so you've worked with special ed students.  You

17   still work with special ed students?

18   A.    Yes.

19   Q.    And in 2014 when officers came to your house, were you

20   working in that field as well?

21   A.    Yes.

22   Q.    And are you a teacher or, like, a paraprofessional?

23   A.    Paraprofessional.

24   Q.    You would agree with me that in 2014 that people in the

25   field wouldn't use the term mentally retarded to refer to

1    people with intellectual disabilities, wouldn't you?

2    A.   Yes.

3    Q.   But you say that's what you were saying to the police

4    officers who were there?

5    A.   Yes, because I was very nervous, and that's the first

6    thing that came to mind and --

7    Q.   And it just came out?

8    A.   Yeah.

9    Q.   And you said, actually, when they first got there that you

10   had just woken up, and you were kind of a little out of it,

11   right?

12   A.   Yes.

13   Q.   Fair to say, when you -- most people, when you wake up,

14   sometimes you can be a little groggy, or you might not be a

15   hundred percent right away until you have some time to get

16   going; is that fair to say?

17   A.   Yes.

18   Q.   Okay.  Now, you said that police officers or agents that

19   were there allowed you to wake up your daughter rather than

20   storming into her room, correct?

21   A.   Yes.

22   Q.   How old was she at the time?

23   A.   So '14.  Let's see.

24   Q.   I can see you doing the math.

25   A.   She's 20 now so '14.  She was, like, 16, going to be 17.

1    Q.   And she was the only female living in your house at the

2    time?

3    A.   Yes.

4    Q.   You said you had other daughters, Heather and Nicole?

5    A.   Yes.

6    Q.   Is Nicole the one who's here today?

7    A.   Yes.

8    Q.   How old is Nicole?

9    A.   Twenty-two.

10   Q.   And she was not living in the house at that time?

11   A.   No.

12   Q.   Does she live nearby you?

13   A.   Now she does.

14   Q.   You came up from -- you still live in Pennsylvania now?

15   A.   Yes.

16   Q.   You came out here just to testify from Pennsylvania,

17   correct?

18   A.   Yes.

19   Q.   Did you get here by driving?

20   A.   Yes.

21   Q.   How long a drive is that?

22   A.   Seven hours.

23   Q.   And you and your daughter came together, made that drive?

24   A.   Yes, and her boyfriend.

25   Q.   And her boyfriend.  Last night or this morning?

1    A.   We left at a quarter of 2 this morning.

2    Q.   You're driving back right after court today?

3    A.   Yes.

4    Q.   That's a long drive.

5    A.   Yes, but she has kids, so we have to get back.

6    Q.   You said that during the execution of the search warrant,

7    there were some people -- you were downstairs at certain

8    points?

9    A.   Yes, most of the time.

10   Q.   Okay.  When you were downstairs, you knew that there were

11   people on the second level of the house, correct?

12   A.   Yes.

13   Q.   Okay.  And you knew they were in Robert's room at that

14   time?

15   A.   Yes, at one point.

16   Q.   Okay.  You couldn't hear what they were discussing, could

17   you?

18   A.   No.

19   Q.   And then you knew that Robert was on the third level of

20   the house, correct?

21   A.   Yes.

22   Q.   You couldn't hear what they were discussing, right?

23   A.   No.

24   Q.   Now, you said that Robert had -- leading up to or up until

25   around Christmastime in 2014, had been working at a chicken

1    restaurant or something?

2    A.    Yes.

3    Q.    And he worked quite a lot?

4    A.    Yes.

5    Q.    And he had to apply for that job, correct?

6    A.    Yes.

7    Q.    In some form or fashion?

8    A.    Some form.

9    Q.    Were you aware that he had a job interview scheduled for

10   the day the search warrant was executed?

11   A.    Yes.

12   Q.    And you said that in the past he had worked at some other

13   jobs too, right?

14   A.    A couple different factories and, like I said, Walmart.

15   He pushed carts.

16   Q.    Okay.  Nothing wrong with pushing carts, right?

17         But to get that job, he had to go through an

18   application process as well, correct?

19   A.    Yes.

20   Q.    And you said he received when he was younger -- he had

21   some problems.  He had trouble making friends, and he was, you

22   know, kind of immature, is that correct?

23   A.    Yes.

24   Q.    Those were some of the things you observed in him as a

25   child?

1    A.    Yes.

2    Q.    Okay.  And that was -- he's how old today?

3    A.    Twenty-seven.

4    Q.    So we're talking about when he was, like, a child?

5    A.    From the time he was four.

6    Q.    Okay.

7    A.    Actually, it stemmed back to when he was nine months old,

8    was the first visit I took him to.

9    Q.    I'm talking about your observations about him not being

10   able to make friends too easily.

11   A.    Yes.

12   Q.    Okay.  But you said he did have some friends, and they

13   would come over to the house and hang out, and he would go over

14   his friends' house and hang out with them there too, correct?

15   A.    Yes.  That was later on in life.

16   Q.    So, like, leading up to the time of the search warrant?

17   A.    Yes.

18   Q.    At that time he had become better employing all the skills

19   he learned from school at interacting with other people?

20   A.    Yes, but all special ed students.

21   Q.    It's a yes-or-no question, ma'am.

22   A.    Yes.

23   Q.    Thank you.  Now, you said that for the last job he had

24   that you knew about, he was driving -- he was a delivery

25   driver?

1    A.    Yes.

2    Q.    So he had a driver's license, correct?

3    A.    Yes.

4    Q.    Now, in Pennsylvania do you have to fill out a written

5    application for a driver's license?

6    A.    I believe it's online.

7    Q.    Okay.  But so you have to take some sort of test, right?

8    A.    Yes.

9    Q.    And you have a license?

10   A.    Yes.

11   Q.    And you had to take some test too?

12   A.    Yes.  I got mine in New Jersey.

13   Q.    And you have to do a driving test as well?

14   A.    Yes.

15   Q.    Okay.  And Robert had a driver's license?

16   A.    Yes.

17   Q.    And you said, actually, he graduated from high school when

18   he was 19, correct?

19   A.    Yes.

20   Q.    And you said -- you mentioned that, because of some

21   behavioral or learning problems, excuse me, he had to stay back

22   in between kindergarten and first grade, correct?

23   A.    Yes.

24   Q.    You would agree with me that that's not uncommon for boys

25   of that age, as a professional in the school system?

1          MR. TENNEN:  Objection.

2          MS. PARUTI:  I'll withdraw it.

3     Q.   But he went through, and he didn't skip any other --

4     excuse me.  He didn't skip any grades, right?

5     A.   No, not once he went to special ed.

6     Q.   And he didn't stay back anymore, right?

7     A.   No.

8     Q.   Because he got the support he needed to address his

9     learning disabilities, correct?

10    A.   I guess you could say that.

11    Q.   Okay.  And you say -- you were talking about how he was on

12    an IEP.  You would agree with me that that stands for

13    Individualized Educational Plan, correct?

14    A.   Yes.

15    Q.   Those are in place so that he can make the most out of his

16    learning environment, correct?

17    A.   Right.

18    Q.   And he was ultimately able to earn a diploma, correct?

19    A.   Yes.  He graduated high school with some areas only

20    achieving a sixth-grade level and in certain places 3.5 grade

21    level.

22    Q.   Okay.  So my question was:  He got a diploma?

23    A.   Yes.

24    Q.   And he did?

25    A.   Yes.

1    Q.    Okay.  And he actually was able to enroll in certain

2    classes in your local community college, wasn't he?  They

3    allowed him to enroll based on who he was and what he submitted

4    to them?

5    A.    Yes, but not college classes.

6    Q.    It's a yes or no.

7              At the community college?

8    A.    Yes, but not college classes.

9    Q.    He didn't take classes related to computers?

10   A.    He took remedial classes, which is not even high school

11   level.

12   Q.    Okay.  So you're discounting his abilities here, fair to

13   say?  You want to qualify that, right?

14   A.    I don't qualify that as college classes, no.

15   Q.    Okay.

16   A.    It wasn't even 12th grade level.

17   Q.    Were you aware, ma'am, that your son kept sort of a

18   budgeting system on his own to keep track of what he owed you

19   and what he was spending his money on?

20   A.    Yes.

21   Q.    Okay.  And were you aware, ma'am, that he actually had

22   made hotel reservations eight months in advance for a location

23   in Massachusetts?

24   A.    No.

25   Q.    You weren't aware of that?

1    A.    (Shakes head.)

2    Q.    Okay.  Oh, and you said, when you were talking about how

3    you would communicate with your son Robert over the term of his

4    life, you would often have to help him understand what you were

5    saying by, like, refocusing him and breaking down what you were

6    talking to him about?

7    A.    Yes.

8    Q.    So you would agree that, if somebody was talking to him

9    and they found that he wasn't paying attention to what they

10   were saying or he wasn't focusing on what they were trying to

11   get across, if they did bring him back, ask him to focus and

12   break it down, that that's something that he had learned to be

13   able to understand, and that would be a good way to help him

14   understand questions and react, actually, to what's being asked

15   from him?

16   A.    Yes, if he could understand it, yes.

17            MS. PARUTI:  Nothing further.

18            THE COURT:  Any redirect?

19            MR. TENNEN:  No, your Honor.

20            THE COURT:  Thank you, Ms. Rang.  You can step down.

21            MR. TENNEN:  So I would call Nicole Rang, your Honor.

22            NICOLE RANG, Sworn

23            THE CLERK:  Please state your name for the record.

24            THE WITNESS:  Nicole Rang.

25            THE CLERK:  You can have a seat, please.

1    DIRECT EXAMINATION BY MR. TENNEN:

2    Q.   Good morning, Ms. Rang.  What city do you live in?

3    A.   Coaldale.

4    Q.   How old are you?

5    A.   Twenty-four.

6    Q.   How are you related to Robert Rang?

7    A.   I'm his sister.

8    Q.   His younger sister?

9    A.   Yes.

10   Q.   And do you presently live in the same house as your mom

11   and dad?

12   A.   No.

13   Q.   When was the last time you lived in that house?

14   A.   When I was 18.

15   Q.   At that time was Robert living in the house there?

16   A.   Yes.

17   Q.   Did you always live with Robert as you were growing up?

18   A.   Yes.

19   Q.   And then your other siblings too, right?

20   A.   Yes.

21   Q.   Do you work?

22   A.   No, not right now.

23   Q.   Are you in the process of --

24   A.   I'm not sure.  I just left my job.

25   Q.   Okay.  That's what I was trying to figure out.

1          I just want to ask you a little bit about some of your

2     observations over the years about Robert and your interactions

3     with him, okay?

4     A.   Okay.

5     Q.   I'm just -- these are just questions about things that you

6     saw or heard.

7     A.   Okay.

8     Q.   So growing up, did you ever go to the same school as

9     Robert?

10    A.   Yes.

11    Q.   Which ones?

12    A.   I was in Panther Valley High School, I believe, for a

13    year.

14    Q.   While you were in which grade?

15    A.   I was a freshman.

16    Q.   And he was?

17    A.   He was a senior.

18    Q.   And was that the only time you guys were in the same

19    school?

20    A.   Yes.

21    Q.   Growing up, would you ever help him with school work?

22    A.   Yes.

23    Q.   When did that start?

24    A.   Probably in my eighth grade year.  I would start to help

25    him with math.  And then it went all the way until he was

1    starting college.

2    Q.    Okay.  How was he in terms of being able to understand the

3    work that you were helping him with?

4    A.    He lacked a lot.  He couldn't understand much of anything.

5    Q.    Okay.  Would you help him in other areas too?

6    A.    Once in a while I would read over things with him, but it

7    was more or less math.

8    Q.    Okay.  While you were in school with him, do you know

9    which classes he was in?

10   A.    Most of them were the special ed, I mean, just regular

11   basic classes but in the special ed room.

12   Q.    There was a specific place in the schoolhouse for that?

13   A.    Oh, yeah.

14   Q.    While he was in school, let's -- high school -- let's talk

15   during that time period -- based on your observations, did he

16   have a lot of friends?

17            MS. PARUTI:  Objection.

18            THE COURT:  I'm going to let it -- go ahead.

19   A.    Not too many.  I don't think he was very social.  He had a

20   few close ones and that was it.

21   Q.    Generally speaking, just your interactions with him during

22   that time period, what are your observations about his ability

23   to just understand conversations and directions and things like

24   that?

25   A.    He -- it depends on how you talk to him.  If you talk to

1    him like he was a kid, he understood more.  If you talk to him

2    like an adult, like I'm talking to you, and use bigger words,

3    he doesn't understand as much.

4    Q.   Is that true even after you left the house?

5    A.   Yes.

6    Q.   Meaning -- you continued to have a relationship with

7    Robert, right?

8    A.   I still visit my parents every day.

9    Q.   So how often would you see him after -- actually, let me

10   take a step back.  When did you move out of the house, when you

11   were at 18?

12   A.   I moved out at 18.

13   Q.   But you stayed in Coaldale?

14   A.   Yes -- No. I moved to Lansford with my grandmother, which

15   is five minutes down the road.

16   Q.   And then back to Coaldale?

17   A.   Back to Coaldale.

18   Q.   How often after you moved out of the house would you see

19   Robert?

20   A.   Every day.

21   Q.   Because you would visit the house?

22   A.   Yeah.

23   Q.   So you would continue to interact with him?

24   A.   Yes.

25   Q.   So what you just talked about in terms of your

1    interactions with him, that was true even during that time

2    period also, right?

3    A.    Yes.

4    Q.    Would you ever help him with managing his money?

5    A.    Trying to talk to Robert about it, I would try to tell

6    him, You can't do this.  You have to -- but he just -- he

7    doesn't want to hear it.  He's stubborn.  He thinks he knows.

8    Q.    Now, you said that he had some friends.  Do you know who

9    some of his friends were?

10   A.    Yes.  Chris Weirich, Chris Schweibinz.  For a little while

11   he hung out with a kid named JJ, but that ended in high school.

12   Q.    The two Chrises you just mentioned, these were people he

13   was with often?

14   A.    Yes.

15   Q.    How often would you see them together?

16   A.    Almost every day.

17   Q.    What kinds of things would you see them doing?

18   A.    They'd either go shoot hoops, ride around in Robert's car

19   aimlessly just to go out for a joy ride, play on his

20   PlayStation.  Either they'd come to our house or Robert would

21   take the game system over there.  Just normal kid things.

22   Q.    When, if you know, was he first friends with those two?

23   A.    Honestly, as long as I can remember, so probably going

24   back to middle school, high school.

25   Q.    Was he friends with them up until the point that the

1    police came to the house to do the search warrant?

2    A.   Yes.

3    Q.   All right.  And so, in terms of talking about what he

4    would do with them, are you describing sort of the things he

5    would do back in around 2014 with them?

6    A.   Yes.

7    Q.   You mentioned PlayStation or maybe video games.  I'm not

8    sure how you put it.

9    A.   Yeah.

10   Q.   Is that something he would do a lot?

11   A.   Oh, yeah.

12   Q.   How often would you see him playing?

13   A.   How often would I see him play?  Probably at least once a

14   day while I was at my parents'.

15   Q.   How often would he play with other people, like the

16   Chrises?

17   A.   I'd say probably at least once a day.  Someone was always

18   there.

19   Q.   Would he play with people other than the Chrises?

20   A.   I don't think I've ever seen other people go to the house

21   and play there.  I mean, I have a few times, but --

22   Q.   But mainly him and the Chrises?

23   A.   Yeah.

24   Q.   Then you say sometimes you would see him take his system

25   and leave the house?

1    A.    Yes.

2    Q.    How often would that happen?

3    A.    At least two to three times a week.

4    Q.    Okay.  Around the time of December 2014, you were still --

5    you were living in Coaldale at that point, right?

6    A.    Yeah, I believe so.

7    Q.    Or transitioning?

8    A.    Somewhere in that general area, Lansford or Coaldale.

9    Q.    Do you know if Robert was working at that time?

10   A.    I don't know.  I don't remember.

11   Q.    Okay.  Fair enough.

12         And were you in the house when the law enforcement

13   came that day?

14   A.    No.

15   Q.    Okay.  You were told about it afterwards?

16   A.    Yes.

17   Q.    All right.

18         MR. TENNEN:  I have nothing further, your Honor.

19         THE COURT:  Any cross?

20   CROSS-EXAMINATION BY MR. TOBIN:

21   Q.    Good morning, Ms. Rang.

22   A.    Good morning.

23   Q.    My name is David Tobin.  We have not met.  I'm one of the

24   prosecutors.  Thank you for coming up.  I know it was a long

25   ride.

1          Did you attend your brother Robert's high school

2    graduation?

3    A.    I believe so, yes.

4    Q.    Was that Panther Valley High School?

5    A.    Yes.

6    Q.    And did he receive a diploma?

7    A.    Yes.

8    Q.    Is that on display somewhere in the Rang home?

9    A.    I don't think so.

10   Q.    That was not a Certificate of Attendance but a diploma, is

11   that accurate?

12   A.    Yes.

13   Q.    And you've told us, have you not, that your brother Robert

14   has had friends for as long as you can remember, is that

15   accurate?

16   A.    Yes.

17   Q.    So he -- part of his life was socializing with non-family

18   members, is that true?

19   A.    Yes.

20   Q.    And would you agree that he really, really liked

21   PlayStation?

22   A.    Yeah.

23   Q.    And he played frequently?

24   A.    Yes.

25   Q.    And you're aware, of course, that he's had various paying

1    jobs throughout his adult life, isn't that accurate?

2    A.    Yes.

3    Q.    He's worked at a -- is it a chicken place, right?

4    A.    Yes.

5    Q.    What was the name of that?

6    A.    Crown Fried Chicken.

7    Q.    Are you aware that he was a driving at that?

8    A.    Yes.

9    Q.    So he has a motor vehicle from the Commonwealth of

10   Virginia?

11   A.    Of Virginia, no.

12   Q.    I said Virginia, didn't I?  I'm sorry.  Pennsylvania.

13   A.    Yes.

14   Q.    I apologize.

15          Are you aware that he's taken some classes at a nearby

16   sort of place or community college on computers?

17   A.    Yes.  I helped him with his work.

18   Q.    Thank you very much.  He enjoys computers; he enjoys

19   things like that, is that accurate?

20   A.    Yeah.

21   Q.    Are you aware that he basically had a clan, which I gather

22   is some group of players he was in charge of, on at least one

23   of these video games?

24   A.    No.

25   Q.    You were not part of his clan?

1    A.    No.

2    Q.    So you don't -- have you ever been part of a clan?

3    A.    No, I don't own my own PlayStation.

4    Q.    Okay.  So you're unaware of what it would take to be able

5    to manipulate or to run a clan to any extent, is that accurate?

6    A.    Yes.

7    Q.    Now, are you aware that your brother had a cell phone?

8    A.    Yes.

9    Q.    And you're aware that -- did you ever watch him sending

10   messages on the cell phone?

11   A.    No.

12   Q.    You don't know what he wrote on the cell phone?

13   A.    No.

14   Q.    Are you aware that PlayStation can send messages to other

15   PlayStations?

16   A.    Yes.

17   Q.    Would you watch him send messages on his PlayStation?

18   A.    If I was in the room playing at the time, yeah.

19   Q.    But you would not make it a point of always watching him,

20   is that accurate?

21   A.    No.

22   Q.    You don't know with whom he communicated or what he said,

23   is that true?

24   A.    That's true.

25   Q.    Were you aware that he had many, many, many young children

1    as individuals that he played on PlayStation with?

2    A.   I would assume so.  I mean, anybody can play.

3    Q.   Did he ever talk to you about his interest in young

4    children?

5    A.   No.

6    Q.   Did he ever talk to you about his sexual interest at all?

7    A.   No.

8    Q.   I don't mean to embarrass you.

9    A.   No, that's okay.  No.

10   Q.   He did not.  So you have no idea what his sexual interests

11   were?

12   A.   No.

13        MR. TOBIN:  I don't have any other questions, but

14   thank you so much.

15        MR. TENNEN:  Can I just ask from here?

16        THE COURT:  Certainly.

17   REDIRECT EXAMINATION BY MR. TENNEN:

18   Q.   The friends that you say he had his whole life, were these

19   the same friends his whole life or different persons?

20   A.   I mean, people came and went, but he's had the same close

21   friends his whole life.

22   Q.   These are the Chrises?

23   A.   Yes.

24   Q.   Do you know where he met them?

25   A.   I would assume school.

1          MR. TENNEN:  Thank you.

2          THE COURT:  Thank you.  You may step down.

3          MS. PARUTI:  May the government call M███ A███?

4          THE COURT:  Yes, you may.

5     M███  A███, Sworn

6          THE CLERK:  Would you state your name for the record

7     and spell your last name.

8          THE WITNESS:  M███ A███, A███.

9          MS. PARUTI:  May I inquire?

10         THE COURT:  You may.

11         MS. PARUTI:  Thank you.

12    DIRECT EXAMINATION BY MS. PARUTI:

13    Q.   Good afternoon, Ms. A███.

14    A.   Good afternoon.

15    Q.   Now, it's kind of loud in here, so if you can keep your

16    voice up so that I can hear you all the way over here, that

17    would be really helpful, okay?

18    A.   Okay.

19    Q.   Thank you.

20         Ma'am, what year were you born in?

21    A.   1987.

22    Q.   So how old are you today?

23    A.   Thirty.

24    Q.   And what town do you live in currently?

25    A.   Plymouth, Mass.

 1    Q.    How long have you lived in Plymouth, Massachusetts?

 2    A.    For, like, 20 years.

 3    Q.    Who do you live with currently in Plymouth?

 4    A.    My mother, my father, my daughter, and my son.

 5    Q.    Who is your mother and your father?

 6    A.    Michael and D████ A████.

 7    Q.    What about your daughter and your son?

 8    A.    *Minor A* and A██ M██████.

 9    Q.    How old is *Minor A*?

10    A.    He just turned 12.

11    Q.    Just this week?

12    A.    Yup.

13    Q.    What about A██?

14    A.    She's four.

15    Q.    What -- did *Minor A* just finish up school for the year?

16    A.    Yes.

17    Q.    And did he just finish up sixth grade?

18    A.    Yes.

19    Q.    Has he ever skipped any grades throughout the course of

20    his schooling?

21    A.    No.

22    Q.    Has he ever had to stay back or anything?

23    A.    No.

24    Q.    Now, do your two kids, do they have the same father?

25    A.    Yes.

1   Q.   What's his name?

2   A.   Nicholas M████.

3   Q.   Is M█████ M█████████?

4   A.   Yes.

5   Q.   Are you currently in a relationship with Nicholas M█████?

6   A.   Yes.

7   Q.   How long have you been in a relationship with Nicholas

8   M█████?

9   A.   Off and on for 14 years now.

10  Q.   Okay.  So how old were you when you first met?

11  A.   We met when we were kids, but we started dating in 2003.

12  I think we were, like, 15.

13  Q.   Okay.  You said on and off.

14  A.   Yeah.

15  Q.   Have there been times when -- well, let me ask you this:

16  Does Mr. M█████ currently live with you?

17  A.   No.

18  Q.   Have there been times when he has lived with you?

19  A.   Yes.

20  Q.   Can you think, now that you're talking to us here today,

21  about how often that was or when that was?

22  A.   He lived with us mostly.  There's probably been, out of

23  the past 15 years or so, he had moved in with us after *Minor A*

24  was born, and he's probably not lived with us for, like, a

25  total of two and a half years out of all of that time.

1    Q.    *Minor A*'s 12 now?

2    A.    Yeah.

3    Q.    So within the last 12-year period, you have been on and

4    off, and he's been out of your house for a total of two and a

5    half years or so?

6    A.    Yeah, probably.

7    Q.    During those time periods when he was not living with you,

8    where would he be living?

9    A.    In Wareham with his father.

10   Q.    For those of us who are not from that area, how far away

11   from Plymouth where you guys live is Wareham where he lived

12   with his dad?

13   A.    He lived within a 15-minute drive.  It's not far.

14   Q.    Now, are you currently working?

15   A.    I just started a new job this week.

16   Q.    Okay.  What kind of job is that?

17   A.    Like, housecleaning.

18   Q.    Have you done other work in the past?

19   A.    Yes.

20   Q.    What kind of jobs have you had before?

21   A.    I worked as a direct support professional for the -- what

22   was it called?  The Seven Hills Foundation.

23   Q.    What kind of an agency is that?

24   A.    It was a nonprofit agency, and I worked, like, in a group

25   home setting for adults with disabilities, like, mental and

1    physical.

2    Q.   How long ago was that that you did that type of work?

3    A.   I've been out of that work for a couple years now but did

4    do it for, like, five years straight.  It was my longest --

5    Q.   Your longest job?

6    A.   Yeah.

7    Q.   Have you had any sort of shorter jobs in between?

8    A.   Yeah, I lot of them.  I worked at a Tedeschi's and a

9    Borders and stuff like that.

10   Q.   Okay.  Now, you said that you're currently in a

11   relationship with Mr. M██████.  Over the time period that your

12   kids have been growing up, how have you divided the parenting

13   duties?

14   A.   Mostly he -- he worked a lot of long hours, so a lot of

15   times -- we just -- we shared it, I guess, like.  A lot of

16   times -- there would be sometimes where he would be gone from,

17   like, 5 in the morning until 8:00 at night because he was doing

18   construction and stuff.

19   Q.   What about the times when he wasn't in the house with your

20   family?

21   A.   He's welcome to come over and see the kids whenever he

22   wants.  He would usually typically take the kids on the

23   weekend, almost every Saturday, I'd say, every Saturday night.

24   Anything going on, like holidays or anything, he would be

25   involved over our house.

1    Q.   Now, the house that you live in now with your parents and

2    your kids, is that the same house that you've lived in since

3    you've been in Plymouth?

4    A.   Yes.

5    Q.   How many bedrooms does that house have?

6    A.   Four.

7    Q.   Can you just describe so the jury can get a sense of what

8    it looks like inside the house?

9    A.   It's a one-story house.  When you go in, it's got a living

10   room and the kitchen and dining room.  It's kind of small.

11   It's one bathroom.  And there's two bedrooms on the main floor,

12   and then there's, like, a refinished basement, and that's where

13   -- I live down there.  My room used to be a garage, and it's

14   turned into a bedroom now.  And across from that is another

15   bedroom.  So there's two bedrooms and, like, the laundry room

16   and stuff and the kitchen and a little TV room.

17   Q.   The kitchen and stuff like that is upstairs or downstairs?

18   A.   Upstairs.  Downstairs we have, like, a fridge and a

19   freezer and, like, a little community room for the kids to play

20   and stuff.

21   Q.   You said you live down in the basement.  Who lives up in

22   the regular part of the house?

23   A.   Right now, my parents and *Minor A* are upstairs.

24   Q.   Okay.  And you said "right now."  Has that been different

25   in the past?

1    A.    Yes.

2    Q.    Can you tell us how?

3    A.    When *Minor A* was younger, he was downstairs -- he was

4    downstairs with us.  He was -- he's been mostly with me for a

5    long time.  We shared a room for, like, the first eight years

6    until his sister was born.

7    Q.    Until what?

8    A.    Until his sister was born, pretty much.

9    Q.    You said A▄▄ was four years old.  Is she --

10    A.    Yes.

11    Q.    Is she almost five?

12    A.    Yeah.  She will be five in July.

13    Q.    So when you were pregnant with A▄▄, was he still sleeping

14    with you?

15    A.    Yeah.

16    Q.    And then once you had A▄▄, what happened to *Minor A*'s

17    sleeping situation?

18    A.    He didn't -- he took up a lot of space, so I think he got

19    aggravated with the crying baby and everything.  He started --

20    we were trying to get him into his own room, but I think that

21    pushed him a little bit more --

22    Q.    And did he ultimately -- I'm sorry.

23    A.    -- into wanting to actually go into his own room more.

24    Q.    Did he ultimately get his own room?

25    A.    Yes.

1    Q.    Where is that in the house?

2    A.    It's upstairs right across from my parents' room.

3    Q.    So upstairs, your parents and *Minor A*, and then downstairs

4    is you and A█?

5    A.    Yes.

6    Q.    Now, does *Minor A* have -- or has, in the past, *Minor A* had

7    a PlayStation of any type?

8    A.    Yes.

9    Q.    How old was *Minor A* when he got his first PlayStation?

10   A.    He started playing -- he didn't have his own.  I had one

11   and he started playing.  I played a lot then.  I was young when

12   I had *Minor A*.  And he started playing very young.  At, like,

13   three he was playing games and stuff.

14   Q.    As a three-year-old.  Could he manipulate the controllers?

15   A.    He couldn't even actually hold the controller.  Like, it

16   was too big.  He would put it on his lap and, like, use his

17   hands that way.

18   Q.    What is *Minor A*'s date of birth?

19   A.    6/25/05.

20   Q.    And then, from the age of three, that's when he started.

21   Did you always have a PlayStation or some other sort of gaming

22   system in the house from that point on?

23   A.    Yeah.

24   Q.    At some point when *Minor A* was a little bit older and

25   actually able to hold the controllers, did he get his own sort

1    of dedicated PlayStation?

2    A.   Yeah.  Well, like, he kind of took over mine.  I wasn't

3    playing as much anymore so he just ended up -- he pretty much

4    took it over.

5    Q.   When he moved -- once you had A█ and you were sort of

6    occupied with her and he moved up into his own room, did he

7    take the PlayStation with him, or did it stay down with you?

8    A.   He took it with him.

9    Q.   Okay.

10   A.   Yeah, he did.

11   Q.   So he had a PlayStation in his room?

12   A.   Yes.

13   Q.   Do you know what kind of PlayStation it was?

14   A.   PlayStation 3.

15   Q.   Was there some sort of monitor or TV or something hooked

16   up to that PlayStation for him to use?

17   A.   Yes.

18   Q.   Was it a TV or like a computer monitor or something else?

19   A.   He had a TV.

20   Q.   That was when he was about eight?  How many years older is

21   he than A█?

22   A.   Like, eight.

23   Q.   When you were living in the house with them and you were

24   downstairs with A█, would *Minor A* be able to play the

25   PlayStation on his own?

1    A.    Yes.

2    Q.    Did you regulate at all -- during that time period when

3    you had a newborn, did you regulate at all how often he played

4    or how long he played?

5    A.    Not really.

6    Q.    Do you know how often he played or how long he played?

7    A.    I know he was getting really into it.  He started playing

8    pretty often, a lot.

9    Q.    When you say "pretty often," how much does that mean to

10   you?

11   A.    Every day, definitely, probably at least a couple hours a

12   day.

13   Q.    And he was in school, right?

14   A.    Yes.

15   Q.    So during the school year, do you know whether he would

16   play before school ever?

17   A.    Not -- no, he wouldn't really play before school.

18   Q.    Would he play after school?

19   A.    Yes.

20   Q.    Would he play -- would you guys all eat dinner as a

21   family, or would it be a little bit more disorganized?

22   A.    A little disorganized.

23   Q.    Would he play around dinnertime or after dinnertime?

24   A.    Yeah.

25   Q.    What about bedtime, did *Minor A* have -- after he moved up

1    into his own room, did *Minor A* have a set bedtime?

2    A.    Not really a set bedtime.  He was always pretty good about

3    going to bed at a decent hour on a school night.  On weekends,

4    we didn't -- he pretty much stayed up whenever he wanted.

5    Q.    When you said he had his own PlayStation, you need

6    controllers to play, right?

7    A.    Yes.

8    Q.    Did he have any other accessories for the game that he

9    used to play?

10    A.    Yeah.  He had a headset.

11    Q.    What does a headset actually look like?  Can you describe

12    it?

13    A.    It just goes on your head with the -- it has, like, a

14    microphone that comes out so people can hear you, and it has

15    speakers so he can hear people too.

16    Q.    Just for the record, when you said there was a microphone

17    that comes out, you kind of drew your finger along across your

18    chin, towards the front of your mouth?

19    A.    Yeah.

20    Q.    Is that connected to the earpiece?

21    A.    Yes.

22    Q.    Does the earpiece cover both ears?

23    A.    Yes.

24    Q.    And are they -- I've never seen one.  I don't have one.

25    Do they, like, stick into your ears or do they cover them?

1    A.    No.  They're like headphones.  They cover them.

2    Q.    They cover them up.

3          Would it be fair to say that -- well, let me ask you

4    this:  When he's playing on the headset, if the volume was at,

5    like, at a normal level, would you be able to hear, when you're

6    in the room with him, what other people are saying through the

7    headset?

8    A.    Sometimes.  You can sometimes hear -- yeah, sometimes, if

9    it's loud enough.  Sometimes he wouldn't always have it on

10   because -- and you could hear, like, other people in the

11   headsets and stuff.  That's why we got it for him, because it

12   was loud.  So when he had the headset on, it was, like, kind of

13   quieter.

14   Q.    Do you mean, if he didn't have the headset, all the noise

15   of the people with headsets would come through the TV?

16   A.    Yes.

17   Q.    So you wanted to eliminate that, and so you bought him the

18   headset?

19   A.    Yeah.  He had asked for it.

20   Q.    If he was using the headset, would it be -- if he wasn't

21   using the headset, you could hear what anybody was saying,

22   right?

23   A.    Yes.

24   Q.    But if he had the headset on, sometimes you could hear

25   what other people were saying and sometimes not?

1    A.    Yeah.

2    Q.    Okay.  Now, when you were -- from where your bedroom was

3    downstairs in the basement, if he was playing with his headset

4    on, assuming he's not, like, screaming and yelling and jumping

5    around, would you be able to hear him and tell that he was

6    actually playing?

7    A.    The only way I would know he was, like, playing, yeah, is

8    he was, like, louder and I would hear him talking.  I could

9    only hear his side.

10   Q.    You could only hear his side from where you were?

11   A.    Yeah, him talking.

12   Q.    Now, did your home -- well, is there a home phone, like a

13   landline at your home?

14   A.    Yes.

15   Q.    And do you have a cell phone?

16   A.    Yes.

17   Q.    How long have you had a cell phone?

18   A.    Probably at least the last 12 years.

19   Q.    Does *Minor A* have a cell phone?

20   A.    No.

21   Q.    Does he have any other -- has he ever had a cell phone

22   before?

23   A.    No.

24   Q.    Has he ever had, to your knowledge, any other device that

25   could do cell-phone-type things, like communicating with other

1    people?

2    A.    No.

3    Q.    Not when you were --

4    A.    Oh, besides the iPod.

5    Q.    Besides what?

6    A.    He had an iPod.

7    Q.    Do you remember when he got an iPod?

8    A.    Not exactly.  I wasn't home.  My sister had given it to

9    him.

10   Q.    So you said that you weren't home.  Where were you when

11   your sister gave it to him?

12   A.    I was in Framingham.

13   Q.    Specifically where in Framingham were you?

14   A.    At the state prison.

15   Q.    Okay.  And do you remember what -- was that around

16   September of 2014 that you ended up going to Framingham?

17   A.    Yeah.

18   Q.    Is that -- is Framingham the only women's facility in

19   Massachusetts that you're aware of?

20   A.    For my county, yes.

21   Q.    Do people frequently just refer to it as Framingham?

22   A.    Yes.

23   Q.    So you said it was in September of 2014 when you went to

24   Framingham?

25   A.    I believe so.  I don't remember exact dates that I went.

1    Q.    Okay.  And what were you there for?

2    A.    Shoplifting.

3    Q.    And how long did you spend in Framingham?

4    A.    Nine and a half months altogether.

5    Q.    Altogether?

6    A.    (Nodding.)

7    Q.    Okay.  Now, do you have a Facebook account?

8    A.    Yes.

9    Q.    How long have you had a Facebook account?

10   A.    Probably about 14 years or so.

11   Q.    So a fair amount of time?

12   A.    Yes.

13   Q.    Does your Facebook account bear or have on it your actual

14   name?

15   A.    Yes.

16   Q.    What's the name?  Is it your full name?

17   A.    Yes.

18   Q.    So M█████ A████?

19   A.    Yup.

20   Q.    Does your Facebook account show a picture of you?

21   A.    Yes.

22   Q.    And has your Facebook account always had your actual name,

23   M█████ A████, on it?

24   A.    Yes.

25   Q.    What other information can other people in the public who

1    have access to Facebook know about you by looking at your

2    Facebook account?  Actually, let me qualify that.  I want you

3    to think back to 2014, that time period.  Thinking back then,

4    what information about you was public on Facebook?

5    A.   You would -- I think my entire Facebook was public then.

6    You would be able to go through my photos and see pictures of

7    me and my family and my birth date, my job, just anything I was

8    doing.

9    Q.   Did you have a phone number associated or published on

10   your account?

11   A.   Yes, yup.

12   Q.   Was your phone number public?

13   A.   Yes.

14   Q.   You said you could see pictures of your family.  Did you

15   ever take pictures and put them up on Facebook of your family?

16   A.   Yes.

17   Q.   And in your network, did you have other family members who

18   were your friends on the network?

19   A.   Yes.

20   Q.   And did any of those people have pictures up of you or

21   your kids or any other family members?

22   A.   Yes.

23   Q.   Now, just so the record is clear -- I think the jury

24   probably knows -- but is Facebook a social media platform?

25   A.   Yes.

1    Q.   You mentioned that your Facebook profile was public back

2    then.  Is there another way that you can have the privacy

3    setting besides public?

4    A.   You can change it.  You can make it private, or you can

5    make some things private and some things public.  It depends on

6    your personal preference.

7    Q.   Okay.  When you're a -- when you have a Facebook profile,

8    you said you had a picture and your name up there.  Do you know

9    -- do you have to put your actual name when you're setting up a

10   profile?

11   A.   No.

12   Q.   Do you have to put your actual picture when you're setting

13   up a profile?

14   A.   No.

15   Q.   Okay.  You said that some -- you can change the setting so

16   that some things are visible to certain people.  Is there a way

17   on Facebook to become a friend of somebody else on Facebook?

18   A.   Yes.  You need to request.

19   Q.   How do you do a friend request?

20   A.   You just -- you search or you come across the profile you

21   want to be friends with, and you -- there's an option that you

22   click to send a friend request to that person.

23   Q.   Okay.  So then when you, as a user, have a friend request,

24   do you see that on your profile somewhere?

25   A.   Yes.  It would pop up that someone has requested your

1    friendship, and you can either accept it, deny it or just

2    ignore it.

3    Q.    Okay.  And if you accept it, does the person who sent it

4    get notification?

5    A.    Yes.

6    Q.    If you deny it, do you know, does the person get

7    notification?

8    A.    They don't.

9    Q.    Okay.  And if you just sort of ignore it and let it sit

10   there, do you know whether the person gets notification?

11   A.    They don't.

12   Q.    But they can't see things that you might have set to be

13   private, correct?

14   A.    Yeah.

15   Q.    Now, what about *Minor A*, did *Minor A* -- around the time of

16   2014, did *Minor A* have a Facebook profile?

17   A.    Yes.

18   Q.    How did *Minor A* get a Facebook profile?

19   A.    I helped him create one so he could -- he had asked me

20   because his cousins were on there, and he wanted to be able to

21   talk to them and stuff like that.

22   Q.    Okay.

23   A.    He was just discovering the computer, so it was something

24   he really wanted.

25   Q.    Okay.  When you set that up for *Minor A*, did you put it in

1    his own name?

2    A.    Yes.  I used his name.

3    Q.    And did you put any pictures on?

4    A.    Yup.

5    Q.    Were those actually pictures of *Minor A*?

6    A.    Yes.

7    Q.    Now, you said you set it up for him.  After you set it up,

8    did you have any sort of level of control over the account at

9    all?

10   A.    Yes.  I had the password, so I was able to check on it

11   whenever I felt like it, and I made -- I was able to set his

12   preferences to private, and I made it so that he could not

13   receive friend requests from people.  So, like, I had --

14   anybody he was friends with, I had -- went from his profile and

15   requested them, so it was mostly family.

16   Q.    Okay.  Do you know, did -- do you know whether *Minor A*

17   knew that you had that control over it?

18   A.    I don't think he knew, really understood.  He didn't

19   really -- he wanted one, but he didn't really use it that

20   often.

21           MS. PARUTI:  Now, if I could please show the witness

22   only from the computer, Page 1 of Exhibit 9-8.

23   Q.    Do you recognize that?

24   A.    Yes.

25           MS. PARUTI:  This has already been admitted into

1    evidence, so could I publish that to all parties, please?

2    Q.    Okay.  So what is that?

3    A.    That would be *Minor A*'s profile picture of his Facebook

4    account.

5    Q.    And that's a -- fair to say that's, like, a screenshot?

6    That's not actually the account, right?

7    A.    Yes.

8    Q.    And see the -- I'm actually going to touch the screen, and

9    a color may appear if I do it right.  See this box here?

10   A.    Yup.

11          MS. PARUTI:  And, for the record, I'm just outlining

12   the inset picture.

13   Q.    Who's in there?

14   A.    That's *Minor A*.

15   Q.    Okay.  And I'm circling the background picture.  Who are

16   those kids, do you know?

17   A.    That's *Minor A* and A█.

18   Q.    And did you select those pictures?

19   A.    Yes.

20   Q.    And did you upload them onto the site?

21   A.    Yes.

22   Q.    And do you remember -- or do you know how old *Minor A* is,

23   actually, in that picture?

24   A.    I believe about seven or eight.  It was a recent picture

25   at the time.

1    Q.   Now, at some point did you --

2         MS. PARUTI:  Actually, at this point can I show the

3    witness only, please, the front page of Exhibit 16?

4    Q.   Do you see that, Ms. A███?

5    A.   Yes.

6    Q.   Do you recognize what's on that front page of what's been

7    premarked as Exhibit 16?

8    A.   Yes.

9    Q.   Do you recognize that?

10   A.   Yup.

11   Q.   What do you recognize that to be?

12   A.   That's my -- a screenshot of my Facebook account.

13   Q.   I'm going to ask Ms. Johnson just to scroll through the

14   other pages of this exhibit so that you can see it.  I want you

15   to just take a look.  There's the second page, the next page.

16   She's going to keep going.  Just take a look.

17        Okay.  So on this last page, you can see here -- oops

18    -- the date, 10/31.

19        MS. PARUTI:  If Ms. Johnson would go to the front

20   page.  Sorry, the next page, the third page.

21   Q.   You see the messages start on September 3rd, correct?

22   A.   Yes.

23   Q.   Okay.  Have you had an opportunity to review this document

24   in paper format prior to today?

25   A.   Yes.

1    Q.    Okay.  And are these a fair and accurate copy of an

2    excerpt of messages between you and another user on Facebook?

3    A.    Yes.

4    Q.    You didn't make -- these are screenshots, right?

5    A.    Yup.

6    Q.    You didn't make these screenshots, did you?

7    A.    No.

8    Q.    You gave somebody else authorization to do it?

9    A.    Yes.

10          MS. PARUTI:  At this point, your Honor, I'd ask to

11    move what's been premarked Exhibit 16 into evidence as Exhibit

12    16.

13          MR. TENNEN:  No objection.

14          THE COURT:  16 is admitted.

15    (Exhibit No. 16 received into evidence.)

16          MS. PARUTI:  I'd ask to display the front page of

17    Exhibit 16 to the jury, please.

18    Q.    So, Ms. A▇▇▇, you can see -- can you see your name on

19    there?

20    A.    Yes.

21    Q.    You said that's the front page of your profile, correct?

22    I've just circled your name, M▇▇▇ A▇▇▇, in the top portion of

23    the screen, correct?

24    A.    Yup.

25    Q.    Is that -- do you see your picture on there anywhere?

1   A.   Yes.

2   Q.   Where do you see your picture?

3   A.   In the smaller box.

4   Q.   The inset box?

5   A.   Yup.

6   Q.   Do you see anybody else's pictures in that upper pane who

7   you recognize?

8   A.   Yes.

9   Q.   Who do you see there that you recognize?

10  A.   That is my niece Tatum and my son *Minor A*.

11  Q.   Your son *Minor A*?

12  A.   Yup.

13  Q.   Now, fair to say these blacked-out boxes, that's just

14  information that's been redacted, right?  The page didn't

15  actually look like that?

16  A.   Yes.

17  Q.   And you see here I'm circling the name *Minor A*.  Was he

18  one of your friends on Facebook?

19  A.   Yes.

20  Q.   And at the time that this picture was created, are you

21  aware of whether or not his account had been disabled or

22  deactivated?

23  A.   It seems it has.

24       MS. PARUTI:  You can clear that, please.

25  Q.   At some point did you come to -- come into contact with a

1    person that you knew as Robert Rang?

2    A.    Yes.

3    Q.    Do you remember how you came into contact with him?

4    A.    On Facebook.  The first time I noticed him was when he --

5    on *Minor A*'s Facebook.

6    Q.    On *Minor A*'s Facebook?

7    A.    Yes.

8    Q.    How did you notice him on *Minor A*'s Facebook?

9    A.    I had logged into *Minor A*'s Facebook to just go through

10   it, like I normally did, to see what he was up to.  And I had

11   seen messages from Robert Rang to *Minor A*.

12   Q.    Okay.  Do you have a memory of what date that actually was

13   that you first saw that message from -- or Facebook message

14   from Robert Rang?  If you don't know, it's okay.  I can refresh

15   it, but I just need to know if you remember.

16   A.    Probably October, early October.

17   Q.    Of what year?

18   A.    2014, maybe.

19   Q.    Were you in Framingham in October of 2014?

20   A.    Oh, yeah.  Is that when I went --

21   Q.    Do you remember when you first saw the message from Robert

22   Rang?

23   A.    No.  It would have been -- I just -- I would think before

24   we first started talking.

25   Q.    Before you started talking.

1          Do you have a specific memory of the actual date?

2    A.   No.

3          MS. PARUTI:  Your Honor, may I approach?

4          THE COURT:  Yes, you may.

5    Q.   Ms. A███, can you just take a look at this?  Don't read

6    anything out loud.  But I'll have you look at that, and then

7    I'll ask you if you remember when he first contacted you.

8    A.   Yup.

9    Q.   Do you remember now when the first date was that you

10   noticed that Robert Rang had communicated with your son on

11   Facebook?

12   A.   It would have been March.

13   Q.   Of 2014?

14   A.   Uh-huh.

15   Q.   How did you -- was that a message or a friend request, do

16   you remember?

17   A.   It was a personal message.

18   Q.   Okay.  So what's the difference between a personal message

19   and a friend request?

20   A.   You can personal message somebody without being friends

21   with them.

22   Q.   So when you personal -- so you can communicate with other

23   Facebook users by personal message?

24   A.   Yup.

25   Q.   Is that -- it sounds like, but is that something where

1    only the sender and the receiver can see what the message is?

2    A.   Yes.

3    Q.   Is there other ways to communicate between user and user

4    on Facebook?

5    A.   If you are friends, you can write on each other's walls,

6    but I'm pretty sure that's it.

7    Q.   If you could keep your voice up so Ms. Dahlstrom can get

8    every word.

9         So you can write on each other's walls.  Is that more

10   like a public forum that other people could see?

11   A.   Yeah.

12   Q.   You said you were reviewing *Minor A*'s private messages,

13   and you saw one around March of 2014?

14   A.   Yes.

15   Q.   How did you react to that?

16   A.   Kind of angrily.

17   Q.   What did you do?

18   A.   I had messaged Rob because the message that I read was --

19   he was trying to tell *Minor A* how to --

20        MR. TENNEN:  Objection.

21   A.   -- friend request.

22        THE COURT:  Objection is sustained.  You can disregard

23   the last testimony.

24   Q.   So without saying what actually was in the message, what

25   did you -- did you respond to Robert Rang --

1    A.   Yes.

2    Q.   -- on Facebook?  I didn't hear you.

3    A.   Yes.

4    Q.   How did you respond to him?

5    A.   Angrily.

6    Q.   At any point did you ask him why he was contacting *Minor*

7    *A*?

8    A.   Yes.

9    Q.   Now, at that point -- do you remember at that point

10   whether or not you had ever heard of or spoken to a person

11   named Robert Rang before?

12   A.   I'm sorry.  What?

13   Q.   Before that day that you saw the Facebook message and

14   reached out to him and said, Why are you talking to my son, had

15   you ever talked to or heard about a Robert Rang before?

16   A.   I didn't recognize -- not -- like, I heard *Minor A* playing

17   on PlayStation with him, but I didn't really put it together at

18   the time that I was messaging him.

19   Q.   That it was the same person, you mean?

20   A.   Yeah.

21   Q.   After that day, when you reached back out to -- when you

22   reached out to Robert Rang and said, Why are you talking to

23   *Minor A*, did he -- did you and he continue to communicate back

24   and forth on Facebook?

25   A.   Yes.

1    Q.    Now, is it fair to say that you continued to correspond on

2    Facebook up until the time that you went to Framingham?

3    A.    Yup.

4    Q.    Now, during that time period, so from March 2014 through

5    the beginning of September 2014, you were living in the

6    Plymouth home?

7    A.    Yes.

8    Q.    Were you working at that time?

9    A.    No.

10   Q.    Why weren't you working at that time?

11   A.    I was in treatment a lot for opiate addiction.

12   Q.    Was your mother -- you said your mother was D███ A██?

13   A.    Yes.

14   Q.    Was she living in the house at the time?

15   A.    Yup.

16   Q.    What about *Minor A*'s dad, Mr. M█████, was he living in the

17   house at the time?

18   A.    Yes.

19   Q.    Mike A███, is that your dad?

20   A.    Yup.

21   Q.    Was he living in the house at the time?

22   A.    Yes.

23   Q.    Did he work during that time period, your dad?

24   A.    Yup.

25   Q.    And did your mom work during that time period?

1    A.    No.

2    Q.    Does your mom work now?

3    A.    No.

4    Q.    Now, during that time period, so you knew that Robert Rang

5    knew your son, right?

6    A.    Yes.

7    Q.    Did you know whether or not, from when you learned of it

8    until September, whether or not they communicated online?

9    A.    What?  I'm sorry.

10   Q.    Do you know during -- from March, when you sent Robert

11   Rang that message, Why are you talking to my son, until you

12   went to prison in September, did you know whether or not --

13   during those months whether or not Robert Rang was

14   communicating with *Minor A* online?

15   A.    No.

16   Q.    You didn't know or you thought it wasn't happening?

17   A.    I didn't know.

18   Q.    What about PlayStation, you said you thought -- you hadn't

19   put two and two together, but you thought they had played

20   before.  Did you know during that time period that they were

21   playing together on PlayStation?

22   A.    Yes.

23   Q.    What kind of games did *Minor A* played on PlayStation?

24   A.    Mostly, I think at the time, Call of Duty and he had -- he

25   has a lot of games, but I think Call of Duty was his most

1    favorite at the time.

2    Q.   How often did -- I know you said earlier that he played

3    pretty much every day.  Did you know at the time how often he

4    played with Robert Rang?

5    A.   I know it was, like, often.

6    Q.   How did you know about that?  Was that from *Minor A* or was

7    that from Robert?

8    A.   Mostly Robert.

9    Q.   How often would you say that you and Robert talked over

10   Facebook, for example?

11   A.   At least weekly.

12   Q.   Were you interested in a relationship with him?

13   A.   No.

14   Q.   Could you tell at any point if he seemed to be interested

15   in a relationship with you?

16   A.   Kind of, yeah.

17   Q.   Did you ever tell him that you wanted to be in a

18   relationship with him?

19   A.   No.

20   Q.   Did you -- what other types of things did you talk about

21   over Facebook over that period of time, in general?

22   A.   I talked mostly about myself.

23   Q.   Uh-huh.

24   A.   He talked a lot about PlayStation.

25   Q.   Okay.  Did he talk to you at all about your son?

1    A.    Yes.

2    Q.    What specifically did he talk to you about regarding *Minor*

3    *A*?

4    A.    He would talk about his, like, gaming and, like, his

5    attitude on the games or the way he was playing with others

6    or --

7    Q.    What type of stuff would he tell you about that?

8    A.    He would tell me, like, if *Minor A* was, like, behaving

9    badly, I guess, on the PlayStation or talking, maybe, like,

10   maybe swearing or not being nice to the younger people or

11   something.

12   Q.    So people younger than *Minor A*?

13   A.    Yeah.

14   Q.    Who was -- he turned -- in 2014, if he was born in 2005,

15   he would have turned nine that summer; is that math right?

16   A.    Yes.

17   Q.    Did he tell you about how he dealt with *Minor A* when *Minor*

18   *A* was allegedly misbehaving?

19   A.    He just -- I think he would just talk to him.  He mostly

20   would talk about rewarding him when he was doing better, when

21   he was playing good and stuff.

22   Q.    What type of -- did Robert Rang tell you at all about what

23   type of rewards he would give him?

24   A.    Yes.  He would send him a gift card to, I think, the

25   PlayStation Network.

1    Q.   How does that work, do you know?

2    A.   I wasn't aware of it at first, but he sent it -- you can,

3    like, send typed information on the PlayStation, too.  He would

4    send him, like, codes to put in so *Minor A* would put the code

5    in on the PlayStation network, and he would have money on his

6    account so he could buy games over the PlayStation network.

7    Q.   Did you have money to buy *Minor A* games on PlayStation at

8    that time?

9    A.   Sometimes, yeah.  His father often bought him games or

10   whatever he wanted.

11   Q.   You said you weren't aware of it at the time.  Do you mean

12   you weren't aware at first when Robert Rang was buying your kid

13   PlayStation games?

14   A.   No.  *Minor A* had already used it by the time I had figured

15   it out.

16   Q.   Do you remember specifically, like, what games Robert Rang

17   bought for him?

18   A.   I remember specifically one we got upset because *Minor A*

19   had bought the new Grand Theft Auto game that we weren't

20   allowing him to play because it was -- we thought was way too

21   more mature.

22   Q.   Way too what?

23   A.   Mature for him.

24   Q.   Mature, okay.  So as you talked to him, you said you

25   talked about yourself a lot.  Did you talk at all, if you

1    remember, about your addiction issues?

2    A.   Yes.

3    Q.   Did you ever tell Robert Rang, at any point when you

4    communicated with him over Facebook, that you actually were

5    going to end up going to Framingham?

6    A.   Yes.

7    Q.   Just be clear, you said that you were there for

8    shoplifting and then probation violation.  Were those

9    situations that came about because of your drug issue?

10   A.   Yes.

11        MS. PARUTI:  Could we please have Exhibit 16 for all

12   parties to see.

13   Q.   It just takes a second.

14        We're looking at the first page of Exhibit 16.  You

15   said that was the front page or your profile page, correct?

16        MS. PARUTI:  Can we go to Page 2, please.

17   Q.   So, obviously, those black boxes there are redactions.

18        MS. PARUTI:  But if Ms. Johnson could blow up the

19   section there.

20   Q.   This is in a section labeled "friend requests," is that

21   correct?

22   A.   Yes.

23   Q.   And is -- you'll see that profile there under the name

24   Rang, Robert.  And it says, Panther Valley Senior High School

25   and there's a picture.  Is that the person that you were -- you

1    referred to earlier as Rob?

2    A.    Yes.

3    Q.    Now, you'll see there that it says --

4           MS. PARUTI:  If you can collapse that, please, and

5    zoom the whole box, please.

6    Q.    Up at the top it says, "Respond to your four friend

7    requests.  Confirm people you know or click 'not now' to hide

8    requests."  Does this show you -- did you ever confirm Robert

9    Rang as a friend on Facebook?

10   A.    No.

11          MS. PARUTI:  You can go to the next page, please.  I'm

12   going to clear my marks here.

13   Q.    You'll see the black on the sides are redacted.

14          MS. PARUTI:  If we can go down to the first

15   highlighted message.

16   Q.    I'm blowing up a message that's dated September 3rd at

17   10:36 p.m.  This was right leading up to the time where you

18   were getting ready to go to Framingham, correct?

19   A.    Yes.

20   Q.    And Robert Rang wrote to you, "Y r u going to prison and

21   when do u think u will be going and for how long?  I need to

22   talk to u about some things that are important at least to me."

23          MS. PARUTI:  Next.

24   Q.    During the course of your conversations with him, fair to

25   say --

1        MS. PARUTI:  And you can blow that up, Ms. Johnson.

2   Q.    -- he gave you the ability to communicate with him in

3   other ways?

4   A.    Yes.

5   Q.    Okay.  Is that one of the phone numbers that he told you

6   about, 570-516-███?

7   A.    Yes.

8   Q.    In fact, he says, "That's my number," right?

9   A.    Yeah.

10       MS. PARUTI:  You can collapse that.

11  Q.    I want to ask you a question.  Before that time -- so this

12  is right before you're getting ready to go to prison -- had you

13  talked on the phone with him before?

14  A.    Not that I specifically remember, but I do remember him,

15  like, calling and trying, but I don't remember, like, a

16  specific conversation.

17  Q.    Okay.  When you say you do remember him calling, do you

18  remember him calling your -- did you have a cell phone at the

19  time before you went to jail?

20  A.    Yes.

21  Q.    Do you remember him calling your cell phone at all?

22  A.    Yes.

23  Q.    Do you remember him calling -- you said your family had a

24  landline.  Do you remember him calling the landline at all?

25  A.    Not specifically.

1    Q.   At your house in Plymouth, where is the -- is it -- do you

2    have phones that are, like, literally stuck into the wall or

3    the cordless kind or something else?

4    A.   We have a cordless phone but it's upstairs.

5    Q.   Okay.

6    A.   So I don't really have use for it.

7    Q.   Okay.  Were you aware of whether or not he -- I know you

8    said you remember him calling your phone at least.  Do you

9    know, before you went to jail, whether or not he was -- he had

10   called the house and was talking to other people at the house?

11   A.   I wasn't aware.

12   Q.   Can't hear you.

13   A.   Not that I remember.

14   Q.   You weren't aware of it?

15   A.   No, not specifically.

16   Q.   Okay.

17        MS. PARUTI:  Can we go to the next page, please.

18   Q.   I'm going to highlight some messages from September 3rd,

19   that same conversation.  And this is Robert Rang writing to you

20   at 10:42 p.m.  "I just put my phone on charge.  I need to ask u

21   a few things if u don't mind.  U don't mind me talking to ur

22   son right?  Y did u block me on his facebook?"

23        Did you block him on *Minor A*'s Facebook, if you

24   remember?

25   A.   Yes.

1    Q.    Why did you do that?

2    A.    I just felt like it was the right thing to do at the time.

3    Q.    Going down to the next part of that conversation, Robert

4    Rang writes -- or Rang Robert, excuse me, writes on 9/3 at

5    10:46 p.m., "I want u to know i work for sony as well i

6    moderate on there i need to tell u something sony said to me

7    that ur son and a few others on my list were typing and saying

8    bad things online but i want u to know im protecting ur son

9    they wanted to ban him due to that i told them anyone on my

10   list u will never ban because they are my friends no matter

11   what they do never ban them as long as theyre on my list they

12   agreed as long as they remain on my list they can never get

13   banned ur son loves his gaming ill never let them take that

14   from him."

15          Now, had Robert Rang told you before that date that he

16   worked for Sony, if you know?

17   A.    I don't know if he told me before that date.  I don't

18   think -- not that I remember.

19   Q.    Did you ever talk to *Minor A* about *Minor A*'s interactions

20   with Robert Rang?

21   A.    Yeah.  He -- yeah.

22   Q.    Did you ever talk about, like, who this Robert Rang was,

23   whether he actually worked for Sony or anything like that?

24          MR. TENNEN:  Objection.

25   A.    Yeah.

1          THE COURT:  Sustained.

2          MS. PARUTI:  You can go on to the next --

3     Q.   Later on in that same conversation, at 10:59 p.m., he

4     says, "Can i ask you something?"  And you write back, "Yea.  U

5     can probably still write to me idk."  What does "idk" mean?

6     A.   "I don't know."

7     Q.   "I don't know."  Just so we're clear, "idk" means "I don't

8     know"?

9     A.   Yes.

10    Q.   And then he asks you, "Do u think im a good role model for

11    *Minor A*"?

12          MS. PARUTI:  Now, can we go to the next page, please,

13    and highlight.  A little bit higher, please.  If we can

14    highlight -- thank you.

15    Q.   "Do u think im a good role model for *Minor A*?"  And you

16    wrote back, "Idk" -- I don't know -- "if you would need like my

17    prison ID number or something."  What were you talking about

18    about that, do you remember?

19    A.   Yes, he -- yes.  He told me he would send me money while I

20    was in Framingham to help me out.

21    Q.   So you knew -- now, at that point you had never been in

22    prison before, right?

23    A.   No.

24    Q.   But you knew at that point and you were trying to figure

25    out what you needed for people to be able to communicate with

1    you?

2    A.    Yes.

3    Q.    And at that point had you gotten a prison ID number yet?

4    A.    No.

5    Q.    And then you write, "You seem okay to me.  Idk" -- I don't

6    know -- "you well."  Was that in response to his question, "Do

7    you think I'm a good role model for *Minor A*?"

8    A.    Seems so, yes.

9    Q.    So you said, I don't know you well.

10          Now, you had been talking or communicating on Facebook

11   with *Minor A* -- excuse me, with Robert Rang for a number of

12   months at that point, right?  This is in September, and he had

13   first messaged -- or you first messaged him in March, right?

14   A.    Yeah.

15   Q.    Did you think that you were friends with Robert Rang?

16   A.    No.

17   Q.    Okay.  When he said to you that -- or when he told you

18   that he would, like, send you money in jail, was that something

19   you wanted him to do?

20   A.    Yeah.

21   Q.    Why did you want him to send you money?

22   A.    'Cause I had no other means to get money, and I knew I

23   would need items in there.

24   Q.    Okay.  So then Robert Rang -- excuse me.  My apologies.

25   Rang Robert writes at 11:01 p.m., "I know but if i was that

1    kind of person do u really think i would want to meet u?"  How

2    did you take that comment by him?

3    A.    I think it's referring to -- I had messaged him saying

4    that I thought he pretty much was a child predator, so I think

5    that's what he was referring to in that.

6    Q.    And you had other family members who were on Facebook,

7    correct?

8    A.    Yes.

9    Q.    Do you know if at that time, in September, right before

10   you left for Framingham, if other family members were aware of

11   the communications between Robert Rang and your son?

12   A.    Yes.

13   Q.    Without saying what they said, would it be fair to say

14   that many of your family members did not approve of that?

15   A.    Yes.

16           MR. TENNEN:  Objection.

17           THE COURT:  Sustained.

18           MS. PARUTI:  If we can go to the next page, please.

19   We're highlighting the message on 9/3, later in that

20   conversation, at 11:08 p.m.

21   Q.    Rang Robert writes, "Really do u mind if I call fast and

22   talk to him u will see a difference if i talk to him trust me."

23           Did Robert Rang ever ask you permission, besides this,

24   obviously, on other times to talk to *Minor A* or interact with

25   *Minor A* that you can think of?

1    A.    No.

2    Q.    Okay.  Do you know what -- how did you take his comment,

3    "U will see a difference if i talk to him trust me"?

4    A.    I don't remember.

5    Q.    You said earlier that Robert told you that he would, like,

6    give *Minor A* rewards for good behavior or talk to him when he

7    was, like, being rude or something on PlayStation.  Did he

8    bring that sort of behavior modification, I guess, up to you or

9    rewards or punishments up to you in other contexts when he was

10   talking to you?  Does that sentence -- did that make any sense?

11   A.    Not really.

12   Q.    If I ask you a question and it makes no sense, just tell

13   me.  If you don't understand, please ask.

14         MS. PARUTI:  Actually, let's just move on to the next

15   slide.  If you could go to the next page.  We're looking at 9/4

16   at 2:05.  I know you --

17         This is -- actually, if we can just highlight -- thank

18   you, so we can see the whole context.

19   Q.    At 9/4, 2:05, Rang Robert writes, "*Minor A* is a mommys boy

20   i can see it."

21         And then later in that session he writes, "I know u

22   dont want to hear any of this from me because u dont really

23   know me but ive been playing with ur son on PS3 for over five

24   months now he is a great kid and he needs u?

25         MS. PARUTI:  Can you please highlight the next.

1    Q.   Rang Robert writes on 9/4 at 2:10 a.m., "He is very smart

2    and most of the time respectful ive seen a change in him since

3    the first day we started playing he says please thank u ur

4    welcome he has changed for the better and id like to think i

5    had a part in that believe it or not when he comes on ps3 the

6    first thing i say is how was ur day and the last thing i say to

7    him before he logs out is good night and sweet dreams."

8         Did you know at that point that Robert Rang was

9    talking to him at night before *Minor A* would go to bed?

10   A.   No, not like that.

11   Q.   Okay.

12        MS. PARUTI:  Let's go on to the next -- I don't have

13   the page numbers, but we're looking at 9/4, 2:22.

14   Q.   So on September 4th at 2:22 a.m. Rang Robert writes, "My

15   number is 570516███ thats my cell phone number its always on."

16        MS. PARUTI:  Can you go to the next message down,

17   please.

18   Q.   "I pay bills and im starting to save money into another

19   account for June ill be bringing like 1 or 2 thousand dollars

20   out there so we can all do things i want to get a hotel out

21   there i want to be there for at least 3 days."

22        Do you at this point -- do you have a memory of what

23   he was talking about about June?

24   A.   Yeah.  He told me he had to -- he would be in Cape Cod on

25   June for something.

1    Q.    Okay.

2          MS. PARUTI:  Let's go to the next page.

3    Q.    You write, "Whats ur real name?  I think i will have to

4    put it down for my phone list."  He writes, "My name is Robert

5    Rang."

6          Now, why did you ask what's your real name at that

7    point?

8    A.    Well, one, because I had tried Googling his name, and

9    nothing was coming up, so I didn't know if the name on the

10   Facebook was real or not.

11   Q.    Okay.  And so you were talking about your phone list.

12   What did you mean by that?

13   A.    When you get to jail, you need to put down a list of phone

14   numbers that you might possibly call while you're there.

15   Q.    How does calling people work when you're in jail?

16   A.    Once your phone list gets approved, you can use the phone

17   and call whatever numbers on your list, but the only way you

18   can actually talk to somebody is if that person puts money on

19   the account for you to be able to actually connect and talk.

20   Q.    You have to get approval for who you're actually calling?

21   A.    Uh-huh.

22   Q.    And then those people actually have to have money logged

23   on to something to do it?

24   A.    Yes.

25   Q.    Did you provide Robert Rang's name and number as somebody

1    to be approved on your call list for Framingham?

2    A.   Yes.

3         MS. PARUTI:  Let's go down to the next one.  We'll

4    just do the whole -- okay.

5    Q.   9/4 at 3:01 a.m., Rang Robert writes, "I was thinking

6    about going with days inn in west yarmouth..is that close by?

7    I plan on coming out June 4th through June 7th do u think that

8    would be okay if so ill book it now."

9         You didn't respond to that, correct?

10   A.   Correct.

11   Q.   But 11 minutes later he writes, "I confirmed it for that

12   whole weekend already have it set up i hope that place is close

13   to you."

14        Now, it was a few days later that you actually went to

15   Framingham, correct?

16   A.   Yes.

17   Q.   And you said that you had put his name and number on the

18   call log or on -- to be approved as a person you could call

19   when you were in prison?

20   A.   Yes.

21        MS. PARUTI:  Can we have Exhibit 15, please.  Can we

22   just zoom in so that we can see the whole -- from there to

23   there.

24   Q.   And so you see here that's the number he gave you, right,

25   570-516-████?

1    A.    Yes.

2    Q.    And you have his name, Robert Rang, friend, correct?

3    A.    Yup.

4    Q.    And then you had other people here, family members and

5    other friends that you had.  We've blacked out their names and

6    numbers for privacy.  And then Mike A███ is your father,

7    correct?

8    A.    Yup.

9    Q.    And that 774-413-███, what number is that?

10   A.    That's my house phone number.

11   Q.    The house phone, okay.

12         MS. PARUTI:  You can take that down.

13   Q.    Now, once you got to Framingham, did you continue to speak

14   with Robert Rang in some way, shape or form?

15   A.    Yes.

16   Q.    How did you communicate with Robert Rang once you were at

17   Framingham?

18   A.    Letters.

19   Q.    Letters, okay.  Did he send you letters?

20   A.    Yes.

21   Q.    And did you send him any letters?

22   A.    A few, yes.

23   Q.    Okay.

24         MS. PARUTI:  If we could pull up for the witness only.

25   Actually, I'm just going to -- may I approach, your Honor?

1          THE COURT:  Yes, you may.

2          MS. PARUTI:  It may be faster.

3          THE COURT:  Which exhibit numbers?

4          MS. PARUTI:  14-1, 2, 5, 6, and 11.

5    Q.    Okay, Ms. A███.  I'm showing you a few documents.  First

6    is 14-1.

7          Now, Ms. A███, have you had an opportunity to review

8    these exhibits before you came into court today?

9    A.    Yes.

10   Q.    Do you recognize what these exhibits are?

11   A.    Yes.

12   Q.    What are they?

13   A.    They are some of the letters I received from Robert while

14   I was incarcerated.

15   Q.    Okay.  And these aren't the originals, obviously, right?

16   A.    No.  They are copies.

17   Q.    Do they appear to be true copies of the originals that you

18   received?

19   A.    Yes.

20          MS. PARUTI:  Your Honor, at this point I would move

21   Exhibits 14-1, 14-2, 14-5, 14-6, and 14-11 into evidence.

22          MR. TENNEN:  No objection.

23          THE COURT:  Those are admitted.

24   (Exhibit Nos. 14-1, 14-2, 14-5, 14-6, 14-11 received into

25   evidence.)

1    MS. PARUTI:  Ms. Johnson, will you please pull up

2    Exhibit 14-1.

3    And, Madame Clerk, could I have that displayed to all

4    parties?

5    Q.   Now, M████, I'm not going to read through every single one

6    of these letters, but I am going to highlight one of these

7    first ones.  This is dated 9/19 of 2014.

8    MS. PARUTI:  Ms. Johnson, if you could highlight that

9    first block.

10   Q.   And I'll read it because it's not typed so the

11   handwriting.  "Dear M████, I have a question when I come there

12   in June I'm going to be bringing my PS3 with me to the hotel.

13   I've told *Minor A* about it already so he asked me if he could

14   hang out with me one night while I'm out there and we could

15   play PS3 all night or at least till he wanted to go to sleep.

16   I said to him maybe your mom will let you if you continue being

17   good and you try your best in school.  Then maybe she will let

18   us have a 'sleep over.'  Lol."

19   Now, was that the trip in June that we were just

20   talking about?

21   A.   Yes.

22   Q.   Okay.  Now, did you ever talk to *Minor A* from -- when you

23   talked to Robert Rang and he booked the hotel in Yarmouth, or

24   West Yarmouth, until you went into Framingham and got this

25   letter about a week later, two weeks later, did you talk to

1    *Minor A* about the plans for Robert Rang to come out and visit

2    you and pay for your hotel at the Days Inn in Yarmouth?

3    A.   No.

4    Q.   Did you have any expectation that you actually would meet

5    up with Robert Rang with your son at a hotel in Yarmouth?

6    A.   No.

7          MS. PARUTI:  Ms. Johnson, could you please highlight

8    the next section.

9    Q.   "Your son is great and I enjoy talking to him and making

10   him laugh because when he laughs tells me I'm doing something

11   right."

12         MS. PARUTI:  Could we go on to Exhibit 14-2, please.

13   Q.   And this letter, Ms. A▇▇▇, is dated 9/23/14.

14         Now, just a question.  When you went to Framingham,

15   how often did you talk to *Minor A*, if you remember?  You said

16   you were there a total of about nine months?

17   A.   I would call home daily and talk to him briefly every day

18   almost.

19   Q.   To your knowledge, did *Minor A* know where you were at the

20   beginning?

21   A.   No.  I think -- no.

22   Q.   Okay.  At some point do you know whether *Minor A* learned

23   that you were in jail?

24   A.   Not that -- not that he really talked about.  I wasn't

25   aware.

1   Q.   Do you know if *Minor A* knows now that you were in jail

2   during that time period?

3   A.   I believe so.

4   Q.   Okay.

5       MS. PARUTI:  Could you highlight that bottom section,

6   please.

7   Q.   I'm reading, "Doing a great job as a mother.  I hope

8   you're not mad that I ask him about school and about his

9   homework but I do it because I care and want him to succeed in

10   life because I know he can and will.  I will be sending you $30

11   or $40 on or around the 5th of October."

12       Now, when you were in jail, I think you said before

13   that *Minor A*'s dad wasn't in the house, correct?

14   A.   Correct.

15   Q.   Robert Rang, who sent this -- or the sender of this letter

16   told you that he'd send you 30 or $40 in a couple of weeks from

17   the date of the letter.  Was that something that Robert Rang

18   actually did?

19   A.   Yes.

20   Q.   Do you remember exactly how many times Robert Rang sent

21   you money while you were incarcerated?

22   A.   It was a handful of times.

23   Q.   Do you remember what the denominations or the amounts of

24   money were that he would send you typically?

25   A.   I don't know.  Like, I think he sent, like, $20 a couple

1    times.  One time it was, like, $10.

2    Q.   Was anyone else sending you money while you were in jail

3    at that time?

4    A.   My father mostly.

5    Q.   Okay.  What did you need the money for while you were

6    incarcerated?

7    A.   Food and, like, hygiene products.

8         MS. PARUTI:  Can we go to Exhibit 14-5, please.

9    Q.   We're looking at the front page of 14-5.  Is that a copy

10   of the envelope that you received this letter in?

11   A.   Yes.

12   Q.   Okay.  And that was your -- let's go back to that front

13   page.  That was your address that you gave people while you

14   were in Framingham, correct?

15   A.   Yes.

16   Q.   And it was actually a P.O. box.  You didn't ever give

17   Robert Rang your physical address of the prison, did you, to

18   your knowledge?

19   A.   No.

20   Q.   Okay.

21        MS. PARUTI:  If we can go to the next page please.

22   Q.   It says "stamps."  Did he ever send you stamps?

23   A.   No.

24   Q.   Do you remember ever having a conversation about stamps?

25   A.   You can't -- you wouldn't be able to send somebody

1    anything like that.

2    Q.   Are stamps one of the things that you can buy through your

3    canteen at the prison?

4    A.   Yes.

5         MS. PARUTI:  Let's go to the next page.

6    Q.   So this letter is dated 10/12/14.

7         MS. PARUTI:  Could you please highlight.

8    Q.   As part of this letter, he writes, "*Minor A* has been doing

9    great.  He has been very respectful and well mannered at least

10   with me."

11        Was it pretty typical that Mr. Rang would talk to you

12   about how good *Minor A* was being when he was in his presence or

13   under his influence?

14   A.   Yeah, seems like that's what he talked about a lot.

15        MS. PARUTI:  Can we go to the bottom part, please.

16   Q.   "Wanted to" -- I'm reading from the bottom section.

17   "Wanted to remind you of my new number again.  It's

18   570-449-7842.  Hope to hear back soon."  All of that text is

19   underlined.

20        At that point that's a different number than the one

21   he initially gave you.  Did you provide that number to the

22   prison authorities so that you could contact him via the

23   telephone while you were at jail?

24   A.   No.

25        MS. PARUTI:  Let's go to the next exhibit, please,

1    14-6.

2    Q.   We're looking at the face sheet of 14-6.  Is it fair to

3    say that's the envelope copy?

4    A.   Yes.

5         MS. PARUTI:  Next page.  And let's go to the text.

6    Q.   This is a letter from October 31 of 2014.

7         MS. PARUTI:  Can you highlight that first section,

8    please.

9    Q.   It says, "Dear M____, I wanted to let you know I called

10   your house, talked to your mom.  I told her who I was.  I gave

11   her my phone number told her to ask you if you can try to call

12   me."

13        Now, on -- at some point did you become aware that --

14   of the investigation underlying this case?

15   A.   Yes.

16   Q.   Do you remember when it was that you actually became

17   aware?

18   A.   I don't remember the exact date.

19   Q.   Do you know if it was the same day that your mother found

20   the messages on the iPod?

21   A.   It would have been at least the day after.

22        MS. PARUTI:  Let's go to the next section.

23   Q.   "I meant no harm.  I also told her I was sending you money

24   and she told me that she would like me to stop sending you

25   money."

1          Did you ever talk to your mom about your interactions

2   with Robert Rang?

3   A.   Yes.

4   Q.   Did you know that Robert Rang continued to call your house

5   after you had -- or somebody from Robert Rang's phone number

6   continued to call your house after you had left the house and

7   gone to Framingham?

8   A.   Yes.

9   Q.   Who did you know that from?

10  A.   My mom.

11  Q.   Okay.  Did you ever learn that from your son?

12  A.   *Minor A* -- he didn't really talk about it much.

13          MS. PARUTI:  Let's go to the next section.  And we're

14  almost wrapped up here.  Can you just lift the top bar a little

15  bit?  Thank you.

16  Q.   "She then said she had to go and it's been at least three

17  days since *Minor A* has been online.  I don't know if they're

18  stopping him from playing with me or if he got grounded...I

19  hope he is okay."

20          MS. PARUTI:  Can we go, finally, just to the next

21  page.

22  Q.   "I'll be sending you some money out this week.  Please

23  respond to this letter or call me, 570-449-7842."

24          Did you ever call -- did you call Robert Rang at all

25  from jail?

1    A.    I believe prior to this, yes.

2    Q.    Okay.  Do you remember if you ever actually talked to him,

3    were able to talk to him?

4    A.    Never talked to him.

5          MS. PARUTI:  Finally, Exhibit 14-11, please.  Let's go

6    to the second page.

7    Q.    And this is dated 11/29/14.  "Dear M████, hope all is

8    well.  I wanted to let you know I came out to see you in prison

9    today."

10         Did you know that Robert Rang was going to drive to

11   Framingham, Massachusetts, to see you while you were

12   incarcerated?

13   A.    No.

14   Q.    At that point -- were you made aware that that was

15   happening --

16   A.    Yes.

17   Q.    -- or that that had happened?

18   A.    Yes.

19   Q.    And do you remember where specifically you were in prison

20   at that time?

21   A.    I was at the pre-release.

22   Q.    Okay.  And that was right after Thanksgiving, right?

23   A.    Yes.

24   Q.    At that time were you aware of the ongoing investigation?

25   A.    Yes.

1    Q.   Do you know whether the prison was aware of the ongoing

2    investigation?

3              MR. TENNEN:  Objection.

4              THE COURT:  Sustained.

5    Q.   Were you made aware of his attempted visit on the day that

6    it happened?

7    A.   Yes.

8              MS. PARUTI:  Let's go to the next part of this and

9    highlight.

10   Q.   Further down on that page he writes, "So they told me I

11   couldn't come see you but I tried.  I drove round trip 19 hours

12   today and couldn't see you.  I was so mad.  Also I tried to

13   call your mom to go see her since I was out there so maybe if

14   she met me she would see I'm nice and I'm not a bad person like

15   she thinks.  But when I called I said, 'Hello, D████, this is

16   Rob.  I know you don't want to talk to me but' -- at that point

17   she hung up on me."

18             Did you know in advance of receiving this letter that

19   Robert Rang was going to try to drive to your house where your

20   son lived?

21   A.   No.

22             MS. PARUTI:  On the next page, the highlight, please.

23   Q.   "I've been helping you as much as I can trying to show you

24   how much I care and want to earn your trust.  I'd never want to

25   hurt you guys."

1          At that point did you trust Robert Rang?

2     A.    No.

3     Q.    Did you continue to write to him?

4     A.    No.

5     Q.    After, did you send him some letters?

6     A.    I don't -- not that I remember.

7          THE COURT:  Ms. Paruti, is there a good time for you

8     to break?

9          MS. PARUTI:  Yeah.  I think this is a good time, your

10    Honor.

11         THE COURT:  So that concludes today.  We will be back

12    here on Wednesday morning, again, ready to start at 9.  I'm

13    going to read the same cautionary instruction to you.  Do not

14    talk among yourselves about the case or about anyone involved

15    with it until the end of the case when you go to the jury room

16    to decide on your verdict.  Do not talk with anyone else about

17    this case or about anyone who has anything to do with it until

18    the trial has ended and you have been discharged as jurors.

19    Anyone else includes members of your family and your friends.

20    You may tell them you are a juror, but do not tell them

21    anything else about the case until you've been discharged by

22    me.

23         Do not mention or discuss this case in any way in any

24    electronic form.  You may not send an email or text message

25    about the case, use Twitter, Facebook, Instagram, et cetera,

1    discussing the case.  Do not let anyone talk to you about the

2    case or about anyone who has anything to do with it.  If

3    someone should try to talk to you, please report it to me.  Do

4    not read anything about the case or anyone involved with it.

5    Do not listen to any reports about the case or anyone involved

6    with it.  And do not conduct your own research -- paper,

7    electronic, internet or otherwise -- on your own.  Please bear

8    these in mind.

9          Have a good weekend.  Thank you for your attention

10   here.  And we'll see you Wednesday morning.

11         THE CLERK:  All rise for the jury.

12   (The jury left the courtroom at 1:03 p.m.)

13         THE CLERK:  You may be seated.

14         THE COURT:  Anything we need to address now?

15         MS. PARUTI:  No, I don't think so.

16         MR. TENNEN:  Just in terms of schedule, I'm probably

17   safe to tell Dr. P that she doesn't have to be here until at

18   least 10:00 on Wednesday.

19         MS. PARUTI:  I have very little left on the direct of

20   Ms. A████, and then we will be calling *Minor A*.  I can't imagine

21   that we would finish with him before the break.

22         THE COURT:  You imagine we will finish with him or you

23   don't imagine?

24         MS. PARUTI:  Oh, not before 11.  I think she can come

25   at 11.

1          MR. TENNEN:  I'll tell her 11.

2          THE COURT:  Let's schedule a time for charging

3     conference then.

4          MS. PARUTI:  Does Wednesday afternoon make sense?

5          THE COURT:  I think that's what we'll need to do.

6          You have only the one witness left?

7          MR. TENNEN:  At that point, yes, and we should be done

8     by 1, I think.

9     (Discussion held off the record.)

10         THE COURT:  I'm looking to doing the conference after

11    a very short lunch break on Wednesday and, hopefully, it will

12    go smoothly.  I'm moving -- I have a revocation hearing at

13    2:30.  I'll move that to 3.  And if -- I've got proposed jury

14    instructions on everything except the -- I do think I should

15    give one on the chain of custody.  So if you were interested in

16    submitting one, feel free, and I will get, hopefully, our

17    instructions ideally before we go today.

18         MR. TOBIN:  Your Honor, just sort of as a -- to let

19    you know, we're also -- I think we're going to be asking you --

20    working on something to give you and the defense attorney an

21    instruction about the limited use of the testimony about

22    cognitive limitations as well as ADHD and bipolar.  It is my

23    understanding that those have been allowed in to go to the jury

24    in order to set the stage for voluntariness and the statement.

25    There is no attempt -- there's been no -- there's no attempt by

1        the defense to suggest there's no lack of -- a lack of criminal

2        responsibility.  So it's not a defense, if you will.  They

3        shouldn't take it as such.  It has to do with the statement and

4        the weight to give the statement alone.

5                THE COURT:  Yes.  And whether it comes in as a

6        limiting instruction or it is as part of the instruction

7        regarding the statement of the defendant, I think Mr. Tennen

8        has proposed language in that context.  You've proposed

9        different ones.  I think we will be debating that, but I think

10       it's in the context of that.

11               MR. TOBIN:  Of course.

12               THE COURT:  Just to sort of let you know what I am

13       trying to work my way through on the proposed instruction

14       regarding the defendant's statement, it seems fairly standard

15       instruction, or pattern instruction even, to include -- that in

16       measuring the -- in considering the defendant's statement, to

17       consider the circumstances in order to figure out if the

18       statement was, in fact, made by the defendant and all of the

19       circumstances around how to weigh the -- essentially the

20       credibility or the value of the statement.  And it would seem

21       to me that that question of cognition in some ways is part of

22       the -- all of the circumstances of understanding what was said

23       there.

24               There is a different part of the request that Mr.

25       Tennen is making, which is essentially the argument from other

1  jurisdictions that the statement -- that the jury be instructed

2  that they may not consider the statement at all without first

3  finding a voluntariness.  Is that a fair statement of the

4  dispute here?

5        MS. PARUTI:  I think that that's -- yeah, I think

6  that's a fair statement.  And I think, even just including the

7  extra -- or the second block of Mr. Tennen's proposed

8  instruction.  I mean, our position is that shouldn't be there

9  at all in the context of that particular instruction.  But I

10  think we do need -- I don't know that I can argue intelligently

11  at this point about -- to specific authority about why or why

12  not they should -- using Mr. Tennen's language versus what we

13  have proposed.  But we'll certainly be prepared to do that.

14        THE COURT:  So to -- I think what would be most

15  helpful for me is if you think about this as two parts to the

16  question.  The first part is:  It is a standard part of an

17  instruction that, in considering the statement of a defendant,

18  you would weigh all of the circumstances around it to determine

19  how much weight to give it.

20        The standard language there doesn't talk about

21  cognition, but I don't think it could be disputed that all of

22  the circumstances wouldn't necessarily also include cognition.

23  It would seem to me that taking that first part of the language

24  and modifying that shouldn't be too controversial.

25        MR. TOBIN:  I don't disagree with that, Judge, but if

1    you're going to start highlighting factors that need to be

2    considered, including cognition or mental acuity or ability,

3    then I think we're going to probably ask for other factors to

4    be considered as well.

5            THE COURT:  I think there are some in the pattern

6    instruction.

7            MR. TOBIN:  Okay.  Right.  But I don't think --

8            THE COURT:  Cognition isn't listed as one of them.

9            MR. TOBIN:  Right.

10           THE COURT:  I think the issue for that half of the

11   instruction would be exactly the question of nature and

12   circumstances.  You can ask all kinds of things about nature

13   and circumstances but would be what is somewhat relevant in

14   light of the circumstances here.

15           MR. TOBIN:  Right.  I take what you're saying is I

16   think you're asking -- or you're suggesting you may insert --

17   under the nature and circumstances, are you telling us you

18   might then say "to include cognition or mental ability"?

19           THE COURT:  Exactly, or other things.  I'm not

20   suggesting --

21           MR. TOBIN:  All I'm suggesting is we may have a list

22   of other things.

23           THE COURT:  That's fine.  What I'm suggesting is that

24   one part of this that shouldn't be so hard is the question of

25   what are the nature and circumstances.

1          MR. TOBIN:  I agree.

2          THE COURT:  There's a second question, which is a

3    legal question, which is:  Do you, in a sense, give the jury a

4    second pass at the finding that I have already made on

5    voluntariness?  My research thus far -- and you're welcome to

6    know what I know to start off with.  But what I have been able

7    to determine so far is it appears that the type of language

8    that Mr. Tennen is suggesting is given in, you know, maybe half

9    of the state jurisdictions.  It is not mandated in federal

10   court.  I have found one First Circuit case saying it's not an

11   error to give it.  That's about it.

12          And the way it is teed up seems to be two things.  One

13   is that the principle at issue for why this rule would stand

14   there is a notion that defendant is not required to testify

15   against himself.  And so it's a bit of putting there a question

16   of -- that goes to that, that if -- so if the person was

17   coerced into something, then it goes against our sense of this

18   bedrock principle that you're not forced to testify, et cetera.

19          That said, the courts seem to require something -- and

20   I can't quite figure out what it is -- that is the set of

21   disputed facts that sort of give the reason why you want this

22   sort of extra go-round to the jury.

23          That's as far as I'm gotten on this question, but I do

24   -- I guess what it seems to me is something is going into the

25   jury about considering his understanding -- Mr. Rang's

1   understanding of the questions posed to him and following what

2   was being said to him and something.  Some of that sort is

3   going to go in, in all events, under the nature of the

4   circumstance, and how that's articulated we can wordsmith.  The

5   second question as to whether you would have this other

6   requirement, you have my sum total of legal research, and we

7   can move on from there.

8           MR. TOBIN:  Thank you, Judge.

9           THE COURT:  Thank you.

10          MS. PARUTI:  Can I just clarify?  I'm sorry.  When do

11  you want submissions by?  In hand on Wednesday or prior to

12  Wednesday if we're submitting anything additional from what

13  we've already submitted?

14          THE COURT:  I will be out Saturday to Tuesday, so I

15  will look at it first thing Wednesday morning.

16          MS. PARUTI:  Thank you.

17          MR. TENNEN:  Like online, like, submitted as a --

18          THE COURT:  If you submit something online, then I can

19  get it as early as I can possibly get it.  If you submit it via

20  the courtroom deputy, then it depends when she will email it to

21  me.

22          MR. TENNEN:  Supplemental instruction maybe.

23          THE COURT:  Supplemental online is probably -- and we

24  may do the same thing in terms of my planned jury instruction.

25  If I put it on the docket, that involves less emailing, and so

1   I may do it that way.

2           MS. PARUTI:  Thank you.

3           THE CLERK:  Court is in recess.  All rise.

4   (Whereupon, at 1:15 p.m. the trial recessed.)

5

6                          * * * * *

7

8                   C E R T I F I C A T E

9

10

11          I certify that the foregoing is a correct transcript

12  of the record of proceedings in the above-entitled matter to

13  the best of my skill and ability.

14

15

16

17

18

19  /s/Cheryl Dahlstrom

20  Cheryl Dahlstrom, RMR, CRR

21  Official Court Reporter

22

23  Dated:  May 16, 2018

24

25